**No. 15-4040**

**UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

—————————————

DERMA PEN, LLC,
*Plaintiff/Counterclaim Defendant*,

v.

BIOSOFT (AUST) PTY LTD, et al.,
*Defendants*,

and

4EVERYOUNG LTD., et al.,
*Defendants/Counterclaim Plaintiffs – Appellees*,

v.

MICHAEL E. ANDERER,
*Counterclaim Defendant – Appellant*,

and

JEREMY JONES, et al.,
*Counterclaim Defendants*.

—————————————

On Appeal from the United States District Court, District of Utah,
Honorable David Nuffer, No. 2:13-cv-00729-DN-EJF

—————————————

**APPELLANT'S OPENING BRIEF**

—————————————

Michael D. Zimmerman (3604)
Linda M. Jones (5497)
Clemens A. Landau (12178)
ZIMMERMAN JONES BOOHER
341 South Main Street, Fourth Floor
Salt Lake City, Utah 84111
801-924-0200
*Attorneys for Michael E. Anderer*

March 3, 2016

**ORAL ARGUMENT IS REQUESTED**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................. i

TABLE OF AUTHORITIES ...........................................................................v

GLOSSARY................................................................................................ vi

PRIOR OR RELATED APPEALS.................................................................. vii

STATEMENT OF JURISDICTION...............................................................1

STATEMENT OF ISSUES ...........................................................................1

STATEMENT OF THE CASE.......................................................................2

1.  Nature of the Case..............................................................................2

2.  Course of Proceedings ......................................................................3

3.  Statement of the Facts.......................................................................4

4.  Disposition Below...........................................................................12

    4.1  December 23, 2014 Order Granting TRO ("December 23 TRO"). ......................................................................................13

    4.2  December 30, 2014 Order Granting Summary Judgment of Derma Pen's Defenses ("December 30 Order")......................13

    4.3  January 12, 2015 Order Granting Preliminary Injunction ("January 12 PI"). .......................................................................14

    4.4  January 21, 2015 Order Granting Temporary Restraining Order ("January 21 TRO"). ............................................................14

    4.5  February 16, 2015 Order Denying Motion for Summary Relief ("February 16 Order"). ..............................................................15

    4.6  February 25 Order Regarding Jurisdiction ("February 25 Order")..................................................................................15

4.7    February 26 Order Granting Preliminary Injunction ("February 26 PI")..........................................................................................16

4.8    April 15 Order Holding Anderer in Contempt for Violating the January 12 PI ("Non-Party Contempt Order")...........................................17

4.9    April 15 Order Holding Anderer in Contempt for Violating the February 26 PI ("Contempt Order")............................................18

SUMMARY OF ARGUMENT ..............................................................................19

ARGUMENT .........................................................................................................20

1.    Jurisdictional arguments under the Anti-Injunction Act, the *Younger* doctrine, and the *Colorado River* doctrine ........................................20

   1.1    Standard of review.....................................................................20

   1.2    Jurisdiction................................................................................20

   1.3    The Anti-Injunction Act bars the district court's injunctive relief orders ..........................................................................................22

   1.4    Abstention was required under the *Younger* doctrine ..............26

      1.4.1    This action interferes with the ongoing State Court Proceeding....................................................................27

      1.4.2    The State Court Proceeding implicates important state interests..........................................................................28

      1.4.3    The State Court Proceeding provides the Defendants with a suitable forum for the adjudication of their rights. ...........28

      1.4.4    The State Court Proceeding predates the Defendants' claims against Anderer in this case ...............................29

   1.5    Abstention was also required under the *Colorado River* doctrine ............31

      1.5.1    The State Court Proceeding and this federal action are parallel...........................................................................32

    1.5.2    The factors weigh heavily in favor of abstention.........................33

2.   The district court's grant of injunctive relief against Anderer should
be reversed. ..................................................................................34

   2.1   Standard of review................................................................34

   2.2   Jurisdiction..........................................................................35

   2.3   The district court erred in entering the February 26 PI because
the Defendants could not meet the elements necessary to support
injunctive relief and because the injunctive relief granted was
insufficiently definite to meet rule 65B.....................................35

      2.3.1    The district court erred in assessing the Defendants
likelihood of success. ...................................................37

      2.3.2    The Defendants could not establish irreparable harm in
the absence of injunctive relief .......................................45

      2.3.3    The balance of the equities does not favor the
Defendants...................................................................47

      2.3.4    The grant of injunctive relief against Anderer is not in
the public interest. .......................................................49

      2.3.5    The injunctive relief granted by the district court failed
to meet the certainty requirements of rule 65B...........................49

3.   The district court's civil contempt orders should be reversed.........................51

   3.1   Standard of review................................................................51

   3.2   Jurisdiction..........................................................................51

      3.2.1    Contempt Order............................................................52

      3.2.2    Non-Party Contempt Order .............................................54

   3.3   The Defendants failed to present sufficient evidence to support
the civil contempt orders entered against Anderer.....................55

    3.3.1    The district court's Contempt Order should be reversed. ............56

    3.3.2    The district court's Non-Party Contempt Order should
              be reversed. .................................................................57

STATEMENT OF COUNSEL AS TO ORAL ARGUMENT ...............................60

CONCLUSION ..................................................................................61

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ....................................62

CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY
REDACTIONS .................................................................................63

CERTIFICATE OF SERVICE ................................................................64

**Attachments:**

A      Memorandum Decision and Order Denying [581] Oral Motion for Summary Relief, filed February 16, 2015

B      Memorandum Decision and Order Regarding Jurisdiction, filed February 25, 2015

C      CORRECTED Memorandum Decision and Order Granting in Part 4EverYoung's Motion for Preliminary Injunction Against Michael E. Anderer; Denying Michael Anderer's Motion to Vacate, filed January 26, 2015

D      Memorandum Decision and Order Holding Michael E. Anderer in Contempt of Court for Violating December 23, 2014 Temporary Restraining Order and January 6, 2015 Preliminary Injunction, filed April 15, 2015

E      Memorandum Decision and Order Holding Michael E. Anderer in Contempt of Court for Violating February 2015 Preliminary Injunction, filed April 15, 2015

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*,
    154 F.3d 1345 (Fed. Cir. 1998) ............................................................58

*Adobe Systems v. James*,
    2011 WL 573393 (D. Utah Feb. 15, 2011)..........................................33

*Ale*mite Mfg. Corp. v. Staff,
    42 F.2d 832 (2d Cir. 1930) .................................................................57

*Amoco Oil Co. v. Rainbow Snow, Inc.*,
    809 F.2d 656 (10th Cir. 1987) ...........................................................47

*Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*,
    398 U.S. 281 (1970).......................................................................24-25

*Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC.*,
    562 F.3d 1067 (10th Cir. 2009) .................................................... 34, 35

*Brooks v. Barbour Energy Corp.*,
    804 F.2d 1144 (10th Cir. 1986) ..........................................................23

*Chase Nat'l Bank v. City of Norwalk*,
    291 U.S. 431 (1934)......................................................................58-59

*Colorado River Water Conservation District v. United States*,
    424 U.S. 800 (1976)............................................................................16

*Deere & Co. v. Miller-Godley Auction Co.*,
    549 S.E.2d 762 (Ga. Ct. App. 2001)...................................................38

*Derma Pen, LLC v. 4Everyoung Ltd, et al.,*
    773 F.3d 1117 (10th Cir. 2014) ........................................xii, 2, 35-36

*Diversified Holdings, L.C. v. Turner*,
    2002 UT 129, 63 P.3d 686...................................................................47

*Druley v. Patton*,
  601 F. App'x 632 (10th Cir. 2015) .......................................................55

*For Your Eyes Alone, Inc. v. City of Columbus*,
  281 F.3d 1209 (11th Cir. 2002) .........................................................31

*Fox v. Maulding*,
  16 F.3d 1079 (10th Cir. 1994) ...........................................................32

*Frank Russell Co. v. Wellington Mgmt. Co.*,
  154 F.3d 97 (3d Cir. 1998) ................................................................20

*FTC v. Kuykendall*,
  371 F.3d 745 (10th Cir. 2004) ...........................................................51

*Grace v. Ctr. for Auto Safety*,
  72 F.3d 1236 (6th Cir. 1996) .................................................. 51, 56, 57

*Greater Yellowstone Coal. v. Flowers*,
  321 F.3d 1250 (10th Cir. 2003) .........................................................45

*Hicks v. Miranda*,
  422 U.S. 332 (1975).............................................................. 29, 30, 31

*Horton v. Clark*,
  948 F.2d 1294 (10th Cir. 1991) .........................................................23

*Huguley v. Gen. Motors Corp.*,
  52 F.3d 1364 (6th Cir. 1995) .............................................................20

*In re Federal Skywalk Cases*,
  680 F.2d 1175 (8th Cir. 1982) ......................................................20-21

*In re Lucre Mnmt. Grp., LLC*,
  365 F.3d 874 (10th Cir. 2004) ...........................................................56

*In re Prudential Ins. Co.*,
  261 F.3d 355 (3d Cir. 2001) ..............................................................20

*In re Woosley*,
    855 F.2d 687 (10th Cir. 1988) ....................................................... 1, 54

*Jones & Trevor Mktg., Inc. v. Lowry*,
    2012 UT 39, 284 P.3d 630 ........................................................... 43, 44

*Joseph A. ex rel. Wolfe v. Ingram*,
    275 F.3d 1253 (10th Cir. 2002) ................................................... 20, 27

*J.R. Simplot Co. v. Sales King Int'l, Inc.*,
    2000 UT 92, 17 P.3d 1100 ........................................................... 47, 48

*Kikumura v. Hurley*,
    242 F.3d 950 (10th Cir. 2001) ...............................................................49

*Kirkland v. St. Vrain Valley Sch. Dist.*,
    464 F.3d 1182 (10th Cir. 2006) ................................................... 21, 22

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997).............................................................................35

*Meredith v. Oregon*,
    321 F.3d 807 (9th Cir. 2003) ...................................................... 21-22

*Merial Ltd. v. Cipla Ltd.*,
    681 F.3d 1283 (Fed. Cir. 2012) ..........................................................59

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*,
    457 U.S. 423 (1982)............................................................................26

*Mitchum v. Foster*,
    407 U.S. 225 (1972)............................................................................26

*Moore v. City of Wynnewood*,
    57 F.3d 924 (10th Cir. 1995) ....................................................... 21, 54

*N.L.R.B. v. Cincinnati Bronze, Inc.*,
    829 F.2d 585 (6th Cir. 1987) ..............................................................56

*New Beckley Mining Corp. v. Int'l Union, United Mine Workers of Am.*,
　946 F.2d 1072 (4th Cir. 1991) ..............................................................32

*Nielson v. Scott*,
　53 P.3d 777 (Colo. App. 2002)..................................................... 46-47

*Nilson v. JPMorgan Chase Bank, N.A.*,
　690 F. Supp. 2d 1231 (D. Utah 2009)..................................................45

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*,
　389 F.3d 973 (10th Cir. 2004) ..................................................... 36, 44

*Pennzoil Co. v. Texaco, Inc.*,
　481 U.S. 1 (1987)..................................................................................28

*Pimentel & Sons Guitar Makers, Inc. v. Pimentel*,
　477 F.3d 1151 (10th Cir. 2007) ................................................ 52, 53, 55

*Princess Lida of Thurn & Taxis v. Thompson*,
　305 U.S. 456 (1939).............................................................................15

*Project B.A.S.I.C. v. Kemp*,
　947 F.2d 11 (1st Cir. 1991)..................................................................56

*Reliance Ins. Co. v. Mast Constr. Co.*,
　84 F.3d 372 (10th Cir. 1996) ......................................................... passim

*Rienhardt v. Kelly*,
　164 F.3d 1296 (10th Cir. 1999) ..................................................... 20, 32

*RoDa Drilling Co. v. Siegal*,
　552 F.3d 1203 (10th Cir. 2009) ..........................................................35

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
　241 F.3d 232 (2d Cir. 2001) ................................................................36

*Seneca-Cayuga Tribe of Okla. v. Okla. ex rel. Thompson*,
　874 F.2d 709 (10th Cir. 1989) ....................................................... 26-27

*Switzer v. Coan*,
   261 F.3d 985 (10th Cir. 2001) ..............................................................45

*Thomas v. Albright*,
   77 F. Supp. 2d 114 (D.D.C. 1999).........................................................24

*Ticonic Nat'l Bank v. Sprague*,
   303 U.S. 406 (1938)...............................................................................48

*Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*,
   805 F.2d 351 (10th Cir. 1986) ..............................................................45

*Tri-State Generation & Transmission Ass'n., Inc. v. Shoshone River Power, Inc.*,
   874 F.2d 1346 (10th Cir. 1989) ..............................................................1

*Waffenschmidt v. MacKay*,
   763 F.2d 711 (5th Cir. 1985) ................................................................58

*Williams v. United States*,
   402 F.2d 47 (10th Cir. 1967) ......................................................... 36, 49

*Winter v. Natural Res. Def. Council*,
   555 U.S. 7 (2008)...................................................................................45

*Younger v. Harris*,
   401 U.S. 37 (1971)..................................................................................16

## **Statutes**

28 U.S.C. § 1292................................................................................ passim

28 U.S.C. § 2283....................................................................................23

Utah Code § 25-6-2 ..................................................................... 38, 39, 40

Utah Code § 25-6-3...................................................................................41

Utah Code § 25-6-5...................................................................................42

Utah Code § 25-6-6...................................................................................39

Utah Code § 25-6-9.................................................................................40

Utah Code § 70A-9a-609 .......................................................................42

Utah Code § 76-10-3102........................................................................49

**<u>Rules</u>**

Fed. R. Civ. P. 65 ...................................................................................4

Utah R. Civ. P. 64 .................................................................................28

Utah R. Civ. P. 65E................................................................................28

**<u>Other</u>**

11A Charles Alan Wright et al., Federal Practice and Procedure
    (2d ed. 1995).................................................................................59

13 Moore's Federal Practice (3d ed. 2003)............................................47

## GLOSSARY

UFTA                    Utah Fraudulent Transfer Act

UCC                     Utah Commercial Code

## PRIOR OR RELATED APPEALS

*Derma Pen, LLC v. 4Everyoung Ltd, et al.*, No. 13-4157, 773 F.3d 1117 (10th Cir. 2014).

*Derma Pen, LLC v. 4EverYoung Ltd.*, No. 13-4176 (May 8, 2014).

## STATEMENT OF JURISDICTION

The court has jurisdiction under 28 U.S.C. § 1292(a)(1), as well as under the doctrine of pendent jurisdiction set forth in *Tri-State Generation & Transmission Ass'n., Inc. v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1353 (10th Cir. 1989), and the non-party exception to the general rule that civil contempt orders are not immediately appealable set forth in *In re Woosley*, 855 F.2d 687, 688 (10th Cir. 1988).

## STATEMENT OF ISSUES

**Issue 1:** Did the district court err in enjoining the previously filed State Court Proceeding notwithstanding the provisions of the Anti-Injunction Act, 28 U.S.C. § 2283?

**Issue 2:** Did the district court err in determining that it was not required to abstain under the *Younger* abstention doctrine?

**Issue 3:** Did the district court abuse its discretion in determining that it was not required to abstain under the *Colorado River* abstention doctrine?

**Issue 4:** Did the district court err in entering injunctive relief against Appellant Michael Anderer?

**Issue 5:** Did the district court err in holding Anderer in civil contempt for violating the injunctive relief orders?

## STATEMENT OF THE CASE

### 1. Nature of the Case

This dispute arises out of a sales distribution agreement ("Distribution Agreement") between Derma Pen, LLC ("Derma Pen") and 4EverYoung, Ltd. ("4EverYoung") and a debtor-creditor relationship between Derma Pen, the debtor, and Anderer, the creditor.

The Distribution Agreement between Derma Pen and 4EverYoung gave Derma Pen the right to distribute 4EverYoung's micro-needling device ("Device") in the United States and to use a certain trademark and domain name that Derma Pen created. The trademark and domain name are associated with the Device. *Derma Pen, LLC v. 4EverYoung Ltd.*, 773 F.3d 1117, 1118 (10th Cir. 2014). Derma Pen terminated the Distribution Agreement effective August 1, 2013, and then immediately filed the present lawsuit against Defendants 4EverYoung, Ltd., Derma Penworld, Biosoft Pty. Ltd., Equipmed International Pty. Ltd., and Stene Marshall (collectively, "Defendants") to prevent infringement of the trademark and domain name. *Id*. One of the claims at issue is whether 4EverYoung had a right to purchase the Derma Pen® trademark and the www.Derma Pen.com domain name (collectively, the "Assets") upon termination of the Distribution Agreement, and, if so, at what price. [Aplt.App.276-80.]

2

The debtor-creditor relationship between Derma Pen and Anderer arose when Anderer loaned money to Derma Pen and obtained a security interest in all of Derma Pen's assets, including the trademark and domain name. In December 2014, after Derma Pen defaulted on the loan, it filed a confession of judgment in state court and Anderer initiated state court proceedings to execute on Derma Pen's assets (the "State Court Proceeding"). [Aplt.App.3954-55.]

## 2.  Course of Proceedings

On January 21, 2015, Defendants filed a second amended counterclaim and third-party complaint against Anderer to stop the State Court Proceeding. [Aplt.App.902-63.][1] Defendants' amended pleading referenced a bankruptcy proceeding filed by Derma Pen on August 8, 2014, in the United States Bankruptcy Court for the District of Delaware. [Aplt.App.935-40;3895-3901.]

One of the claims at issue in Defendants' third-party complaint against Anderer was a claim under Utah's Fraudulent Transfer Act ("UFTA"), Utah Code § 25-6-1 to -14. [Aplt.App.946-49.] In this claim, Defendants sought to invalidate Anderer's liens, including a debtor-in-possession lien that the bankruptcy court granted to Anderer in connection with the Bankruptcy Proceeding. The Defendants

---

[1] Although Defendant's second amended counterclaim was procedurally defective, the district court permitted Defendants to correct these defects *nunc pro tunc*. [Aplt.App.1506.]

also sought to defeat Anderer's attempts to execute upon a judgment against

Derma Pen that Anderer obtained in the State Court Proceeding based on a

Confession of Judgment that Derma Pen signed in favor of Anderer after it

defaulted on its loans. [*Id.*]

On January 21, 2015, 4EverYoung filed an *ex parte* motion for temporary

restraining order and preliminary injunction against Anderer. [Aplt.App.983-

1003.][2] The district court entered a temporary restraining order, held several days

of hearings on 4EverYoung's request for injunctive relief, entered a preliminary

injunction, and eventually held Anderer in contempt of its injunctive orders.

[Aplt.App.1378,1439-40,1492-94,1712-26,1727-33.]

### 3.  Statement of the Facts

Michael Anderer is an investor in a variety of technology based start-up

ventures. [Aplt.App.2637-40.] Anderer's business model involves making loans to

the start-up, obtaining a security interest in the business assets, providing favorable

lending rates and terms, and taking a minority interest in the business's  equity,

while allowing the owners to retain control of the managerial and operational

aspects of the business. [Aplt.App.3424-25.]

---

[2] This motion was procedurally defective because 4EverYoung failed to meet the requirements for when a temporary restraining order may be issued *ex parte*. Fed. R. Civ. P. 65(b).

In 2011, Anderer met with two Derma Pen officers—Michael Morgan and Chad Milton—to discuss an opportunity related to the distribution of micro-needling devices in the United States. [Aplt.App.2834-35;3430-31,4876-83.] The distribution program would be based on an agreement with 4EverYoung and its owner, Stene Marshall. [Aplt.App.1841, 4571-92.] During meetings, Morgan presented Anderer to Marshall as a potential investor who would provide Derma Pen with funding for the business. [Aplt.App.2774-75.] In addition, Morgan—not Anderer—negotiated the form of the distribution agreement between Derma Pen and 4EverYoung. [Aplt.App.2640-41,3477-78.] Eventually, both parties signed a distribution agreement that became effective on August 1, 2011 (the "Distribution Agreement"). [Aplt.App.2686-87,2695-96,2775,2796,2874,4571-92.] Anderer was not copied on key revisions to the contract pertaining to the Assets and was unaware of the exact contents of the agreement until several months after it was signed. [Aplt.App.2640-41,2694-98,2715-17,3477-78,4670-72.]

In mid-2011, Anderer made an initial loan to Derma Pen of $10,000 by personal check. [Aplt.App.2895-97,3431-32.] Shortly thereafter, Anderer made a second loan to Derma Pen of $60,000, again by personal check. [Aplt.App.2675,2893-98,2957-59,2962,4568,4802-05.] The parties understood that Anderer's loans would be secured with all of Derma Pen's property, including the Assets. [Aplt.App.2774-75,2799-2800,2824,3436,3469,3489-90.] During the

ensuing months, Anderer made additional loans totaling $300,000.

[Aplt.App.2893-99,2902,2912-15,2957-61,2965,2986,3871-73,3874-77,3878-80,3881,3882 ,4568,4569,4724-4801.]

The purpose of the loans from Anderer to Derma Pen was to provide Derma Pen with capital to purchase inventory and pay operating expenses. [Aplt.App.2824.] At the time Anderer made each of the loans, he expected to be repaid, and he expected that the loan proceeds would assist Derma Pen to become a successful business. [Aplt.App.3464-66.] At no time did Anderer encourage Derma Pen to violate any of its contractual obligations. [Aplt.App.2985-86,3343,3441.]

In addition to lending money to Derma Pen, Anderer received a 33% membership interest, which was subsequently diluted to a 26% membership interest when an additional member was added to Derma Pen. [Aplt.App.3437-38.] After Derma Pen became a Delaware entity, Anderer became a member and chairman of Derma Pen's board, but he never was an officer or manager of Derma Pen, he had no control over the day-to-day operations or management of Derma Pen, he never signed any contracts or checks for Derma Pen, and he did not control its use of the loan proceeds. [Aplt.App.2783,3436,3438.]

Anderer was not involved in any of the contract, vendor or employee decisions of the company. [Aplt.App.3438-39,3441.] Anderer did not have signing authority on Derma Pen's bank account and never used Derma Pen money.

[Aplt.App.3441.] Derma Pen was a separate and distinct entity, had officers and directors, held corporate meetings, kept corporate minutes, and had its own bank accounts. [Aplt.App.3438-39,3441.] Further, no individual board member of Derma Pen could make decisions for the company and any major decisions could only be made with the majority vote of the board members. [Aplt.App.3438.] This arrangement was consistent with Anderer's business model, where his role was as a lender to the start-up but not an operator of the company. [Aplt.App.2651-52,3424-29.]

Unfortunately, the relationship between Derma Pen and 4EverYoung soured soon after the Distribution Agreement was consummated. [Aplt.App.4692-4716.] Various attempts were made to amend the Distribution Agreement or merge the companies. [Aplt.App.2769-70,2830-31,4601-04,4717-23, 4876-83.] The attempts all failed, and Derma Pen subsequently terminated the Distribution Agreement on May 30, 2013, effective August 1, 2013. [Aplt.App.3459,3869,4593-4600.]

During this time frame, Derma Pen's management learned that 4EverYoung was using the Trademark to sell the Device in the USA. [Aplt.App.4892-96.] For example, during this period, Derma Pen was unable to register as a marketer at a medical device trade show in the USA because 4EverYoung had previously registered at the same trade show using Derma Pen's trademark. [Aplt.App.2829.]

On August 1, 2013, Derma Pen filed a complaint in federal court, seeking, among other things, a temporary restraining order and preliminary injunction against 4EverYoung's use of the Assets in the United States. [Aplt.App.17.] Anderer was not a party to the lawsuit, and 4EverYoung did not attempt to make Anderer a party to the lawsuit until January 21, 2015. [Aplt.App.3464.][3] Further, from the inception of this lawsuit, 4EverYoung has never sought, and the district court has never issued, any pre-judgment writs of attachment in favor of 4EverYoung with regard to the Assets. [Aplt.App.17-131.] Between August 2013 and August 2014, 4EverYoung and its affiliates continued to use Derma Pen's trademark and information to compete with Derma Pen for sales of the Device in the United States. [Aplt.App.2828-30,3488-90.]

In mid-2014, Anderer advanced additional funds to Derma Pen (the "2014 Note"). [Aplt.App.3464,3883-85,3886-89.] The loan proceeds from the 2014 Note were used to pay legal fees that Derma Pen owed to its counsel in connection with this lawsuit. [Aplt.App.2966-68,3890,4566-67,4570.] As of early 2015, the outstanding balance on Anderer's loans was $597,136.78. [Aplt.App.2968,4566-67,4570.]

_____

[3] The district court erred in granting 4EverYoung's *ex parte* motion to effect service alternate service on Anderer after only minimal attempts had been made to serve Anderer pursuant to the rules. [Aplt.App.1492.]

At about the same time, the FDA conducted an audit of Derma Pen, which threatened to cause a termination of Derma Pen's ability to sell the Device and a resulting loss or indefinite suspension of its revenues. [Aplt.App.2829-30,3475.] As a result, Derma Pen initiated the Bankruptcy Proceeding. [Aplt.App.3895-3901.] Prior to initiating the Bankruptcy Proceeding, Anderer resigned from Derma Pen's board because he believed there was a conflict with his role as a creditor and his role as a board member. [Aplt.App.3466.]

In the Bankruptcy Proceeding, Anderer and Derma Pen were represented by separate counsel, and Anderer had no involvement in the management of Derma Pen. [Aplt.App.3466-67.] In that proceeding, Anderer was scheduled with an undisputed secured claim in the amount of $580,284.90. [Aplt.App.4246-78.] As such, 4EverYoung and Marshall were aware that Anderer had a security interest in the Assets, even though Marshall never investigated whether there were any liens against the Assets, never conducted a UCC search of Derma Pen, and never inquired of Derma Pen about whether there were any liens against the Assets. [Aplt.App.4933-35.]

During the Bankruptcy Proceeding, Derma Pen sought authority to use Anderer's cash collateral, and it also sought authority to borrow up to an additional $150,000 from Anderer. [Aplt.App.4307-26,4327-45,4346-4401.] After discovery and further hearings, the Bankruptcy court entered its Final Order authorizing

Derma Pen's use of cash collateral, granting adequate protection to Anderer and authorizing post-petition financing. [Aplt.App.4447-60.] Among other things, this Final Order recognized the validity, priority and amount of Anderer's security interest and secured debt, and granted additional liens to Anderer in connection with his post-bankruptcy loans to Derma Pen. [Aplt.App.4447-60.] The final order granted 4EverYoung and Marshall a right to challenge Anderer's security interests and liens, but it established a deadline for them to do so. [Aplt.App.4447-60.] The order also preserved Anderer's defenses to any such challenge, if one were filed. [Aplt.App.4447-60.] The Bankruptcy court extended 4EverYoung's challenge deadline to December 23, 2014, but 4EverYoung made no such challenge and did not seek to extend the deadline any further. [Aplt.App.4461.]

The funds from Anderer's post-bankruptcy loans to Derma Pen were used by Derma Pen to obtain bankruptcy counsel and pay operating expenses. [Aplt.App.3467.] Derma Pen has not repaid any of the funds loaned to it by Anderer during the bankruptcy. [Aplt.App.2828-29,2968.] As of January 29, 2015, the outstanding balance on the post-petition bankruptcy loan was $102,383.80.4 [Aplt.App.2974,4570.]

---

[4] This amount is in addition to the original amount secured by the Assets.

10

After the Bankruptcy Proceeding was dismissed on December 19, 2014 as a bad faith filing, Anderer decided that he needed to move quickly to recover his collateral. [Aplt.App.3468-69,4462-79.] On December 19, 2014, Anderer's counsel sent a default notice to Derma Pen's CEO, demanding immediate payment of $687,918.82, plus interest, in connection with Derma Pen's secured obligations to Anderer. [Aplt.App.4538-39.] Derma Pen responded to Anderer's notice, agreeing with the statements therein. [Aplt.App.4540-41.]

On December 22, 2014, Anderer's counsel sent an email to Derma Pen requesting a "partial surrender of some of the secured collateral assets in favor of Mike Anderer per Article 9 of the Utah Commercial Code, rather than being in a situation where Mike would have to seize the assets." [Aplt.App.4542-44.] To effectuate this, Anderer's counsel requested that Derma Pen immediately record an assignment of the Trademark using the USPTO Electronic Transfer Assignment System in order "to effectuate this partial surrender in as timely a manner as possible." [Aplt.App.4542-44.] On December 22, 2014, Derma Pen made an electronic assignment of the Trademark to Anderer and received a receipt from the USPTO to that effect. [Aplt.App.4545-48,4549.] An actual Assignment of the Trademark also was executed on December 22, 2014, and the USPTO acknowledged that the Assignment was effected on December 22, 2014. [Aplt.App.4545-52.]

11

On December 22, 2014, Derma Pen also executed a Confession of Judgment in favor of Anderer, acknowledging a liability of Derma Pen to Anderer in the amount of $791,012.18. [Aplt.App.3954-55,3954-56.] Two days later, Anderer filed an action in state court to levy on Derma Pen's secured assets. *See Anderer v. Derma Pen, LLC*, in the Third Judicial District Court, Salt Lake County, Utah, Case No. 140908635, Honorable Robert Faust. Based on the Confession of Judgment, the state court entered a Judgment against Derma Pen in favor of Anderer in the amount of $791,012.18 (the "Judgment"). [Aplt.App.3959-61.]

After the Judgment was entered, Anderer filed an Application for Writ of Execution and noticed a UCC public auction for the Assets to be held on January 22, 2015. [Aplt.App.3962-75.] In response, the state court issued a Writ of Execution on January 13, 2015. [Aplt.App.3976-77.] On January 13, 2015, Anderer filed a Praecipe instructing a constable to levy execution on all of Derma Pen's assets. [Aplt.App.4553-61.] A day later, a constable levied execution on all of Derma Pen's assets, thereby bringing them within the *in rem* jurisdiction of the state court. [Aplt.App.4562.] On January 16, 2015, the constable noticed a Constable Sale to take place on January 30, 2015 with regard to the Writ and Levy. [Aplt.App.4563.]

## 4. Disposition Below

In this section, Anderer summarizes the relevant district court orders.

12

### 4.1   December 23, 2014 Order Granting TRO ("December 23 TRO").

The district court conducted a telephonic status conference and sua sponte entered a TRO, restricting Derma Pen and "anyone acting in concert with it" from transferring the Assets. [Aplt.App.760.] The December 23 TRO was based on a motion Defendants filed on May 2, 2014—long before Anderer was named as a counterclaim defendant— in which Defendants argued they were entitled to injunctive relief because they were likely to succeed on their claims for specific performance under the Distribution Agreement as well as their tortious interference claim. [Aplt.App.386-447.]

### 4.2   December 30, 2014 Order Granting Summary Judgment of Derma Pen's Defenses ("December 30 Order").

The district court entered summary judgment in favor of 4EverYoung on Derma Pen's affirmative defenses to 4EverYoung's claim for specific performance under the Distribution Agreement. [Aplt.App.767-799.] The district court rejected as a matter of law Derma Pen's affirmative defenses, including, among others, unclean hands, laches, waiver, estoppel, fraud, and prior material breach. [Aplt.App.780-797.] In this order, the district court also foreclosed Derma Pen from conducting further discovery under rule 56(d) of the Federal Rules of Civil Procedure to develop additional support of its defenses. [Aplt.App.797-799.]

### 4.3   January 12, 2015 Order Granting Preliminary Injunction ("January 12 PI").

The district court entered a preliminary injunction, restricting Derma Pen and "anyone acting in concert with it" from transferring the Assets. [Aplt.App.803-819.] In this order, the district court granted summary judgment in favor of 4EverYoung on the specific performance claim as the basis for finding a likelihood of success on the merits and thereby granting injunctive relief. [Aplt.App.809-10 (noting the grant of "partial summary judgment on specific performance . . . established the likelihood of success issue on the preliminary injunction").] In addition, the district court relied on its December 30 Order as a basis for granting the January 12 PI. [Aplt.App.809-10.]

### 4.4   January 21, 2015 Order Granting Temporary Restraining Order ("January 21 TRO").

On January 21, 2015 the district court entered a temporary restraining order against Anderer, without notice or a hearing, based on its prior entry of summary judgment on the Defendants' claim for specific performance and the Counterclaim Plaintiffs' likelihood of success on their claim for fraudulent transfer against Anderer. [Aplt.App.1003A_001-11.][5]

### 4.5   February 16, 2015 Order Denying Motion for Summary Relief ("February 16 Order").

---

[5] As noted, 4EverYoung's *ex parte* request was procedurally defective. *See supra* note 2.

On February 16, 2015, the district court entered an order rejecting several of Derma Pen's arguments pertaining to the likelihood of success prong of 4EverYoung's motion for preliminary injunction. [Aplt.App.1195-1206.] Specifically, the court's ruling addressed whether 4EverYoung was likely to succeed on its UFTA claim against Anderer. [Aplt.App.1196.] The district court rejected Anderer's likelihood of success arguments, ruling that 4EverYoung had standing to make a UFTA claim, that Anderer had not established his defenses under UFTA, and that he was not insulated from 4EverYoung's claim by virtue of UFTA's definition of "asset." [Aplt.App.1195-1206.] The district court concluded that none of Anderer's arguments foreclosed 4EverYoung's request for injunctive relief. [Aplt.App.1206.]

### 4.6  February 25 Order Regarding Jurisdiction ("February 25 Order").

The district court entered an order that resolved additional issues pertaining to 4EverYoung's injunctive relief request. [Aplt.App.1360-1376.] The February 25 Order addressed the relationship between the Bankruptcy Proceeding, the State Court Proceeding, and this case. [*Id.*]

Specifically, the district court addressed whether it had "possession" of the Assets prior to the State Court Proceeding under the doctrine set forth in *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 466 (1939), and whether the relief requested by 4EverYoung was therefore possible notwithstanding the

15

provisions of the Anti-Injunction Act, 28 U.S.C. § 2283. [Aplt.App.1364-69.] The

district court also addressed whether abstention was required under the doctrines

set forth in *Younger v. Harris*, 401 U.S. 37 (1971) and *Colorado River Water*

*Conservation District v. United States*, 424 U.S. 800, 817 (1976). [Aplt.App.1370-

76.] Again, resolution of these issues was necessary to determine whether

4EverYoung was likely to succeed on its claims against Anderer. The district

court's ruling that it had possession of the Assets prior to the State Court

Proceeding, and therefore did not need to abstain, served as a necessary predicate

to the district court's subsequent ruling that 4EverYoung was likely to succeed on

its Asset-based claims against Anderer. [Aplt.App.1376.]

### 4.7   February 26 Order Granting Preliminary Injunction ("February 26 PI").

On February 26, 2015, the district court granted in part 4EverYoung's

motion for preliminary injunction, and denied Anderer's motion to vacate the

January 21 TRO. [Aplt.App.1377-1440.] The February 26 PI detailed the

contractual relationships among the parties, the allegations in the operative

pleadings, and the procedural history of this lawsuit, the Bankruptcy Proceeding,

and the State Court Proceeding. [Aplt.App.1384-1421.]

The February 26 PI described and relied upon the findings and conclusions

included in the December 23 TRO, December 30 Order, January 12 PI, and

January 21 TRO. [Aplt.App.1411-1421.] It also described and relied on the

16

conclusions included in the February 16 Order pertaining to 4EverYoung's

likelihood of success on its UFTA claim. [Aplt.App.1379,1423,1426,1429,1432-

34.] Based in part on these prior orders, the district court concluded that

4EverYoung was entitled to a preliminary injunction preventing Anderer from

transferring the Assets "except in connection with a foreclosure based on the

Debtor In Possession Financing." [Aplt.App.1439.]

    Importantly, the order allowed Anderer to credit bid "the principal and

interest owing under the Debtor In Possession Financing at any foreclosure based

on the lien of or amounts owing under the Debtor In Possession Financing without

further order of this court." [Aplt.App.1439.] During a telephonic hearing on

February 26, 2015, the district court denied 4EverYoung's emergency motion to

clarify the above language, in which 4EverYoung argued that allowing the

language to stand would permit Anderer to foreclose on and obtain the Assets.

[Aplt.App.1446; *see also* Aplt.App.1448-49.]

### 4.8    April 15 Order Holding Anderer in Contempt for Violating the January 12 PI ("Non-Party Contempt Order").

    On April 15, 2015, the district court entered an order holding Anderer in

contempt of court for violating the December TRO and January 12 PI.

[Aplt.App.1712-26.] In this order, the district court ruled that Anderer could be

held in contempt of the January 12 PI—even though he was not a party at on

January 12—on the basis that he was "acting in concert" with Derma Pen during

17

the relevant time period. [Aplt.App.1723-25.] The Non-Party Contempt Order was

based on actions Anderer took in the State Court Proceedings between January 9,

2015, and January 18, 2015 to foreclose on the debtor-in-possession loan.

[Aplt.App.1722-23.]

### 4.9    April 15 Order Holding Anderer in Contempt for Violating the February 26 PI ("Contempt Order").

On April 15, 2015, the district court entered an order holding Anderer in

contempt for violating the February 26 PI. [Aplt.App.1727-33.] The Contempt

Order was based on actions Anderer took after the district court entered the

February 26 PI, at which time Anderer was a party to the lawsuit. [Aplt.App.1731-

32.] Specifically, the Contempt Order was based on Anderer's foreclosure of the

debtor-in-possession loan, and subsequent transfer of the Assets to an entity called

Dermagen International. [Aplt.App.1730-31.] In the Contempt Order, the district

court also denied Anderer's motion to amend the February 26 PI to make clear that

he could make post-foreclosure transfers of the Assets. [Aplt.App.1733.]

## SUMMARY OF ARGUMENT

This court should reverse the district court's February 26 PI and orders holding Anderer in civil contempt on four grounds.

First, the district court misinterpreted the Anti-Injunction Act as permitting it to enjoin the previously filed State Court Proceeding.

Second, it misread the scope of the *Younger* and *Colorado River* abstention doctrines in concluding that abstention was not required under the circumstances of this case.

Third, even if injunctive relief was not foreclosed under the above theories, the district court erred in entering the February 26 PI because the evidence presented by 4EverYoung failed to establish clearly and convincingly each of the four injunction factors and because the February 26 PI was insufficiently definite to meet the requirements of rule 65B of the Federal Rules of Civil Procedure.

Fourth, the district court erred in entering orders holding Anderer in civil contempt for violations of its various injunctive relief orders. Both of the district court's civil contempt orders are premised upon injunctive relief orders that are insufficiently specific and definite to support a finding of contempt. And the district court's Non-Party Contempt order is insufficient to support "in concert" civil liability against a non-party.

## ARGUMENT

**1. Jurisdictional arguments under the Anti-Injunction Act, the Younger doctrine, and the Colorado River doctrine**

### 1.1 Standard of review

A district court's interpretation of the Anti-Injunction Act and the *Younger* abstention doctrine is reviewed de novo. *See, e.g.*, *Joseph A. ex rel. Wolfe v. Ingram*, 275 F.3d 1253, 1266 (10th Cir. 2002); *In re Prudential Ins. Co.*, 261 F.3d 355, 363 (3d Cir. 2001); *Frank Russell Co. v. Wellington Mgmt. Co.*, 154 F.3d 97, 101 (3d Cir. 1998); *Huguley v. Gen. Motors Corp.*, 52 F.3d 1364, 1369-70 (6th Cir. 1995). A district court's application of the *Colorado River* abstention doctrine is reviewed for an abuse of discretion. *See, e.g.*, *Rienhardt v. Kelly*, 164 F.3d 1296, 1302 (10th Cir. 1999).

### 1.2 Jurisdiction

This court has immediate jurisdiction under 28 U.S.C. § 1292(a)(1) to consider Anderer's Anti-Injunction Act arguments. Arguments advanced under the Anti-Injunction Act—a federal act that forbids federal courts from granting injunctions to stay state court proceedings—necessarily fall within the scope of this court's jurisdiction under section 1292(a)(1). *See, e.g.*, *In re Federal Skywalk Cases*, 680 F.2d 1175, 1177 (8th Cir. 1982) ("[W]e conclude that we do have

jurisdiction under 28 U.S.C. § 1292(a)(1) and further that the order must be

vacated because it violates the Anti-Injunction Act, 28 U.S.C. § 2283.").[6]

Next, this court has pendent jurisdiction to consider Anderer's arguments

under the *Younger* and *Colorado River* doctrines. Under *Moore v. City of*

*Wynnewood*, pendent jurisdiction exists if the nonappealable decision is either

"inextricably intertwined with the appealable decision," or if "review of the

nonappealable decision is necessary to ensure meaningful review of the appealable

one." 57 F.3d 924, 930 (10th Cir. 1995) (quotations omitted). Pendent jurisdiction

exists when "a district court denies a motion to dismiss on the basis of *Younger*

abstention and then grants injunctive relief that potentially interferes with ongoing

---

[6] In the alternative, this court has pendent jurisdiction over the Anti-Injunction Act
issue because the district court's resolution of that issue is "inextricably
intertwined" with or "necessary to ensure meaningful review" of the appealable
decision. *Kirkland v. St. Vrain Valley Sch. Dist.*, 464 F.3d 1182, 1198 (10th Cir.
2006). Anderer's Anti-Injunction Act defense, like the defenses addressed in the
preliminary injunction orders, turns on the interplay of the present Federal case
with the prior bankruptcy and state court proceedings. More specifically, Anderer's
defenses all turn on when the respective cases were filed, what claims were at issue
in each proceeding, what property each court had constructive possession of based
on those claims, and whether Anderer was a party to each at the relevant time.
[*Compare* Aplt.App.1364-69, *with* Aplt.App.1498-1503 (addressing the interplay
of the confession of judgment in the state court proceeding and the present case);
Aplt.App.1504,1506,1508 (addressing the interplay of the bankruptcy proceeding
and the present case); Aplt.App.1506 (addressing Anderer's status as a non-party).]
Therefore, under the doctrine of pendent jurisdiction, this court has jurisdiction to
entertain an immediate appeal from the orders addressing Anderer's Anti-
Injunction Act arguments even if it concludes that the arguments fall outside of the
scope of its jurisdiction under section 1292(a)(1).

state proceedings." *Meredith v. Oregon*, 321 F.3d 807, 816 (9th Cir. 2003). This is true because, in such cases, "review of the court's *Younger* abstention decision is necessary to ensure meaningful review of the grant of the preliminary injunction." *Id.* (quotation omitted). Under the circumstances of this case, Anderer's defenses under the *Younger* and *Colorado River* doctrines and his state-law defenses all turn on the interplay of the present Federal case with the prior Bankruptcy Proceeding and State Court Proceeding. [*Compare* #629 at 11-17, *with* #634 at 49-54,55,57,59.] This court has jurisdiction to consider Anderer's abstention arguments because they are either "inextricably intertwined with" or "necessary to ensure meaningful review of" the immediately appealable decisions. *Kirkland*, 464 F.3d at 1198 (quotation omitted).[7]

### 1.3   The Anti-Injunction Act bars the district court's injunctive relief orders

---

[7] If this court decides it has jurisdiction under section 1292(a)(1) to consider Anderer's Anti-Injunction Act arguments, then the case for pendent jurisdiction over Anderer's abstention arguments is even stronger because the district court's reasons for rejecting Anderer's abstention arguments are virtually the same as its reasons for rejecting his arguments under the Anti-Injunction Act . [Aplt.App.1369 (rejecting Anderer's Anti-Injunction Act defense on the basis that the district court obtained jurisdiction over the property before the state court proceeding); Aplt.App.1373-74 (rejecting Anderer's *Younger* abstention argument on the basis that the federal court action preceded the state court action); Aplt.App.1375 (rejecting Anderer's *Colorado River* abstention arguments on the basis that the federal court first assumed jurisdiction over the property).]

The district court erred in applying the "necessary in aid of its jurisdiction" exception to the Anti-Injunction Act, 28 U.S.C. § 2283. [Aplt.App.1369.] The Anti-Injunction Act provides that "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. Because the Anti-Injunction Act was "enacted to preserve the independence of state judicial systems," courts "should resolve doubts against issuing the injunction . . . and *narrowly construe* the Act's three exceptions." *Brooks v. Barbour Energy Corp.*, 804 F.2d 1144, 1146 (10th Cir. 1986) (emphasis added); *see also Horton v. Clark*, 948 F.2d 1294 (10th Cir. 1991) (unpublished) (holding a state foreclosure action is "precisely the type of case where federal courts . . . properly refuse to exercise jurisdiction" under the Anti-Injunction Act even if an exception to the statute applied). The district court's decision to enjoin the State Court Proceeding was incorrect for several reasons.

First, the district court overlooked that enjoining the State Court Proceeding was improper because the State Court Proceeding predated the federal claims against Anderer. The Federal Action has been pending against Anderer at best since January 21, 2015, when 4EverYoung made its first attempts to join Anderer.

[Aplt.App.902-936.][8] Anderer initiated the State Court Proceeding against Derma Pen on December 22, 2014, when he obtained a Confession of Judgment. [Aplt.App.3959-61.] The Confession of Judgment was followed by entry of a Judgment, a Writ of Execution, and a levy on the Assets before any claim was ever brought against Anderer in federal court, and before any TRO was issued against Anderer in the Federal Action. [Aplt.App.3962-77,4553-63.] Accordingly, as to Anderer, the State Court Proceeding predates this action. The Anti-Injunction Act exists to prevent expressly this type of federal court interference in preexisting state court proceedings. In this case, it prevents the federal court from adjudicating the validity of Anderer's secured claims against Derma Pen when there is a prior state court proceeding in which 4EverYoung could—and did—raise those issues.[9]

Second, the district court erred in broadly construing the "necessary in aid of its jurisdiction" exception. [Aplt.App.1369.] That exception allows a district court to enjoin state court litigation "to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the

---

[8] As noted, 4EverYoung's service of its amended pleading on Anderer was procedurally defective. *See supra* note 3.
[9] The sequence of proceedings forecloses any application of the relitigation exception to the Anti-Injunction Act. Under that exception, a federal court can "enjoin a state court action where, in effect, the state court is asked to relitigate matters already determined by a federal court." *Thomas v. Albright*, 77 F. Supp. 2d 114, 119 (D.D.C. 1999), *aff'd sub nom*, *Thomas v. Powell*, 247 F.3d 260 (D.C. Cir. 2001).

federal court's flexibility and authority to decide that case." *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 295 (1970). The exception does not apply in this case because the issues being litigated in the Federal Action are separate and distinct from the issues being litigated in the State Court Proceeding. The issues in the State Court Proceeding involve enforcement of security interests and the collection of debt. The parties are Anderer and Derma Pen. Before 4EverYoung attempted to join Anderer, the issues in the Federal Action involved contract interpretation and implementation. The parties were Derma Pen and 4EverYoung. There were no issues in the federal case before January 21, 2015, that addressed liens against the Assets, not to mention no issue addressed Anderer and no issue addressed Anderer's specific security interests.

In any event, the district court erred in concluding that it had *quasi in rem* jurisdiction over the Assets. [Aplt.App.1364-69.] The nature of this lawsuit is to determine 4EverYoung's contract rights under the Distribution Agreement. Under that contract, 4EverYoung has a contract claim to buy the Assets from Derma Pen, for a price fixed by the federal court, but subject to any valid liens that have attached to the Assets. [Aplt.App.4571-92.] To be sure, the contract does not say that 4EverYoung can acquire the Assets free and clear of liens, and it does not prohibit Derma Pen from granting liens against the Assets. [*Id.*] Allowing Anderer to collect his claims in the State Court Proceeding does not interfere with the

federal court's ability to adjudicate the contract claims between Derma Pen and

4EverYoung.

Further, this exception only allows a federal court to "enjoin a state court

proceeding in order to protect its jurisdiction of a *res* over which it had *first*

*acquired jurisdiction.*" *Mitchum v. Foster*, 407 U.S. 225, 235 (1972) (emphasis

added). As noted, the nature of this lawsuit is to determine 4EverYoung's contract

rights under the Distribution Agreement. 4EverYoung has only a contract claim to

buy the Assets from Derma Pen, for a price fixed by the federal court, but subject

to any valid liens that have attached to the Assets. For these reasons, the Anti-

Injunction Act barred the district court from enjoining the State Court Proceeding.

### 1.4   Abstention was required under the *Younger* doctrine

The *Younger* doctrine requires a federal court to abstain when a federal

proceeding would (1) interfere with an ongoing state judicial proceeding (2) that

implicates an important state interest and (3) that affords an opportunity for the

federal-court plaintiff an adequate forum to raise its claims from the federal

lawsuit. *See, e.g.*, *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457

U.S. 423, 432 (1982). "*Younger* abstention is not discretionary once the above

conditions are met absent extraordinary circumstances that render a state court

unable to give state litigants a full and fair hearing on their federal claims."

26

*Seneca-Cayuga Tribe of Okla. v. Okla. ex rel. Thompson*, 874 F.2d 709, 711 (10th Cir. 1989) (citations omitted). In this case, all three elements are met.

### 1.4.1    This action interferes with the ongoing State Court Proceeding

It is undisputed that this federal court action interferes with the pending State Court Proceeding. "*Younger* governs whenever the requested relief would interfere with the state court's ability to conduct proceedings, regardless of whether the relief targets the conduct of a proceeding directly." *Joseph A. ex rel. Wolfe v. Ingram*, 275 F.3d 1253, 1272 (10th Cir. 2002). The state court's Judgment establishes that Derma Pen is liable to Anderer under the loan documents and the Bankruptcy Court's Final Order. [Aplt.App.3959-61.] In connection with Anderer's efforts to collect upon that Judgment, the Assets became the subject of the State Court's Levy and Writ of Execution. [Aplt.App.3976-77,4553-63.] In this action, the Defendants are arguably challenging Derma Pen's liability to Anderer under the same loan documents and Final Order. The Defendants also are challenging Anderer's security interest against the same Assets that are subject to the Writ and Levy in the State Court Proceeding. Defendants' efforts in this case therefore interfere with the State Court proceedings. The Defendants are effectively asking the federal court to reverse the state court's determination of Derma Pen's liability as memorialized in the Judgment, and vacate the Writ and Levy. As discussed above, determining the

amount that Derma Pen owes to Anderer and the validity of Anderer's security

interest against the Assets are within the State Court's exclusive *in rem*

jurisdiction.

### 1.4.2 The State Court Proceeding implicates important state interests

The State Court Proceeding implicates important state interests. In *Pennzoil*

*Co. v. Texaco, Inc.*, the Supreme Court recognized that "States have important

interests in administering certain aspects of their judicial systems." 481 U.S. 1, 12-

13 (1987). It further recognized the "importance to the States of enforcing the

orders and judgments of their courts." *Id.* at 13. The state's ability to enforce its

own Judgment in the State Court Proceeding is an important state interest.

### 1.4.3 The State Court Proceeding provides the Defendants with a suitable forum for the adjudication of their rights.

The Defendants' causes of action against Anderer are based entirely on state

law, not federal law. The Utah Rules of Civil Procedure afford the Defendants with

an adequate opportunity to raise their claims against Anderer and object to the Writ

of Execution, which Defendants have done. *See* Utah R. Civ. P. 64(e) (setting out

procedures for third persons who claim rights to property subject to execution); *id.*

R. 65E(d) (setting out procedures for filing replies to a writ of execution). Further,

as noted, the state court has exclusive jurisdiction over the Assets, and, since the

causes of action arise under state law, the state court is a better forum for

adjudicating any such claims. The state court is not only the only forum with jurisdiction to hear Defendants' challenges to Anderer's claims and security interests, it is also the more suitable forum.

### 1.4.4    The State Court Proceeding predates the Defendants' claims against Anderer in this case

The *Younger* doctrine applies where a state proceeding is "begun against the federal plaintiffs after the federal complaint is filed but before any proceedings of substance on the merits have taken place in the federal court." *Hicks v. Miranda*, 422 U.S. 332, 349 (1975). Anderer filed the State Court Proceeding on December 24, 2014. [Aplt.App.3959-61.] Later, on January 21, 2015, the Defendants filed their Third-Party Complaint attempting to name Anderer for the first time. [Aplt.App.902-963.][10] Before January 21, 2015, the Defendants never sought to join Anderer as a party to this case, and the prior pleadings in this case do not assert any causes of action against Anderer.

The Defendants' failure to name Anderer as a party prior to the commencement of the State Court Proceeding is significant. In *Hicks*, when the federal plaintiffs filed their federal court complaint, no state court proceedings were pending against them. 422 U.S. at 348. But a state court criminal proceeding

---

[10] As noted, 4EverYoung's service of its amended pleading on Anderer was procedurally defective. *See supra* note 3.

was pending against their two employees, and the federal plaintiffs "had a substantial stake in the state proceedings, so much so that they sought federal relief." *Id.* Indeed, the federal plaintiffs initiated the federal court action to demand that the state statute relevant to the state court proceeding be declared void. *Id.* Several months after they initiated the federal case, the state prosecution amended the criminal complaint to name the federal plaintiffs. *Id*. at 349. The Supreme Court held that, even though the state criminal proceedings had begun against the federal plaintiffs after the federal complaint, *Younger* still applied because no proceedings of substance on the merits had taken place in the federal court. *Id.*

In applying the *Younger* doctrine in *Hicks*, the Supreme Court did not examine the date that the state criminal proceeding had commenced against the two employees, which was filed several days before the commencement of the federal court action. Instead, the Supreme Court examined the date that the federal plaintiffs were added to the state court proceeding, which was several months after the commencement of the federal court action. In so doing, the Supreme Court implicitly recognized that the relevant date is the date a party is joined to an action; it is not the date on which the action is filed. Here, the Defendants did not attempt to join Anderer to this case until after he initiated the State Court Proceeding. Accordingly, the *Younger* doctrine applies.

This determination is supported by the purpose of the *Younger* doctrine, which is to "permit state courts to try state cases free from interference by federal courts, particularly where the party to the federal case may fully litigate his claim before the state court." *Id.* at 349 (quotation omitted). In developing the *Younger* doctrine, the Supreme Court was more concerned with principles of comity than with "focusing disproportionately on the respective commencement dates of the state and federal actions in determining whether *Younger* abstention applies." *For Your Eyes Alone, Inc. v. City of Columbus*, 281 F.3d 1209, 1219 (11th Cir. 2002).

Further, applying the *Younger* doctrine to this case does not require a broad interpretation of the doctrine that could override a "plaintiff's choice of whether to litigate in a federal or state forum" or cause duplication and delay. *Id.* When Anderer filed the state court proceeding, he was not a party to the federal case, and there were no claims in the federal case with respect to any liens. Further, Anderer was not a party to the underlying distribution agreement, which was the subject of the federal case between Derma Pen and 4EverYoung. [Aplt.App.4571-92.] For these reasons, the federal court should have abstained under the Younger doctrine.

**1.5   Abstention was also required under the *Colorado River* doctrine**

The district court abused its discretion in refusing to abstain under the *Colorado River* abstention doctrine. Under this doctrine, abstention is possible, even if other abstention doctrines are inapplicable, if "judicial economy concerns

may justify deferral of a federal suit when pending state litigation will resolve the issues presented in the federal case." *Rienhardt v. Kelly*, 164 F.3d 1296, 1302 (10th Cir. 1999). To qualify for abstention under the *Colorado River* doctrine, the state and federal proceedings at issue must be parallel. *Fox v. Maulding*, 16 F.3d 1079, 1081 (10th Cir. 1994). If the proceedings are parallel, a multi-factor analysis is required to determine whether the federal court should abstain. *Id.* The factors include: "(1) whether either court has assumed jurisdiction over the property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; . . . (4) the order in which the courts obtained jurisdiction"; (5) "the vexatious or reactive nature of either the federal or the state action"; (6) "whether federal law provides the rule of decision"; (7) "the adequacy of the State Court Proceeding to protect the federal plaintiff's rights"; and (8) "whether the party opposing abstention has engaged in impermissible forum shopping." *Id.* at 1082.

### 1.5.1    The State Court Proceeding and this federal action are parallel

"Suits are parallel if substantially the same parties litigate substantially the same issues in different forums." *New Beckley Mining Corp. v. Int'l Union, United Mine Workers of Am.*, 946 F.2d 1072, 1073 (4th Cir. 1991). For example, in *Adobe Systems v. James*, a Utah federal district court held that a state court proceeding and federal court action were parallel because: (1) both suits involved the same parties, (2) all of the claims between the parties involved the same disputed issues

32

of fact in both forums, and (3) even though the form of relief sought was different in each forum—*viz*, "injunction and damages compared to declaratory relief"—it did "not affect the parallel nature of the suits because the relief sought all depend[ed] on the resolution of identical issues arising from the same two contracts." No. 2:10-CV-1228-TS, 2011 WL 573393, at *6 (D. Utah Feb. 15, 2011).

Likewise, this case is parallel to the State Court Proceeding with respect to the Defendants' claims against Anderer. Both actions involve the same parties: Derma Pen, Anderer, and 4EverYoung. Both actions involve substantially the same disputed issues of fact: the validity of Anderer's claims against Derma Pen and his security interests against the Assets. Although the post-judgment status of the State Court Proceeding is somewhat different than the procedural posture of this federal action, this does not affect the parallel nature of the suits as they involve identical issues. As a result, the State Court Proceeding and this federal proceeding are parallel.

### 1.5.2    The factors weigh heavily in favor of abstention

In addition, almost all of the factors weigh in favor of abstention.[11] First, the state court has exclusive jurisdiction over the Assets, including the trademark and

---

[11] The only factor that is neutral is the one with respect to the inconvenience of the federal forum because both actions are pending in Utah.

URL. Second, abstention will prevent piecemeal litigation of the validity of

Anderer's liens and security interests. Third, the State Court obtained *in rem*

jurisdiction over the Assets first, and also first obtained jurisdiction over Anderer.

Fourth, the federal court claims against Anderer were in reaction to the State Court

Proceeding. Fifth, there is no federal law at issue in this case—all of the

Defendants' claims against Anderer arise from state law. Sixth, the State Court

Proceeding provides an adequate forum to adjudicate the Defendants' rights.

Seventh, forum-shopping considerations weigh in favor of abstention. Rather than

use the adequate state court forum, the Defendants sought to join Anderer to this

action and obtained a stay of the State Court Proceeding—effectively reversing the

State Court's Judgment. As such, Defendants have shopped for a different forum

for the purpose of avoiding an adverse ruling in the State Court Proceeding.

In sum, the district court abused its discretion in failing to abstain because

virtually every *Colorado River* factor weights in favor of abstention.

## 2. The district court's grant of injunctive relief against Anderer should be reversed.

### 2.1   Standard of review

A district court's grant of a preliminary injunction is reviewed for an abuse

of discretion. *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC.*, 562 F.3d

1067, 1070 (10th Cir. 2009). A district court's underlying legal conclusions,

however, are reviewed de novo. *See, e.g.*, *Derma Pen, LLC v. 4EverYoung Ltd.*,

773 F.3d 1117, 1119 (10th Cir. 2014); *see also Beltronics*, 562 F.3d at 1070

(noting an "error of law" is an abuse of discretion). Whether the district court's

grant of injunctive relief complies with the definiteness requirement set forth in

rule 65(d) presents a legal question subject to de novo review.

### 2.2  Jurisdiction

This court has immediate jurisdiction under 28 U.S.C. § 1292(a)(1) to

consider Anderer's appeal from the district court's orders "granting, continuing,

modifying, refusing or dissolving injunctions, or refusing to dissolve or modify

injunctions."

### 2.3  The district court erred in entering the February 26 PI because the Defendants could not meet the elements necessary to support injunctive relief and because the injunctive relief granted was insufficiently definite to meet rule 65B.

To obtain a preliminary injunction, Defendants were required to prove by

clear and convincing evidence all of the following elements: "(1) a likelihood of

success on the merits; (2) a likelihood that the movant will suffer irreparable harm

in the absence of preliminary relief; (3) that the balance of equities tips in the

movant's favor; and (4) that the injunction is in the public interest." *RoDa Drilling

Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009); *see also Mazurek v.

Armstrong*, 520 U.S. 968, 972 (1997) ("[A] preliminary injunction is an

extraordinary and drastic remedy, one that should not be granted unless the

movant, by a clear showing carries the burden of persuasion." (quotation omitted)).

Further, a movant must satisfy a heavier burden when seeking a preliminary injunction that "alter[s] the status quo." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004) (noting that courts should be especially hesitant to grant an injunctive relief that "would alter the status quo prior to a trial on the merits"). Indeed, in *O Centro Espirita*, this court observed that "an injury resulting from a preliminary injunction that disturbs the status quo by changing the relationship of the parties *is* a judicially inflicted injury," because "[i]t is [an] injury that would not have occurred but for the court's intervention and one inflicted before a resolution of the merits." *Id.* at 978.

In addition, to be valid, injunctive relief orders must be "specific and definite enough to apprise those within its scope of the conduct that is being proscribed." *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240-41 (2d Cir. 2001) (quotation omitted). "[A]n injunction must be worded in such specific terms and with such detail as to put the party enjoined on notice of precisely what he is called upon to do or refrain from doing. It cannot be so general as to leave the party open to the hazard of conducting business in the mistaken belief that it is not prohibited by the injunction and thus make him vulnerable to prosecution for contempt." *Williams v. United States*, 402 F.2d 47, 48-49 (10th Cir. 1967). For example, in *Reliance Insurance Co.  v. Mast Construction Co.*, this court affirmed summary judgment in favor of a party defending a civil contempt claim on the

basis that the injunctive order at issue "failed to meet the requirements of Rule 65(d) because it was not sufficiently definite and specific to support a civil contempt judgment." 84 F.3d 372, 376 (10th Cir. 1996).

### 2.3.1    The district court erred in assessing 4EverYoung's likelihood of success.

In January 2015, 4EverYoung attempted, for the first time, to allege claims against Anderer. [Aplt.App.902-963.] Those claims included fraudulent transfer claims brought under UFTA, Utah Code sections 25-6-5(1)(a) and 25-6-6(2). [Aplt.App.946-949.] They also included claims based on Anderer's alleged status as an "alter ego" of Derma Pen. [Aplt.App.950,952,955,956,958,959.] But the evidence failed to establish 4EverYoung's likelihood of success on any of these claims against Anderer.

4EverYoung cannot prevail on its fraudulent transfer claims because: (i) Anderer is a secured creditor and his rights trump the rights of a party with an unsecured contractual right, (ii) nothing in the Distribution Agreement grants 4EverYoung rights superior to a secured party, (iii) the Assignment is not avoidable, and (iv) even if the Assignment was avoidable, it does not strip Anderer's properly perfected lien on the Assets. At best, 4EverYoung has a right to purchase the Trademark subject to Anderer's lien.

Pursuant to the UFTA, valid liens are honored above the putative interest of parties seeking injunctions. The definition of an "asset" in the UFTA expressly

excludes "property to the extent it is encumbered by a valid lien." Utah Code § 25-6-2(2)(a). This is consistent with the purpose of the UCC, which is "to create a dependable system of secured transactions which could be protected when there was compliance with the Code's filing requirement." *Deere & Co. v. Miller-Godley Auction Co.*, 549 S.E.2d 762, 765 (Ga. Ct. App. 2001). It is undisputed that Anderer gave consideration in exchange for obtaining his security interest in the Assets. In fact, the bankruptcy court expressly acknowledged that, as of August 8, 2014, Derma Pen had "one secured creditor—Anderer—who also is an insider of [Derma Pen], with a claim in the total amount of $580,284.90 secured by a lien against all assets of [Derma Pen]."[ Aplt.App.4462-79.] It is further undisputed that 4EverYoung claims a contractual right to purchase the Assets only pursuant to the Distribution Agreement.[12] Anderer's rights as a properly perfected secured party trump the rights of 4EverYoung's rights as an unsecured party with a putative, inchoate contract right under this contract. Accordingly, the UFTA is inapplicable. Anderer's valid lien precludes the avoidance of the Assignment under the UFTA.

─────────────────────

[12] The Distribution Agreement does not contain (i) a single provision that requires Derma Pen to transfer the Assets free and clear of liens, (ii) any covenants that prevent Derma Pen from borrowing money and pledging the Assets as collateral to secure loans, and (iii) any representations or warranties regarding the security status of the assets. [Aplt.App. 4571-92.] Nothing in the Distribution Agreement grants 4EverYoung rights superior to Anderer as a secured party. [*Id.*]

Moreover, looking at the necessary elements under the UFTA, 4EverYoung has no chance of prevailing. Under UFTA, "[a] transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at the time, and the insider had reasonable cause to believe that the debtor was insolvent." Utah Code § 25-6-6(2). As a result, to prevail 4EverYoung must prove that (i) it is a creditor whose claim arose before the transfer, (ii) the transfer was made to Anderer, who is an insider, for an antecedent debt, (iii) Derma Pen was insolvent at the time, and (iv) Anderer had reasonable cause to believe that the debtor was insolvent. 4EverYoung cannot satisfy these elements.

First, if 4EverYoung is seeking specific performance and the opportunity to pay money to Derma Pen to acquire the Trademark, then it cannot be a creditor. A "creditor" is defined as "a person who has a claim" and a "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* § 25-6-2(3), (4). As the holder of an inchoate claim for specific performance which requires 4EverYoung to pay money to Derma Pen, the alleged debtor-transferor, it does not have a right to payment from Derma Pen.

Second, the Assignment, which 4EverYoung seeks to avoid, is not a "transfer" as defined in the UFTA. Pursuant to the UFTA, "'[t]ransfer means every mode . . . of disposing of or parting with an asset or an interest in an asset." *Id.* § 25-6-2(12). An "asset" is defined as "property of a debtor, but does not include: (a) property to the extent it is encumbered by a valid lien." *Id.* § 25-6-2(2). Here, 4EverYoung claims that Derma Pen transferred an asset through the Assignment. But the Trademark and URL are not "assets" under the UFTA because they are encumbered by a valid lien. And, based on 4EverYoung's valuation of those Assets, they are fully encumbered so there is no equity in them for 4EverYoung or for any other creditor of Derma Pen. [Aplt.App.1511 (disclosing value of $353,000).] Accordingly, since Derma Pen did not dispose of or part with an "asset," there is no "transfer" for 4EverYoung to avoid. The existence of a "transfer," as the term is defined in the UFTA, is a prerequisite to a claim under both sections 25-6-5(1)(a) and 25-6-6, and no such "transfer" exists here.

Third, pursuant the UFTA, "[a] transfer is not voidable under . . . Section 25-6-6 if the transfer results from: . . . (b) enforcement of a security interest in compliance with Title 70A, Chapter 9a, Uniform Commercial Code – Secured Transactions." Utah Code § 25-6-9(5). 4EverYoung's attempt to avoid the transfer through the Assignment is expressly prohibited by the UFTA because the

40

"transfer" was done through Anderer enforcing a security interest in compliance with the UCC.

Fourth, Derma Pen was not insolvent at the time the transfer was made and Anderer did not have reasonable cause to know that Derma Pen was insolvent. On December 19, 2014, three days before the Assignment, the bankruptcy court entered its Memorandum Decision that, in part, found that Derma Pen was solvent when it filed its bankruptcy petition. The Bankruptcy Court went on to find that a "[c]loser examination of the schedules reveals that . . . . [e]xcept for the rising litigation costs . . . there is no indication that the Debtor's operations were suffering from financial stress."[ Aplt.App.4462-79.] Based on these findings alone, it is impossible for 4EverYoung to demonstrate that Derma Pen was insolvent and that Anderer had reasonable cause to know that Derma Pen was insolvent. Furthermore, the UFTA defines a debtor as "insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at fair valuation." *Id.* § 25-6-3(1). Here Derma Pen filed sworn Schedules in the bankruptcy case that attested to the fact that it was not insolvent, and 4EverYoung never contested these Schedules. [Aplt.App.4246-78.] Furthermore, because Anderer was loaning money to Derma Pen to pay its operating expenses, Derma Pen also generally was paying its debts as they became due. Utah Code § 25-6-3(2). Accordingly, 4EverYoung cannot succeed on its fraudulent transfer claim under section 26-6-6(2).

41

4EverYoung's fraudulent transfer claim under section 25-6-5(1)(a) faces similar flaws. To establish a fraudulent transfer claim under this section, a creditor must show: (i) the creditor has a claim "that arose either before or after the transfer was made or the obligation was incurred"; and (ii) the transfer was made "with actual intent to hinder, delay, or defraud any creditor of the debtor." *Id.* § 25-6-5(1). As detailed above, if 4EverYoung wants specific performance, then it is not a creditor under the UFTA. Moreover, Derma Pen did not "transfer" an "asset" as those terms are defined in the UFTA. Additionally, there is no evidence that the Assignment was made "with actual intent to hinder, delay, or defraud any creditor of the debtor." After Derma Pen's bankruptcy case was dismissed and the automatic stay was dissolved, Anderer was free to enforce his security interest and exercise his remedies to collect on his loans. Lacking any viable defense, Derma Pen was obligated to cooperate and turn over possession of the collateral, which it did through the Assignment and Confession of Judgment. These actions by Derma Pen are simple initial steps in the foreclosure and collection process, which were justified by Anderer's indisputable position as a senior secured creditor with a loan that was in default. *Id.* § 70A-9a-609. There is no evidence of actual fraud. Anderer's loans were open and transparent, fully disclosed to the bankruptcy court and known to 4EverYoung. The Assignment was similarly open, notorious and a matter of public record. The UCC Financing Statements also were matters of

public record. 4EverYoung cannot enjoin the foreclosure sale and avoid the

Assignment simply because it wants to purchase the Assets free and clear of liens,

a right it does not possess under the Distribution Agreement.

4EverYoung is similarly unable to establish any likelihood of success on its

theory of alter ego liability. Utah courts will only "reluctantly and cautiously"

allow a claimant to pierce the corporate veil under an alter ego theory. *Jones &

Trevor Mktg., Inc. v. Lowry*, 2012 UT 39, ¶15, 284 P.3d 630 (quotation omitted).

Under Utah law, there is a two-prong test to determine when a party may pierce the

corporate veil: "(1) there must be such unity of interest and ownership that the

separate personalities of the corporation and the individual no longer exist, viz., the

corporation is, in fact, the alter ego of one or a few individuals; and (2) the

observance of the corporate form would sanction a fraud, promote injustice, or an

inequitable result would follow." *Id.* ¶14 (quotation omitted). To establish the first

prong—known as the "formalities requirement"—a court considers whether there

was: "(1) undercapitalization of a one-man corporation; (2) failure to observe

corporate formalities; (3) nonpayment of dividends; (4) siphoning of corporate

funds by the dominant stockholder; (5) nonfunctioning of other officers or

directors; (6) absence of corporate records; [and] (7) the use of the corporation as a

facade for operations of the dominant stockholder or stockholders." *Id.* ¶¶16, 20

(quotation omitted). To establish the second prong—known as the "fairness

requirement"— a claimant must "appeal to the court's equitable powers and articulate how the observance of the corporate form would sanction a fraud, promote injustice, or an inequitable result would follow." *Id.* ¶20 n.6 (quotation omitted).

In this case, 4EverYoung has not attempted to establish a likelihood of success on any of the legal requirements of its claims against Anderer premised on alter ego liability. Derma Pen was a separate and distinct entity from Anderer, had officers and directors, held corporate meetings, kept corporate minutes, and had its own bank accounts. [Aplt.App.3438-39,3441.] Further, no individual board member of Derma Pen could make decisions for the company and any major decisions could only be made with the majority vote of the board members. [Aplt.App.3438.] Anderer was never an officer or manager of Derma Pen, he had no control over the day-to-day operations or management of Derma Pen, he never signed any contracts or checks for Derma Pen, and he did not control its use of the loan proceeds. [Aplt.App.2783,3436,3438.]

Accordingly, 4EverYoung cannot establish any likelihood of success on its UFTA or alter ego theories of liability against Anderer, much less the heightened showing necessary to support a preliminary injunction that alters that status quo. *O Centro Espirita*, 389 F.3d at 975.

### 2.3.2   The Defendants could not establish irreparable harm in the absence of injunctive relief

To satisfy the irreparable harm requirement a movant must "demonstrate[] a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (quotation omitted); *see also Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986). Critically, a movant must prove not just a "possibility" of irreparable harm, but a more substantial "likelihood" of irreparable harm. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22-23 (2008).

To determine whether a party will be irreparably harmed, courts analyze whether the moving party has an adequate remedy at law. *Nilson v. JPMorgan Chase Bank, N.A.*, 690 F. Supp. 2d 1231, 1256 (D. Utah 2009). The availability of an adequate legal remedy precludes injunctive relief. *See Switzer v. Coan*, 261 F.3d 985, 991 (10th Cir. 2001) ("[T]he general rule [is] that equitable relief is available only in the absence of adequate remedies at law.").

In the present case, Anderer scheduled a public disposition of collateral pursuant to the UCC at which any interested party could bid on and purchase the Assets. [Aplt.App.3962-65.] 4EverYoung was given notice of the sale and had the opportunity to attend and bid. [*Id.*] Because 4EverYoung could have bid at the UCC sale, it had an adequate remedy at law to protect its claimed contract rights.

45

In fact, purchasing the Assets and the associated goodwill at the foreclosure sale is the only way that 4EverYoung can obtain a valid interest in the Assets.

Moreover, both 4EverYoung and Derma Pen have submitted expert reports to assist the district court in determining the market value of the Assets so that 4EverYoung may purchase them from Derma Pen. [Aplt.App.1511,4611-61.] Indeed, 4EverYoung's report disclosed that the Assets have a limited value of $353,000. [Aplt.App.1511.] By this admission, 4EverYoung has recognized that there is no equity in the collateral above and beyond Anderer's undisputed, secured claim.

Nevertheless, the best way to test the veracity of 4EverYoung's valuation is a public auction. And the auction's effect was to either deliver possession of the Assets to 4EverYoung free and clear of all liens, or fix the market value of the Assets, which 4EverYoung could then use as a basis to calculate damages against Derma Pen.

Finally, it bears reemphasizing that 4EverYoung negotiated the Distribution Agreement, which allows Derma Pen to obtain loans and secure them with the Assets. Derma Pen did nothing wrong or prohibited by the Distribution Agreement when it borrowed money from Anderer and secured the loan with the Assets. It is a basic maxim that equity does not afford relief when the event complained of is the result of the plaintiff's own conduct. *See, e.g.*, *Nielson v. Scott*, 53 P.3d 777, 780

(Colo. App. 2002). In this case, 4EverYoung could have protected itself with different covenants in its Distribution Agreement. The foreseeable consequences of its failure to do so cannot be considered irreparable harm for purposes of a request for injunctive relief.

### 2.3.3    The balance of the equities does not favor the Defendants

The balance of the equities does not favor the movant "[i]f the hardship experienced by the non-movant if the injunction were granted outweighs the hardship likely to be experienced by the movant if the injunction were denied." 13 Moore's Federal Practice, § 65.22[1][e] (3d ed. 2003); *Amoco Oil Co. v. Rainbow Snow, Inc.*, 809 F.2d 656, 665 (10th Cir. 1987). Here, the hardship Anderer will experience if the injunction remains in effect vastly outweighs any potential harm to 4EverYoung.

Perfection of a secured claim creates both the priority of the perfecting creditor's claim and warns other creditors of that priority. *Diversified Holdings, L.C. v. Turner*, 2002 UT 129, ¶42, 63 P.3d 686. "Perfection means that the secured party has taken all the steps required . . . to bring the interest to completion and establish a priority." *J.R. Simplot Co. v. Sales King Int'l, Inc.*, 2000 UT 92, ¶22, 17 P.3d 1100. The priority created by perfection offers creditors considerable protection in the event of a competition for collateral: "a party who has secured its interest in accordance with article 9 has priority, upon a debtor's default, over

anyone anywhere, anyhow except as otherwise provided by the remaining Code priority rules." *Id.* ¶14 (quotation omitted). "[T]o the extent that one debt is secured and another is not there is manifestly an inequality of rights between the secured and unsecured creditors, which cannot be affected by the principle of equality of distribution" *Ticonic Nat'l Bank v. Sprague*, 303 U.S. 406, 412 (1938).

In this case, 4EverYoung has an unsecured, unliquidated inchoate contractual right to purchase the Assets from Derma Pen. [Aplt.App. 4571-92.] The Distribution Agreement negotiated by 4EverYoung does not require Derma Pen to keep and sell the assets free and clear of liens. [*Id.*] Further, the agreement does not include any restrictions on Derma Pen's ability to take loans or secure those loans with the Assets. [*Id.*]

Anderer's position, by contrast, is a secured creditor. [Aplt.App.4447-60.] Anderer loaned funds to Derma Pen and secured and perfected his interest in the same. [Aplt.App.3871-73,3874-77,3878-80,3881,3882,3883-85,3886-89,3890,4570.] Anderer's secured and perfected claim is prior to 4EverYoung's unliquidated and unsecured contractual right to purchase the Assets. In such a situation, the balance of harms unquestionably favors allowing the secured creditor to move forward to protect their claim. Indeed, in comparing the magnitude of the losses potentially suffered between Anderer's secured claim and 4EverYoung's

unsecured, unliquidated inchoate contract right, the balance weighs heavily in

Anderer's favor. The district court erred in concluding otherwise.

### 2.3.4    The grant of injunctive relief against Anderer is not in the public interest.

To be entitled to an injunction, 4EverYoung must prove that the injunction

will not be adverse to the public interest. *Kikumura v. Hurley*, 242 F.3d 950, 955

(10th Cir. 2001). In this case, 4EverYoung is seeking to enjoin a secured, perfected

and judgment lien creditor from collecting on a lawful debt. While the injunction

may serve 4EverYoung's private interest, no proof was offered that it would even

marginally serve the public interest. And any holding in favor of 4EverYoung, the

unsecured creditor, would not only run contrary to the public interests that

undergird the UCC, but also the Anti-Injunction Act, which forecloses federal

court interference once a state court acquires jurisdiction over the res, and the Utah

Antitrust Act, Utah Code section 76-10-3102, which declares the importance of

open competition—such as the public sale procedures followed in the State Court

Proceeding.

### 2.3.5    The injunctive relief granted by the district court failed to meet the certainty requirements of rule 65B.

As noted, "an injunction must be worded in such specific terms and with

such detail as to put the party enjoined on notice of precisely what he is called

upon to do or refrain from doing." *Williams*, 402 F.2d at 48-49. In the present case,

the district court initially enjoined Anderer from transferring the assets "except in connection with a foreclosure based on the Debtor In Possession (DIP) Financing," and permitted Anderer to credit bid "the principal and interest owing under the Debtor In Possession (DIP) Financing . . . at any foreclosure based on the lien of or amounts owing under the Debtor In Possession (DIP) Financing without further order of this court." [Aplt.App.1439-40.][13]

Based on the text of the February 26 PI, and only after the district court denied 4EverYoung's request to clarify, Anderer purchased the assets at issue at a foreclosure sale and transferred them to an entity called Dermagen International, LLC. [Aplt.App.1729-30.] Nevertheless, and in an apparent reversal of its prior interpretation of the February 26 PI, the district court denied Anderer's motion to amend and held him in contempt for violating the February 26 PI. [Aplt.App.1727-33.]

Language in an injunctive order expressly allowing Anderer to transfer the Assets "in connection with a foreclosure" and further expressly allowing Anderer

---

[13] Immediately after the February 26 PI was entered, 4EverYoung filed a request to clarify this language, arguing that the court's ruling, if allowed to stand, would allow Anderer to obtain the assets at a foreclosure sale and render "any victory obtained by 4EverYoung [] for naught." [Aplt.App.1441-47.] The court denied 4EverYoung's motion, apparently agreeing with Anderer's reading of the February 26 PI, and only amended paragraph (c) of the order to add the phrase "the asset sold under" to the beginning of that paragraph. [Aplt.App.1448-49; 1512-13.]

to credit bid "the principal and interest owing under the Debtor in Possession (DIP) Financing" cannot be read to disallow the transfer without simultaneously running afoul of the definiteness requirement incorporated into rule 65B. Accordingly, even if 4EverYoung had met its heavy burden to establish entitlement to injunctive relief in this case, the February 26 PI, and everything that springs from it, must nevertheless be reversed.

### 3. The district court's civil contempt orders should be reversed.

#### 3.1 Standard of Review

A district court's determination of civil contempt is reviewed for an abuse of discretion. *FTC v. Kuykendall*, 371 F.3d 745, 756 (10th Cir. 2004). Whether the language of an underlying order is sufficient to support contempt presents an issue of law, reviewed de novo. *Grace v. Ctr. for Auto Safety*, 72 F.3d 1236, 1241 (6th Cir. 1996) ("Resolving any ambiguity in favor of those who are claimed to have been in contempt, we conclude as a matter of law that the order must be read as permitting dissemination of the deposition to anyone . . . .").

#### 3.2 Jurisdiction

This court has jurisdiction to consider an immediate appeal from both of the district court's civil contempt orders. Because the jurisdictional issues presented are distinct for each order, this brief addresses the two orders in turn.

### 3.2.1     Contempt Order

There are two reasons this court has jurisdiction to consider an immediate appeal from the district court's order refusing to modify the February 26 PI and its order holding Anderer in contempt for violating the February 26 PI.

First, the district court's refusal to modify the February 26 PI is immediately appealable under section 1292(a)(1). This court has jurisdiction under section 1292(a)(1) whenever a district court's order "alters the legal relationship between the parties or substantially changes the terms and force of the injunction." *Pimentel & Sons Guitar Makers, Inc. v. Pimentel*, 477 F.3d 1151, 1154 (10th Cir. 2007) (quotation omitted).

In the present case, the district court initially enjoined Anderer from transferring the assets "except in connection with a foreclosure based on the Debtor In Possession (DIP) Financing," and permitted Anderer to credit bid "the principal and interest owing under the Debtor In Possession (DIP) Financing . . . at any foreclosure based on the lien of or amounts owing under the Debtor In Possession (DIP) Financing without further order of this court." [Aplt.App.1512-13.] Immediately after the February 26 PI was entered, 4EverYoung filed a request to clarify this language, arguing that the court's ruling, if allowed to stand, would allow Anderer to obtain the assets at a foreclosure sale and render "any victory obtained by 4EverYoung [] for naught." [Aplt.App.1441-47.] The court denied

4EverYoung's motion, apparently agreeing with Anderer's reading of the February

26 PI, and only amended paragraph (c) of the order to add the phrase "the asset

sold under" to the beginning of that paragraph. [Aplt.App.1448-49,1513.]

After the district court denied 4EverYoung's motion to clarify, Anderer

purchased the assets at issue at a foreclosure sale and transferred them to an entity

called Dermagen International, LLC. [Aplt.App.1729-30.] 4EverYoung

immediately filed a motion for an order to show cause against Anderer based on

Anderer's actions. [Aplt.App.1729-30.] Anderer responded to 4EverYoung's

motion, arguing the asset transfer was in compliance with the provisions of the

Utah Commercial Code ("UCC") and expressly permitted by the February 26 PI.

[Aplt.App.1590-1603.] Anderer also asked the court to amend the February 26 PI

to more explicitly recognize the validity of his post-foreclosure sale transfer.

[Aplt.App.1600-02.] In conflict with the express language of the February 26 PI, or

in an apparent reversal of that order, the district court denied Anderer's motion to

amend and held him in contempt for violating the February 26 PI. [Aplt.App.1727-

33.] In doing so, the district court either "modified" or "gross[ly] . . .

misinterpret[ed]" the February 26 PI, giving rise to jurisdiction under 1292(a)(1).

*Pimentel*, 477 F.3d at 1155.

Second, this court also has jurisdiction to consider the Contempt Order

under the pendent jurisdiction doctrine because the validity of both the February 26

53

PI and the Contempt Order turn on the common question of whether the February 26 PI was specific and definite enough to apprise [Anderer] of the conduct that is being proscribed. Pendent jurisdiction is appropriate because if this court rules that the February 26 PI is not "sufficiently definite" to meet the requirements of rule 65(d) of the Federal Rules of Civil Procedure, *see Reliance Ins. Co. v. Mast Constr. Co.*, 84 F.3d 372, 376 (10th Cir. 1996), then that ruling would "necessarily resolve[]" the propriety of the Contempt Order, *see Moore v. City of Wynnewood*, 57 F.3d 924, 930 (10th Cir. 1995) (emphasis omitted). Accordingly, even if this court determines that it does not have section 1292(a)(1) jurisdiction to consider the Contempt Order in this appeal, it should nevertheless exercise pendent jurisdiction over that order.

### 3.2.2   Non-Party Contempt Order

There are two reasons this court has jurisdiction to consider an immediate appeal from the district court's order making the January 12 PI applicable to Anderer and holding Anderer in contempt for violating the January 12 PI.

First, the Non-Party Contempt Order is immediately appealable under the non-party exception to the general rule that civil contempt orders are not immediately appealable. *See, e.g.*, *In re Woosley*, 855 F.2d 687, 688 (10th Cir. 1988).

Second, the Non-Party Contempt Order is also immediately appealable under section 1292(a)(1). As noted, any modification that "alter[s] the legal

relationship between the parties or substantially changes the terms and force of the injunction" is immediately appealable. *Pimentel*, 477 F.3d at 1154 (quotation omitted). Specifically, the Non-Party Contempt Order is the first order entered by the district court finding that Anderer acted in concert with Derma Pen and from which Anderer could appeal. [Aplt.App.1723-25.] The February 26 PI did not include this finding. [Aplt.App.1450-1513.] The December order granting 4EverYoung's motion for a temporary restraining order is not appealable. *See Druley v. Patton*, 601 F. App'x 632, 634 (10th Cir. 2015) (unpublished) ("The general rule is that orders granting . . . temporary restraining orders are not appealable." (quotation omitted)). And the orders at issue were all entered before Anderer was a party to this lawsuit. Accordingly, the district court's finding in the Non-Party Contempt Order altered the legal relationship of the parties by expressly including Anderer as an enjoined party under the January 12 PI. As a result, the order is immediately appealable under section 1292(a)(1). *Pimentel*, 477 F.3d at 1154.

### 3.3   The Defendants failed to present sufficient evidence to support the civil contempt orders entered against Anderer.

To establish entitlement to an order holding a party in civil contempt, a movant must establish by clear and convincing evidence that: (1) the non-movant had notice of the order upon which the contempt is based, (2) the order was in effect during the relevant time period, and (3) the order was "clear and

unambiguous." *Reliance Ins. Co.*, 84 F.3d at 377 (quoting *Grace v. Ctr. for Auto Safety*, 72 F.3d 1236, 1241 (6th Cir. 1996)); *see also In re Lucre Mnmt. Grp., LLC*, 365 F.3d 874, 875 (10th Cir. 2004) (requiring the language of the underlying order to be "specific and definite" in order to support civil contempt); *N.L.R.B. v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 591 (6th Cir. 1987) (same); *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 16 (1st Cir. 1991) (listing cases to support the proposition that "civil contempt will lie only if the putative contemnor has violated an order that is clear and unambiguous"). Notably, "[a]ny ambiguities or omissions in the order" are construed in favor of the person charged with contempt. *Reliance Ins. Co.*, 84 F.3d at 377; *see also Grace*, 72 F.3d at 1241 ("[A]mbiguities must be resolved in favor of persons charged with contempt."). Finally, "in levying contempt sanctions, the court must exercise the least possible power suitable to achieve the end proposed." *Project B.A.S.I.C.*, 947 F.2d at 16. In the present case, the evidence introduced to support the Contempt Order and the Non-Party Contempt Order was insufficient to meet the rigorous standard articulated above.

### 3.3.1     The district court's Contempt Order should be reversed.

The district court misinterpreted the legal principles set forth above in entering its Contempt Order based on Anderer's transfer of the Assets in connection with the foreclosure sale. The lack of definiteness of the February 26 PI is addressed in Part 2.3.5, *supra*. At best, the Contempt Order is ambiguous as to

whether Anderer's transfer to Dermagen International in connection with the foreclosure sale was definitely and specifically forbidden by the February 26 PI. As set forth above, the district court was required to construe this ambiguity in favor of Anderer and against a finding of contempt. *See, e.g.*, *Reliance Ins. Co.*, 84 F.3d at 377; *Grace*, 72 F.3d at 1241. For this reason, the Contempt Order should be reversed.

### 3.3.2    The district court's Non-Party Contempt Orders should be reversed.

The district court abused its discretion in entering the Non-Party Contempt Order based on Anderer's actions when he was a non-party to the present case. Although nonparties are "typically not bound by a temporary restraining order, a significant exception occurs where a nonparty has actual notice of a restraining order and is in active concert or participation with a party or his privy." *Reliance Ins. Co.*, 84 F.3d at 377. To establish non-party "in concert" liability against Anderer, 4EverYoung was required to present clear and convincing evidence that Anderer was either legally identified with Derma Pen or had actual notice of the underlying order and aided and abetted Derma Pen in violating it. *Id.*; *see also Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 833 (2d Cir. 1930) (holding that non-parties may only be held in contempt if they "either abet the defendant, or [are] legally identified with him").

First, Anderer cannot be considered to be "legally identified" with Derma Pen. An individual is only legally identified with an entity if they are "'so identified in interest with those named in the decree that it would be reasonable to conclude that [their] rights and interests have been represented and adjudicated in the original injunction proceeding.'" *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 154 F.3d 1345, 1352 (Fed. Cir. 1998) (quoting 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2956, at 340-41 (2d ed. 1995)). In the present case, Anderer was not a board member, officer or manager of Derma Pen at the relevant time. Rather, he was a secured creditor of Derma Pen, with legal interests adverse to Derma Pen.

Second, Anderer cannot be considered as an aider and abettor of Derma Pen under the present circumstances. "Non-parties are subject to contempt sanctions if they act with an enjoined party to bring about a result forbidden by the injunction, but only if they are aware of the injunction and know that their acts violate the injunction." *Additive Controls*, 154 F.3d at 1353. As a result, "good faith is relevant to whether [a non-party] aided or abetted [an enjoined party] in dissipating the funds with knowledge that it was violating the court's orders." *Waffenschmidt v. MacKay*, 763 F.2d 711, 726 (5th Cir. 1985). Thus, non-parties "who act independently and whose rights have not been adjudged according to law" cannot be held liable under this exception. *Chase Nat'l Bank v. City of Norwalk*, 291 U.S.

431, 437 (1934); *see also Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1304 (Fed. Cir.

2012) ("[A] non-party to an injunction may not be held in contempt for its wholly

independent conduct."); 11A Charles Alan Wright et al., *Federal Practice and*

*Procedure* § 2956 (noting that an individual "who acts on his own behalf will not

be deemed to be included in a decree enjoining a corporation and 'its agents,

servants, employees, attorneys and all persons in active concert or participation

with any of them'" (quoting *United States v. Porhownik*, 182 F.2d 829, 832 (2d

Cir. 1950))).

In its Non-Party Contempt Order, the district court held Anderer in civil

contempt for various actions he took following the entry of the January 12 PI and

prior to the entry of the January 21 TRO. [Aplt.App.1722-23.] These acts included:

(1) preparation and filing of financing statements, (2) preparation and issuance of a

notice of sale, (3) preparation and filing of a writ of execution, (4) preparation and

filing of a Praecipe, (5) preparation and filing of a keeper's receipt, (6) issuance of

a notice of constable sale, (7) filing of a return of service for the writ of execution,

and (8) his attorney's statement in open court that he intended to go forward with

the execution sale. [Aplt.App.1722-23,1882.] Anderer took the actions in his own

behalf, in good faith, and in an effort to vindicate his rights as a secured creditor of

Derma Pen. Accordingly, these acts are insufficient to support the district court's

imposition of "in concert" civil contempt liability because Anderer acted

independently on his own behalf—and against Derma Pen—and not as an aider and abettor of a violation by Derma Pen.

Further, the district court's December 23 TRO and January 12 PI are also not sufficiently specific and definite to support civil contempt. Both orders provide that "Derma Pen, its officers, agents, servants, employees, and attorneys, and those acting in concert, with them (collectively, the "Enjoined Parties") shall not transfer the trademark and domain name." [Aplt.App.760,818.] The orders do not purport to prevent secured parties from engaging in efforts to foreclose their valid interests in the Assets pursuant to the Utah Rules of Civil Procedure, even though by that time all parties and the district court were aware that 4EverYoung had never contracted for a right to receive the Assets free and clear of all liens, and also aware that the Assets were in fact encumbered by Anderer's liens. [Aplt.App.4246-78, 4571-92.] And as noted above, any ambiguities in the district court's orders with respect to this issue must be construed in Anderer's favor.

Accordingly, both the Contempt Order and the Non-Party Contempt Order should be reversed.

## STATEMENT OF COUNSEL AS TO ORAL ARGUMENT

Anderer respectfully requests oral argument to more fully assist the Court with the specialized areas of Federal and Utah law at issue in this case, and to permit counsel to address matters of specific concern to the panel.

## CONCLUSION

For the foregoing reasons, Anderer respectfully requests the court reverse the injunctive relief orders entered by the district court, and reverse the district court's subsequent orders holding Anderer in civil contempt for violating those injunctive relief orders.

Dated this 3rd of March, 2016.

s/ Clemens A. Landau
Michael D. Zimmerman
Linda M. Jones
Clemens A. Landau
ZIMMERMAN JONES BOOHER LLC
Kearns Building, Suite 721
136 South Main Street
Salt Lake City, UT 84101
Telephone: 801-924-0200
Facsimile: 801-924-0240
ljones@zjbappeals.com
clandau@zjbappeals.com

*Attorneys for Appellant Michael E. Anderer*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

### Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,766 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in a 14-point Times New Roman font.

I certify that the information on this form is true and correct to the best of

my knowledge and belief formed after a reasonable inquiry.

DATED this 3rd day of March, 2016.

s/ Clemens A. Landau
Michael D. Zimmerman
Linda M. Jones
Clemens A. Landau
ZIMMERMAN JONES BOOHER LLC
Kearns Building, Suite 721
136 South Main Street
Salt Lake City, UT 84101
Telephone: 801-924-0200
ljones@zjbappeals.com
clandau@zjbappeals.com
*Attorneys for Appellant Michael E. Anderer*

62

**Certificate of Digital Submission**

I hereby certify that *Appellant's Opening Brief*, as submitted in digital form via this court's CM/ECF system, is an exact copy of any written document required to be filed with the Clerk and has been scanned for viruses with Microsoft Security Essentials version 1.215.46.0 (updated March 3, 2016), and, according to the program, is free of viruses. I also certify that any required privacy redactions have been made.

DATED this 3rd day of March, 2016.

s/ Clemens A. Landau
Michael D. Zimmerman
Linda M. Jones
Clemens A. Landau
ZIMMERMAN JONES BOOHER
*Attorneys for Appellant Michael E. Anderer*

63

**Certificate of Service**

I hereby certify that on the 3rd day of March, 2016, I caused the foregoing

*Appellant's Opening Brief* to be filed via the CM/ECF System, which

electronically served the following:

Mr. Douglas R. Short: douglasrshort@gmail.com
Mr. Robert Allen Brundage: robert.brundage@morganlewis.com
Ms. Carla Beth Oakley: coakley@morganlewis.com

s/ Clemens A. Landau
Michael D. Zimmerman
Linda M. Jones
Clemens A. Landau
ZIMMERMAN JONES BOOHER LLC
*Attorneys for Appellant Michael E. Anderer*

**Attachment A**

Memorandum Decision and Order Denying [581] Oral Motion for Summary Relief, filed
February 16, 2015

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DERMA PEN, LLC,<br><br>  Plaintiff,<br><br>v.<br><br>4EVERYOUNG LIMITED d/b/a DERMAPENWORLD, BIOSOFT (AUST) PTY LTD d/b/a DERMAPENWORLD, EQUIPMED INTERNATIONAL PTY LTD d/b/a DERMAPENWORLD, and STENE MARSHALL d/b/a DERMAPENWORLD,<br><br>  Defendants. | **MEMORANDUM DECISION AND ORDER DENYING [581] ORAL MOTION FOR SUMMARY RELIEF**<br><br>Case No.:  2:13-CV-00729-DN-EJF<br><br>District Judge David Nuffer<br><br>Magistrate Judge Evelyn J. Furse |
| 4EVERYOUNG LTD. And EQUIPMED INTERNATIONAL PTY. LTD.,<br><br>  Counterclaim Plaintiffs,<br><br>v.<br><br>DERMA PEN, LLC, MICHAEL E. ANDERER, JEREMY JONES, MICHAEL J. MORGAN, CHAD MILTON, MEDMETICS, LLC, a Delaware limited liability company, and JOHN DOES 1-25,<br><br>  Counterclaim Defendants. | |

At the conclusion of the presentation of 4EverYoung Limited's ("4EverYoung")

evidence in the most recent hearing[1] on several motions[2], counsel for Michael Anderer

("Anderer") moved for summary relief against 4EverYoung because 4EverYoung had failed to

---

[1] Minute Order, docket no. 583, filed February 12, 2015.

[2] Emergency Motion for Order to Show Cause Regarding Trademark and Domain Name Transfer Injunctions, docket no. 481, filed January 15, 2015; 4EverYoung's Motion for Temporary Restraining Order and Preliminary Injunction against Michael E. Anderer, docket no. 504, filed January 21, 2015; and Motion to Vacate TRO and Memorandum in Opposition to Motion for Preliminary Injunction Against Michael E. Anderer, docket no. 529, filed January 28, 2015.

present essential elements necessary to its success on the motions.[3] Argument on the limited

issues of likelihood of success on 4EverYoung's claims under the Utah Fraudulent Transfer Act

("UFTA") was held Friday, February 13, 2015.[4] Argument on the issues under the Anti-

Injunction Act, *Younger* Doctrine and the Motion for Order to Show Cause will be held Tuesday

February 17, 2015.[5]

Counsel for Mr. Anderer argued three major points on Friday February 13th which are

resolved in this order.

1.    4EverYoung Has Standing..................................................................................................... 2
2.    4EverYoung Did Not Need to Disprove Mr. Anderer's Defenses under Utah Code Ann.
      §25-6-9 ............................................................................................................................... 7
      Mr. Anderer Bears the Burden to Prove the Defense under Utah Code Ann. § 25-6-9(1) . 8
      Grants of Security Interests are Not Per Se Protected from UFTA Attack ....................... 9
      Anderer Bears the Burden to Prove the Defense Under § 25-6-9(6)(c) .......................... 10
3.    The Definition of Asset does not insulate Anderer from the UFTA claims ................... 10

## 1.   4EVERYOUNG HAS STANDING

Anderer claims that 4EverYoung lacks standing to make a UFTA claim because it is not a

creditor. "'Creditor' means a person who has a claim"[6] and "'[c]laim' means a right to payment,

whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent,

matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."[7] Because

---

[3] Oral Motion Entered on the Record on February 13, 2015, docket no. 581.

[4] Minute Order, docket no. 584, filed February 13, 2015.

[5] *Id.*

[6] Utah Code Ann. § 25-6-2(4).

[7] *Id.* § 25-6-2(3).

4EverYoung's adjudicated claim[8] is for specific performance, and not solely a claim for

payment, Anderer contends 4EverYoung cannot seek a UFTA remedy.

The UFTA "is a codification of the common law that provided a remedy against debtors

who sought to conceal their assets from creditors."[9] "Because the Fraudulent Transfer Act is

remedial in nature, it should be liberally construed."[10] Although there is no Utah case law

clarifying the definition of "right to payment," courts in other jurisdictions have defined the

phrase broadly. Alabama's Supreme Court, for example, in *Foy v. Foy*,[11] stated that "[a]nyone is

a creditor, under . . . [the AFTA], who has a right by law to demand, either presently or upon

future contingency, the fulfillment of any obligation or contract."[12] "The word 'creditors' as used

in the [AFTA] . . . does not have a narrow or technical interpretation."[13] Also, the Supreme Court

has stated in the Bankruptcy context that "[t]he plain meaning of a right to payment is nothing

more nor less than an enforceable obligation. . . ."[14] "Consistent with this definition, other courts

have held an equitable remedy will 'give rise to a right of payment' and therefore be deemed a

'claim,' when the payment of monetary damages is an alternative to the equitable remedy."[15]

---

[8] Memorandum Decision and Order Granting 4EverYoung's 241 Motion For Partial Summary Judgment on Specific Performance . . . (Specific Performance Order), docket no. 476, filed January 12, 2015.

[9] *National Loan Investors, L.P. v. Givens*, 952 P.2d 1067, 1069 (Utah 1998).

[10] *Id.*

[11] 447 So.2d 158

[12] *Id.* at 163; *see also Strategic Well-Site Materials and Logistics LLC v. Frac Master Sands LLC*, 2013 WL 1282053, *3 (Because Strategic Well–Site had an existing contract with FMS [for the purchase of silica sand], and thus a contingent claim, at the time the conveyances . . . , Strategic Well–Site is a creditor within the meaning of the AFTA.").

[13] *Id.*

[14] *F.C.C. v. NextWave Personal Communications Inc.*, 537 U.S. 293, 303 (2003). Although the United States Supreme Court was defining the "right to payment" phrase found in the Bankruptcy Code 11 U.S.C.A. § 101, this distinction is immaterial.

[15] *Rederford v. US Airways, Inc.*, 586 F. Supp. 2d 47, 52 (D.R.I. 2008) *aff'd sub nom. Rederford v. U.S. Airways, Inc.*, 589 F.3d 30 (1st Cir. 2009) *citing In Re Matter of Udell*, 18 F.3d 403, 407 (7th Cir.1994) (holding "one example of a 'claim' under the Bankruptcy Code is a right to an equitable remedy that can be satisfied by an 'alternative' right to payment"); *Air Line Pilots Ass'n v. Cont'l Airlines*, 125 F.3d 120, 135-36 (3d Cir.1997)

Utah law on specific performance provides that "where a plaintiff seeks specific performance of a contract and that relief is not available, the trial court may grant monetary damages for breach of contract."[16]

Here, 4EverYoung requests[17] (and has been ordered to receive)[18] specific performance of the parties' post-contractual obligations to purchase the Trademark and Domain Name. Although 4EverYoung has argued these are unique assets, this alone is not dispositive. If the fulfillment of the specific performance order becomes impossible (for example, through state court execution sale or other alienation of those assets), then an alternative claim for damages would go to a jury under the breach of contract cause of action. 4EverYoung's current pleading seeks damages as part of its breach of contract claim,[19] which was the foundation of the specific performance decision.

Anderer, during argument, cited to four cases supporting his view that specific performance is not considered a claim. Because of the dearth of case law in the context of the UFTA, Anderer relies on cases arising in Bankruptcy. In that context, defining a cause of action as a "claim" has the effect of discharging the claim, and ending the rights of the claimant. The pre-disposition of bankruptcy courts to avoid satellite litigation and questions about jurisdiction

---

(analogizing to reinstatement when explaining that the airline pilots' equitable remedy of seniority integration could give rise to a right to payment and thus fall within the Bankruptcy Code's definition of claim); *see also In Re The Ground Round, Inc.,* 482 F.3d 15, 20 (1st Cir.2007) (stating that because a damage claim is an alternative to a request for specific performance the definition of claim in Bankruptcy would arguably include the equitable remedy).

[16] *Richards v. Baum,* 914 P.2d 719, 721 (Utah 1996); *see also Wagner v. Anderson,* 250 P.2d 577, 580 (Utah 1952) (stating that "when decreeing specific performance, a court of equity may award damages also to the plaintiff if the decree of specific performance will not give complete relief").

[17] Third Amended Counterclaim . . . ¶¶ 146-152, docket no. 547, filed February 3, 2015.

[18] Specific Performance Order.

[19] Third Amended Counterclaim . . . ¶151.

4

over such ancillary litigation[20] favors finding equitable causes of action to not be "claims." A UFTA claim is presented, by contrast, to a court with broader jurisdiction by someone seeking protection, and obliteration of claims is not the primary function of such a court. In the bankruptcy context, courts focus on the *desirability* of an alternative monetary remedy for an equitable claim. If the monetary remedy is not a viable alternative, the claim is not discharged in bankruptcy. In the UFTA context, the analysis must be different. If a secondary alternative damages remedy were not cognizable as a remedy, then a holder of a specific performance claim could never prevent alienation of the asset. The remedial purpose of the UFTA would be defeated.

In *Kennedy v. Medicap Pharmacies, Inc.*,[21] the issue was whether "an injunction for breach of a covenant not to compete is a claim, and therefore, dischargeable in bankruptcy."[22] The debtor asserted it was and that he was free to engage in competitive behavior. In this setting a narrow view of "claim" would protect the party claiming rights under the injunction. The court stated that "[t]he right to equitable relief constitutes a claim only if it is an alternative to a right to payment or if compliance with the equitable order will itself require the payment of money."[23] The court concluded that "compliance with an injunction would not require the expenditure of money. . . . Looking at the substance of the equitable relief sought, it is clear that Medicap was not seeking the payment of money. Medicap's right to equitable relief [a non-compete injunction] does not, therefore, equate to being a claim."[24] *Kennedy* is distinguishable from the present case

---

[20] Ralph Brubaker, *A "Summary" Statutory and Constitutional Theory of Bankruptcy Judges' Core Jurisdiction After Stern v. Marshall*, 86 Am. Bankr. L.J. 121 (Winter 2012).

[21] 267 F.3d 493 (2001).

[22] *Id.* at 497.

[23] *Id.*

[24] *Id.* at 497–498. *But cf. Ohio v. Kovacs,* 469 U.S. 274, 282–83 (1985)* (holding that an injunctive order was a "claim" that was dischargeable in bankruptcy).

because 4EverYoung's specific performance claim may be alternatively satisfied with monetary damages, even though that is not 4EverYoung's preference. There was no showing in *Kennedy* that the injunction could not be fulfilled or that fulfillment required payment of money. Here, 4EverYoung's right to specific performance may be factually defeated by external circumstances, making a damages alternative necessary.

In *In re Ben Franklin Hotel Associates*,[25] another case cited by Anderer, the Third Circuit decided "whether an equitable demand for reinstatement of an interest in a partnership constitutes a 'claim' within the meaning of section 101(5)(B) of the Bankruptcy Code."[26] The Third Circuit rejected the debtor's argument that because damages and equitable relief were sought, this alone shows that monetary relief is a viable alternative remedy. The court clarified that "[t]he relevant issue . . . is not the form of relief that appellees most hoped to achieve . . . , but whether damages are an alternative BFG's proposed equitable remedy for the loss of its partnership interest."[27] The Third Circuit noted that the parties had specifically alleged that they did not have an adequate remedy at law because "their losses cannot be properly measured nor adequately compensated for by an award of monetary damages, and because their partnership interests are unique."[28] The Third Circuit held that BFG would not be in a position to calculate its damages with any sufficient degree of certainty, and therefore monetary damages were not an adequate substitute for reinstatement of its partnership interest. The decision of the court protects the holder of the equitable right by finding the equitable remedy to not be a claim.

---

[25] 186 F.3d 301 (3d 1999).

[26] *Id.* at 302.

[27] *Id.*

[28] *Id.*

Anderer's remaining two cases are also distinguishable. *Multibank 2009-1 CML-ADC Venture, LLC v. Yoshizawa*[29] held that a party had "not offered any citation to authority" that a claim for reformation of a deed and declaratory judgment was a claim under the Nevada Uniform Fraudulent Transfer Act.[30]

The last case cited by Anderer is *American Monument Foundation, LLC v. Fairbrother.*[31] American Monument Foundation ("AMF") sought to avoid its payment obligations under a Note to Fairbrother by claiming Fairbrother's assignment of the Note to a third party was a fraudulent transfer. The court held that AMF had no right to payment under the Note under which it was obligee and so had no standing under the Nevada Fraudulent Transfer Act. In *American Monument Foundation,* AMF had the obligation to pay on its promissory note. Neither Global nor Fairbrother had an obligation to AMF. Here, Derma Pen has an obligation to 4EverYoung based on the post-termination provisions of the Sales Distribution Agreement.

Anderer's argument also discounts the presence of other claims stated in the 4EverYoung's current pleading and prior pleadings. The hostile and contentious testimony about use of the Trademark, and customer interference on both sides provide some factual basis for these claims, sufficient for the "claim" definition under the UFTA.

### 2.   4EVERYOUNG DID NOT NEED TO DISPROVE MR. ANDERER'S DEFENSES UNDER UTAH CODE ANN. §25-6-9

Anderer argues that 4EverYoung's fraudulent transfer claim is defeated by the good faith transfer defenses under Utah Code Ann. § 25-6-9. Anderer states that § 25-6-9(1) is a defense to

---

[29] No. 2:10-CV-00695-LDG, 2011 WL 1100104, D. Nev. Mar. 24, 2011).

[30] *Id.* at *2.

[31] No. 2:05-CV-00019-PMPPAL, 2006 WL 3063473 (D. Nev. Oct. 24, 2006) *aff'd in part sub nom. Am. Monument Found., LLC v. Creeger,* 327 F. App'x 31 (9th Cir. 2009).

4EverYoung's fraudulent transfer claim under § 25-6-5(1) and that §§ 25-6-9(5) and (6) are

defenses to 4EverYoung's fraudulent transfer claim under § 25-6-6(2).

**Mr. Anderer Bears the Burden to Prove the Defense under Utah Code Ann. § 25-6-9(1)**

Section 25-6-9(1) states the defense of a good faith purchase for value: "A transfer or

obligation is not voidable under Subsection 25-6-5(1)(a) against a person who took in good faith

and for a reasonably equivalent value or against any subsequent transferee or obligee." Anderer

argues 4EverYoung has presented no evidence that Anderer took any of the transfers in bad faith.

However, because this is a defense, the UFTA places the burden of showing fraud upon

the creditor Anderer. Once the creditor establishes, through the presence of sufficient badges of

fraud, an inference that the debtor "made the transfer or incurred the obligation . . . with actual

intent to hinder, delay, or defraud any creditor of the debtor[,]"[32] then the burden shifts to the

transferee to come forward with rebuttable evidence that he took in good faith and for a

reasonably equivalent value.[33]

Evidence of several badges of fraud has been presented by 4EverYoung. These include

that Anderer is an insider;[34] that the debtor Derma Pen has maintained control of the Domain

Name and Trademark at all times, even after the Trademark Assignment and Confession of

Judgment;[35] that the transfer and obligation were not made known by concurrent filing of UCC-1

financing statements;[36] that there was serious conflict between Derma Pen and 4EverYoung

---

[32] Utah Code Ann. § 25-6-5(1)(a).

[33] *See Territorial Sav. & Loan Ass'n v. Baird*, 781 P.2d 452, 462 n. 18 (Utah Ct. App. 1989); *see e.g., In re M & L Bus. Mach. Co., Inc.*, 84 F.3d 1330, 1338 (10th Cir. 1996) (stating that transferee has the burden of establishing good faith under § 548(c) of the Bankruptcy Code, a section similar to that of the UFTA); *Aptix Corp. v. Quickturn Design Systems Inc.*, 148 Fed.Appx. 925, 930 (9th Cir. 2005) (stating that statute requires the transferee present evidence of transferee's good faith).

[34] Utah Code Ann. §25-6-2(a).

[35] Utah Code Ann. §25-6-2(b).

[36] Utah Code Ann. §25-6-2(c).

before the execution of the 2012 Note and Security Agreement, the 2014 Note and Security

Agreement and the Trademark Assignment and Confession of Judgment;[37] that the 2014 Note

and Security Agreement and the Trademark Assignment and Confession of Judgment were of

substantially all of Derma Pen's assets;[38] that Derma Pen declared itself insolvent by its

bankruptcy filing near the time of the 2014 Note and Security Agreement;[39] and that the 2014

Note and Security Agreement was executed shortly before the August 2014 trial and the

Trademark Assignment and Confession of Judgment were executed immediately after the

bankruptcy dismissal which renewed exposure to this litigation.[40] The burden, therefore, now

shifts to Anderer (as the transferee) to provide rebuttable evidence that he took in good faith and

for a reasonably equivalent value.

**Grants of Security Interests are Not Per Se Protected from UFTA Attack**

Anderer contends that the transfer is not voidable under Utah Code Ann. § 25-6-6, "if the

transfer results from . . . enforcement of a security interest."[41] Anderer is not absolutely insulated

from a fraudulent transfer attack simply because he holds a security interest.[42] The circular error

in Anderer's argument is similar to that discussed in Part 3 below.

---

[37] Utah Code Ann. §25-6-2(d).

[38] Utah Code Ann. §25-6-2(e).

[39] Utah Code Ann. §25-6-2(i).

[40] Utah Code Ann. §25-6-2(j).

[41] Utah Code Ann. § 25-6-9(5)(b).

[42] See Aptix, 148 Fed.Appx. at 930 ("[W]e affirm the decision of the district court voiding as a fraudulent transfer the security interest Aptix granted to Mohsen."); Matter of Holloway, 955 F.2d 1008, 1008 (5th Cir. 1992) ("Under a correct application of the law, the evidence can only support the conclusion that Allison is an insider; therefore, the transfer of the security interest is voidable as a fraudulent conveyance."); Phillips v. Phillips, No. A13-0699, 2014 WL 902683, at *1 (Minn. Ct. App. Mar. 10, 2014) (unpublished) (reversing and remanding because district court erred by failing to treat the grant of a security interest as a "transfer" under the MUFTA).

**Anderer Bears the Burden to Prove the Defense Under § 25-6-9(6)(c)**

A transfer is not voidable under § 25-6-6(2) "if made pursuant to a good-faith effort to rehabilitate the debtor and the transfer secured present value given for that purpose as well as an antecedent debt of the debtor."[43] This defense

> is new and reflects a policy judgment that an insider who has previously extended credit to a debtor should not be deterred from extending further credit to the debtor in a good faith effort to save the debtor from a forced liquidation in bankruptcy or otherwise. A similar rationale has sustained the taking of security from an insolvent debtor for an advance to enable the debtor to stave off bankruptcy and extricate itself from financial stringency. The amount of the present value given, the size of the antecedent debt secured, and the likelihood of success for the rehabilitative effort are relevant considerations in determining whether the transfer was in good faith.[44]

"A transfer is made for present value if the exchange between the debtor and the transferee is intended by them to be contemporaneous and is in fact substantially contemporaneous."[45] Furthermore, the transferee must show that the transfer was made in a good-faith attempt to rehabilitate the debtor.[46] Anderer, as the transferee claiming the defense, has the burden to show that (1) the transfer he received from the debtor was a security interest; (2) the transfer secured present value; and (3) the transfer was *made in a good-faith effort* to rehabilitate the debtor.

## 3. THE DEFINITION OF ASSET DOES NOT INSULATE ANDERER FROM THE UFTA CLAIMS

Anderer claims that the UFTA definition of asset protects his interest from attack because he holds a valid lien. Transfers subject to scrutiny under the UFTA must be of "an asset or an

---

[43] Utah Code Ann. § 25-6-9(6)(c).

[44] Unif. Fraudulent Transfer Act § 8, Comments (internal citations omitted).

[45] *Id.* § 3(c).

[46] *Prairie Lakes Health Care System, Inc. v. Wookey*, 1998 SD 99, 583 N.W.2d 405 (S.D. 1998) (holding that the "good faith effort to rehabilitate" defense was inapplicable when preferential transfer to son was made to dispose of entire real estate portfolio rather than to rehabilitate the debtor).

interest in an asset."[47] "'Asset' means property of a debtor, but does not include . . . property to the extent it is encumbered by a valid lien[.]"[48] Therefore, Anderer claims his liens are immune from UFTA attack. He asserts these liens were validated in the Bankruptcy proceeding[49] and in the State Court action.[50] Neither of those actions included claims by 4EverYoung under the UFTA. The Bankruptcy proceeding was dismissed before those claims could be asserted.

Anderer's technical compliance with the underlying legal requirements for a grant of lien under Article 9 of the Uniform Commercial Code does not insulate him from a fraudulent transfer attack. If Anderer's rationale was true, then any fraudulent transfer receiving a grant of lien would be insulated.

A similar issue was raised in an accelerated, interlocutory appeal in *Telephone Equipment Network, Inc., v. TA/Westchase Place, Ltc.*[51] There, the trial court granted a temporary injunction enjoining Telephone Equipment Network, Inc. ("TEN") "from foreclosing on and disposing of property owned by Telephone Liquidation, Inc., f/k/ a Charles Tharp, Inc. d/b/a Southwest Communications, Inc. ["Southwest"], in which TEN claim[ed] a security interest."[52] TEN argued that it had a valid lien in Southwest's assets, and therefore those assets could not be the subject of an injunction because any property encumbered by a valid lien is excluded from the definition of "asset."[53] The appellate court, rejecting TEN's argument, stated that TEN's argument is flawed as it presumes "that its security interest in Southwest's property will not be found to be voidable

---

[47] Utah Code Ann. § 25-6-2(12).

[48] *Id.* § 25-6-2(2).

[49] Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, and 363 . . . , *In re: Derma Pen, LLC.*, Case No. 14-11894 (KJC) U.S.B.C. Del. October 16, 2014), marked as Exhibit 123.

[50] Confession of Judgment, docket no. 460-1, lodged December 24, 2015.

[51] 80 S.W.3d 601 (Tex. App. 2002).

[52] *Id.* at 603.

[53] *Id.* at 608.

as part of a fraudulent transfer or obligation under UFTA."[54] The court further explained that "[t]he assignment of Sterling Bank's security interest to TEN is an integral part of the alleged fraudulent transfer of assets at issue in this suit. Particularly, the assignment of the security interest in Southwest's property was but the first step in the alleged fraudulent transfer of Southwest's assets to TEN. If Westchase ultimately prevails at trial on the merits of its UFTA claims, TEN's security interest, as part of the fraudulent transfer of assets, will be voidable."[55]

Similarly, 4EverYoung has the right to attempt to show that Anderer's security interests and documents to enforce them may be part of an alleged fraudulent transfer of assets. If 4EverYoung ultimately prevails at trial on the merits of its UFTA, then Anderer's security interest, and therefore his valid liens, would be voidable just as any other transfer under the UFTA.

## CONCLUSION

None of the arguments advanced February 13, 2015, at the end of 4EverYoung's presentation prevent further proceeding. Argument will proceed February 17, 2015 and presentation of evidence will proceed on the days thereafter.

Dated February 16, 2015.

BY THE COURT:

David Nuffer
United States District Judge

---

[54] *Id.*

[55] *Id.* at 608–609.

**Attachment B**

Memorandum Decision and Order Regarding Jurisdiction, filed February 25, 2015

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DERMA PEN, LLC,<br><br>     Plaintiff,<br><br>v.<br><br>4EVERYOUNG LIMITED d/b/a DERMAPENWORLD, BIOSOFT (AUST) PTY LTD d/b/a DERMAPENWORLD, EQUIPMED INTERNATIONAL PTY LTD d/b/a DERMAPENWORLD, and STENE MARSHALL d/b/a DERMAPENWORLD,<br><br>     Defendants. | **MEMORANDUM DECISION AND ORDER REGARDING JURISDICTION**<br><br><br><br><br><br>Case No.:  2:13-CV-00729-DN-EJF<br><br>District Judge David Nuffer<br><br>Magistrate Judge Evelyn J. Furse |
| 4EVERYOUNG LTD. And EQUIPMED INTERNATIONAL PTY. LTD.,<br><br>     Counterclaim Plaintiffs,<br><br>v.<br><br>DERMA PEN, LLC, MICHAEL E. ANDERER, JEREMY JONES, MICHAEL J. MORGAN, CHAD MILTON, MEDMETICS, LLC, a Delaware limited liability company, and JOHN DOES 1-25,<br><br>     Counterclaim Defendants. | |

Michael E. Anderer ("Anderer") opposes 4EverYoung Limited's ("4EverYoung")

Motion for Temporary Restraining Order and Preliminary Injunction against Michael E.

Anderer[1] ("Motion for Preliminary Injunction") in part based on the abstention doctrine

---

[1] 4EverYoung's Motion for Temporary Restraining Order and Preliminary Injunction against Michael E. Anderer, docket no. 504, filed January 21, 2015.

enunciated by the United States Supreme Court in *Younger v. Harris*[2], and the Anti-Injunction

Act, 28 U.S.C. § 2283.[3] 4EverYoung filed its response[4] on February 14, 2015, and Anderer filed

a reply[5] on February 16, 2015. Argument was heard February 17, 2015.[6]

BACKGROUND FACTS...........................................................................................................2
ANALYSIS............................................................................................................................5
        This Court Had Constructive Possession of the Property Prior to the State Court
              Action..........................................................................................................5
        Anti-Injunction Act........................................................................................... 10
        Younger Doctrine............................................................................................... 11
        Colorado River Doctrine..................................................................................... 15
CONCLUSION...................................................................................................................17

## BACKGROUND FACTS

This case was filed August 1, 2013,[7] and set for bifurcated two-week jury trial on August

11, 2014.[8] Derma Pen LLC ("Derma Pen") filed a Chapter 11 bankruptcy in Delaware on August

8, 2014, one business day before the scheduled jury trial.[9] The bankruptcy court dismissed the

case as not filed in good faith on December 19, 2014. Three days later, on December 22, 2014,

Anderer requested and Derma Pen executed a Confession of Judgment in favor of Anderer,

---

[2] 401 U.S. 37 (1971).

[3] Anderer's Supplemental Bench Memorandum in Opposition to Motion for Preliminary Injunction on Issue of Futility ("Anderer's Bench Memo"), docket no. 576, filed February 10, 2015.

[4] Response to Bench Memorandum in Opposition to Motion for Preliminary Injunction on Issue of Futility ( "4EY's Response"), docket no. 586, filed February 14, 2015.

[5] Anderer's Reply in Support of Supplemental Bench Memorandum in Opposition to Motion for Preliminary Injunction on Issue of Futility ("Anderer's Reply"), docket no. 587, filed February 15, 2015.

[6] Docket no. 591.

[7] Complaint, docket no. 2, filed August 1, 2013.

[8] Memorandum Decision and Order Re: Jury Trial on derma Pen, LLC's 22nd and 24th Causes of Action and Part of Defendants' 1st Counterclaim Cause of Action at 2-3, docket no. 207, filed June 24, 2014.

[9] *See In Re Derma Pen, LLC*, case no. 14-11894 (KJC), 2014 WL 7269762 (Bankr. D. Del. Dec. 19, 2014); *see also* Notice of Filing of Bankruptcy and Automatic Stay Under 11 U.S.C. § 362, docket no. 422, filed August 8, 2014.

which referenced certain debts owed by Derma Pen to Anderer.[10] That same day, Anderer filed

an action in the Third District Court, State of Utah ("State Court Action"), against Derma Pen to

obtain a judgment and levy against all of Derma Pen's assets that Derma Pen pledged to Anderer

as collateral for loans made by Anderer to Derma Pen.[11]

     On December 23, 2014, during a telephone conference with the court to discuss the

impact of the bankruptcy dismissal, counsel for Derma Pen disclosed the December 22, 2014

Confession of Judgment filed in the Third District Court of the State of Utah. Counsel for

4EverYoung requested "that the Court rule upon the motion for preliminary injunction filed by

4EverYoung, which was Document 141."[12] No objections were made by counsel for Derma

Pen.[13] At the conclusion of the telephone conference, the Court entered a Temporary Restraining

Order,[14] ordering that "Derma Pen, its officers, agents, servants, employees, and attorneys, and

those acting in concert, with them (collectively, the 'Enjoined Parties') shall not transfer the

trademark and domain name."[15]

     Based on the Confession of Judgment, the State Court, on December 24, 2014, entered

Judgment against Derma Pen and in favor of Anderer in the amount of $791,012.18.[16] On

January 12, 2015, Anderer filed an Application for Writ of Execution in the State Court,

requesting the issuance of a Writ of Execution for the levy and sale of all of Derma Pen's

---

[10] Confession of Judgment, docket no. 460-1, lodged December 24, 2014.

[11] *See Anderer v. Derma Pen, LLC*, case No. 140908635, Third Judicial District Court, Salt Lake County, Utah.

[12] December 23, 2014 Telephonic Conference Transcript at 5:2-3, docket no. 520, filed January 27, 2015.

[13] *Id.* at 23:20-23.

[14] Memorandum Decision and Order Granting in Part Defendants' Motion for Temporary Restraining Order (the "December 23, 2014 TRO") at 2–3, docket no. 451, filed December 23, 2014.

[15] *Id.* at 6, ¶ 2.

[16] Confession of Judgment, docket no. 529-17; Judgment December 24, 2014, docket no. 529-18.

assets.[17] Hearing on continuation of the restraint as a preliminary injunction in this Court was set for January 6, 2015.

In the January 6, 2015 hearing, counsel for Derma Pen stated they had no objection to continuation of restraint and a preliminary injunction was ordered against Derma Pen, its officers, agents, servants, employees, and attorneys, and those acting in concert, with them (collectively, the "Enjoined Parties"), enjoining them from transferring the DermaPen Trademark and Domain Name to anyone other than 4EverYoung. On January 12, 2015, based upon Defendants' Injunction Motion,[18] the January 6, 2015 hearing, and the pleadings and papers on file, a preliminary injunction order was filed by this Court.[19]

On January 13, 2015, the State Court Clerk issued a Writ of Execution in connection with the State Court action.[20] On January 26, 2015, 4EverYoung filed a Reply to Writ and Request for Hearing in the State Court Action ("Reply to Writ").[21] 4EverYoung, in the Reply to Writ, argued, among other things, that the Writ of Execution was wrongfully obtained and requested an evidentiary hearing.[22] Anderer, on February 4, 2015, filed his Response to 4EverYoung's Reply ("Response to Reply to Writ").[23] According to Anderer, the State Court has set a hearing on the Writ of Execution issue for March 4, 2015.[24]

---

[17] Application for Writ of Execution, docket no. 576 at 12.

[18] Defendants' Motion for Temporary Restraining Order and Preliminary Injunction and Supporting Memorandum, docket no. 141, filed May 2, 2014.

[19] Memorandum Decision and Order Granting 4EverYoung's 241 Motion for Partial Summary Judgment on Specific Performance and Granting in Part Defendants' 141 Motion for Preliminary Injunction, docket no. 476, filed January 12, 2015.

[20] Writ of Execution January 13, 2015, docket no. 529-20, filed January 28, 2015.

[21] Reply to Writ, docket no. 576, exhibit 2.

[22] Id.

[23] Response to Third Party Claimant 4EverYoung Ltd's Reply to Writ and Request for Hearing, docket no. 576, exhibit 3.

[24] Anderer's Reply at 9, n. 36.

On February 3, 2015, 4EverYoung and Equipmed International Pty. Ltd ("Equipmed") (collectively, "4EverYoung" or "Counterclaim Plaintiffs") filed claims against Anderer in this Court ("Third Amended Counterclaim").[25] 4EverYoung's Third Amended Counterclaim alleges, among other things, that "[b]y virtue of the 2012 Security Interest and 2013 Lien, Derma Pen fraudulently transferred its assets to Anderer, with the actual intent to hinder, delay, or defraud 4EverYoung."[26] And "[i]n 2014, by virtue of the 2014 Security Interest and the 2015 Lien, just prior to Derma Pen's filing of the Bankruptcy Case, and despite Derma Pen's and Anderer's knowledge of 4EverYoung's claims against Derma Pen, Derma Pen again fraudulently transferred its assets or interests in its assets to Anderer with the intent to hinder, delay, or defraud 4EverYoung."[27]

## ANALYSIS

### This Court Had Constructive Possession of the Property Prior to the State Court Action

Anderer argues that the Trademark and Domain Name are within the exclusive *in rem* jurisdiction of the State Court because he (1) filed an Application for Writ of Execution in the State Court; (2) the Writ of Execution was issued by the Third District Court Clerk; and (3) a constable levied execution on the Trademark and Domain Name.[28]

In response, among other things, 4EverYoung argues that "whether or not the state court has issued the writ, the writ does not exten[d] to property of Derma Pen that has long been the

---

[25] Second Amended Counterclaim, Third-Party Complaint, and Demand for Jury Trial, docket no. 492 and docket no. 494, filed January 21, 2015. On January 21, 2015, the Counterclaim Plaintiffs' Emergency Motion for Alternative Service was granted, docket no. 503 (Corrected Order, docket no. 507, filed January 22, 2015), and service on Anderer was effected by serving Anderer's counsel. *See also* Third Amended Counterclaim and Demand for Jury Trial, docket no. 547, filed February 3, 2015; Motion for Leave *Nunc Pro Tunc* to File Third Amended Complaint and Brief Regarding Propriety of Previous Filing of Third Amended Complaint, docket no. 569, filed February 6, 2015; Memorandum Decision and Order Granting [569] *Nunc Pro Tunc* Motion, docket no. 588, filed February 16, 2015.

[26] Third Amended Counterclaim at 46, ¶ 165.

[27] *Id.* at 46–47, ¶ 166.

[28] Anderer's Bench Memo at 5.

subject of litigation in this Court."[29] "Rather, because this action seeks to resolve the issue of the ownership of the Trademark and Domain Name, it is in the nature of an action *quasi in rem*, pursuant to which 'the court . . . has possession or must have control of the property which is the subject of the litigation in order to proceed with the cause and grant the relief sought.'"[30]

Anderer replies that this court never had *in rem* jurisdiction over the assets at issue, because the "Court never issued a prior levy or attachment against the Assets, and it still has not done so[,]" and "the defendants[31] do not hold, and never have held, any lien or security interest in the Assets."[32] Furthermore, "the Defendants only sought to adjudicate the validity of Anderer's liens when they amended their counterclaim and asserted a third-party complaint. At that time, the Assets were within the jurisdiction of the State Court."[33] Anderer also contends "it is irrelevant that this original action was filed before the State Court case, because the parties and the claims in those actions are completely different."[34] Anderer claims that Defendants are conflating their claims against Derma Pen with their claims against him:

> The action between D[erma]P[en] and 4E[ver]Y[oung] is about interpretation and enforcement of the Distribution Agreement. Anderer is not a party to that contract, and never was a party. That original action makes no mention of liens or security interests against the Assets, does not attempt to adjudicate the validity of any liens, and it does not even mention Anderer's security interests. By contrast, the State Court action is a lien enforcement and collection proceeding brought by Anderer against D[erma]P[en]. For the first time, the Third-Party Complaint attempts to challenge Anderer's liens, but that challenge was brought weeks after the State Court action was filed.[35]

---

[29] 4EY's Response at 2–3.

[30] *Id.* at 3 (quoting *Princess Lida of Thum & Taxis v. Thomas*, 305 U.S. 456, 466 (1939)).

[31] Defendants refers to the Counterclaim Plaintiffs.

[32] Anderer's Reply at 2.

[33] *Id.* at 3.

[34] *Id.*

[35] *Id.*

"To avoid unseemly and disastrous conflicts in the administration of the dual judicial system, and to protect the judicial processes of the court first assuming jurisdiction, the principle, applicable to both federal and state courts, is established that the court first assuming jurisdiction over the property may maintain and exercise that jurisdiction to the exclusion of the other."[36] In determining whether a court has assumed jurisdiction over the property in question, a court must look to the judgment sought. When the judgment sought is for the "recovery of money or for an injunction compelling or restraining action by the defendant" then "the judgment sought is strictly *in personam.*"[37] In such a case, "both a state court and a federal court having concurrent jurisdiction may proceed with the litigation, at least until judgment is obtained in one court which may be set up as res adjudicata in the other."[38] Where, however, the judgment sought requires "that the court or its officer have possession or control of the property which is the subject of the suit in order to proceed with the cause and to grant the relief sought," then the proceeding is considered *in rem* or *quasi in rem.*[39] Where "the two suits are in rem or quasi in rem . . . the jurisdiction of one court must of necessity yield to that of the other."[40] Therefore, "when the two suits have substantially the same purpose and the jurisdiction of the courts is concurrent, that one whose jurisdiction and process are first invoked by the filing of the bill [complaint] is treated as in *constructive possession of the property* and as authorized to proceed with the cause."[41] It is of no effect that another court subsequently acquires actual possession.[42]

---

[36] *Penn General  Casualty Co. v. Commonwealth of Pennsylvania ex rel. Schnader*, 294 U.S. 189, 195 (1935) (internal citations omitted).

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.* at 196.

[42] *Id.*

This test is accepted and utilized by courts faced with a conflict of jurisdiction.[43] For example, in *Farmer's Loan & Trust Company v. Lake Street Elevated Railroad Company*,[44] the Supreme Court found that a federal court action to foreclose a mortgage and a state court action brought to enjoin the foreclosure were substantially the same controversy, and held that the filing of the bill and service of process in the federal court action amounted to a constructive possession of the property. Similarly, in *Palmer v. State of Texas*[45] the Supreme Court held that a state court action brought by the state seeking the forfeiture of a corporate charter and a winding up of the company's affairs was substantially similar in purpose to a federal court action brought by a stockholder to liquidate the corporation. In that case, a state court that had appointed receivers but had not taken possession until the case was examined on appeal was held to be in constructive possession of the property and was given priority with regard to the property as against federal receivers who had taken actual possession under a subsequently filed bill.

The present litigation commenced on August 1, 2013; one aspect of relief sought by Derma Pen was declaratory judgment that 4EveryYoung has no right of first refusal to the sale of Derma Pen's Trademark and Domain Name.[46]  Predictably, 4EveryYoung counterclaimed on May 2, 2014, seeking specific performance by Derma Pen requiring the offer of sale and the sale

---

[43] *See e.g.*, *Princess Lida*, 305 U.S. at 466 ("[I]f the two suits are in rem, or quasi in rem, so that the court, or its officer, has possession or must have control of the property which is the subject of the litigation in order to proceed with the cause and grant the relief sought the jurisdiction of the one court must yield to that of the other."); *Boynton v. Moffat Tunnel Imp. Dist.*, 57 F.2d 772, 779 (10th Cir. 1932) (McDermott, J.), cert. denied, 287 U.S. 620, (1932) ("The rule that as between two actions quasi in rem the one first filed excludes the later one is subject to an important and wellsettled qualification, to wit, that the two actions shall invoke the same jurisdiction. This qualification is essential to the administration of justice; except for it, a stockholder could apply for a receiver and either indefinitely postpone relief to creditors or bondholders, or could require them to come to the court of the stockholder's selection."); *Straus v. Straus*, 987 F. Supp. 52, 53-55 (D. Mass. 1997) (same).

[44] 177 U.S. 51, 61 (1900).

[45] 212 US 118, 130-31 (1909).

[46] Complaint ¶ Q, docket no. 2, filed August 1, 2013.

of the Trademark and Domain Name to 4EveryYoung.[47] Thus, by May 2, 2014 at the latest, this court could only afford relief on the counterclaim if it had control over the Trademark and Domain Name.  Hence, this court had constructive possession of the Trademark and Domain Name by May 2, 2014. When the State Court Action was commenced months later, on December 22, 2014, one aspect of relief sought by Anderer was the sale of Derma Pen's Trademark and Domain Name to cover unpaid, collateralized debts.  For either court to award relief, it must have possession or control of the property, making both actions either *in rem* or *quasi in rem*. Further, the two suits seek the *sale* of the same Trademark and Domain Name assets. Thus, under *Penn General,* "the two suits have substantially the same purpose" and thus seek to invoke the same jurisdiction.[48]  Because this Court's jurisdiction and processes were invoked first, this Court has constructive possession of the *res* (subject matter) and is authorized to proceed with its case.[49]  Therefore, it is this Court rather than the state court that may exercise jurisdiction over the sale of the Trademark and Domain Name assets and the rights of the parties therein.

Anderer makes much of the fact that he was not a party to this action until after the state court was filed and that the commencement of the action against him should govern.  As the cases above demonstrate repeatedly, the dispositive moment occurs when the court had

---

[47] Answer to First Amended Complaint, Counterclaim, Third-Party Amended Complaint, and Demand for Jury Trial ¶ C, docket no. 139, filed May 2, 2014.

[48] *See Penn General Casualty Co.,* 294 U.S. at 196.

[49] *See id.*

jurisdiction over the *res*.[50]  The identity of the parties claiming an interest in the *res* has no

consequence.[51]  Thus the question turns on the identity of the *res*, not the identity of the parties.

### Anti-Injunction Act

Under the Anti–Injunction Act, this Court may not grant "an injunction to stay the

proceedings in a State court except as expressly authorized by Act of Congress, or where

necessary in aid of its jurisdiction, or to protect or effectuate its judgments."[52] The statute is

interpreted broadly and includes injunctions directed at the parties rather than the state court

itself.[53]

Courts have interpreted "the 'necessary in aid of' exception to § 2283 . . . as

incorporating [an] historical *in rem* exception."[54]  Specifically, the Supreme Court has

acknowledged that "where the federal court has obtained jurisdiction over the res, prior to the

state-court action" an historical exception to the Anti-Injunction Act exists.[55]

Here, this exception to the Act applies. An injunction against the State Court Action is

necessary to aid this court's jurisdiction. As discussed above, this court obtained jurisdiction

over the property at issue—specifically, the Trademark and Domain Name—prior to the filing of

the State Court Action.  Thus to protect its jurisdiction, the court may enjoin state court action.

---

[50] *See id.*

[51] *See id.* at 191-92 (noting the federal plaintiff was a shareholder, but the state plaintiff was the state attorney general); *Princess Lida*, 305 U.S. at 459 (noting filers in state court were two surviving trustees on behalf of three trustees and the filers in federal court were the beneficiaries of the trust).

[52] 28 U.S.C. § 2283.

[53] *Atlantic Coast Line R.R. Co. v. Brotherhood of Locomotive Engineers,* 398 U.S. 281, 287 (1970).

[54] *Vendo Co. v. Lektro–Vend Corp.,* 433 U.S. 623, 641 (1977); *see also In re Joint Eastern and Southern District Asbestos Litigation,* 134 F.R.D. 32, 37 (E. & S.D.N.Y. 1990) ("Courts have interpreted the 'necessary in aid of jurisdiction' exception liberally 'to prevent a state court from ... interfering with a federal court's flexibility and authority' to decide the case before it.") (*quoting Atlantic Coast Line R.R. Co.,* 398 U.S. at 295).

[55] *Id.*

**Younger Doctrine**

Federal courts have a "virtually unflagging obligation" to exercise their jurisdiction except in certain extraordinary circumstances.[56] "[E]ven in the presence of parallel state proceedings, abstention from the exercise of federal jurisdiction is the exception not the rule."[57] However, under the abstention doctrine that the Supreme Court articulated in *Younger v. Harris,*[58] "federal courts should not 'interfere with state court proceedings by granting equitable relief—such as injunctions of important state proceedings or declaratory judgments regarding constitutional issues in those proceedings—' when a state forum provides an adequate avenue for relief."[59] *Younger* is grounded in notions of comity—the idea that a state court should not, in certain circumstances, be interfered with.[60] In the present circumstance, both this action and the State Court Action require disposition of the *res*, which makes the claims *in rem* or *quasi in rem* as discussed above. "*In rem* proceedings are exceptions to the abstention doctrine."[61] Therefore, "[t]he considerations of comity and federalism as outlined in *Younger* . . . do not apply to this proceeding."[62]

Even if it were assumed that *Younger* applied, the first factor of *Younger* has not been met, and therefore, abstention is inappropriate. *Younger* holds that a federal court should abstain when (1) there is an ongoing state judicial proceeding; (2) "the state court must offer an adequate forum to hear the federal plaintiff's claims from the federal lawsuit"; and (3) "the state

---

[56] *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817 (1976).

[57] Sprint Communications v. Jacobs, ___ U.S.__, 134 S. Ct. 584, 593 (2013) (internal quotation omitted).

[58] 401 U.S. 37 (1971).

[59] *Weitzel v. Div. of Occupational & Prof'l Licensing,* 240 F.3d 871, 875 (10th Cir. 2001) (quoting *Rienhardt v. Kelly,* 164 F.3d 1296, 1302 (10th Cir. 1999)).

[60] *Younger*, 401 U.S. at 44.

[61] *Eggleston v. State of Colorado*, 588 F. Supp. 1352, 1354 (D. Colo. 1984).

[62] *Id.*

proceeding must involve important state interests, matters which traditionally look to state law for their resolution or implicate separately articulated state policies."[63] Once the three conditions are met, "*Younger* abstention is non-discretionary[.]"[64]

*There Is No Ongoing State Judicial Proceeding*

As to the first condition, Anderer contends that the State Court Action was an ongoing state proceeding when 4EverYoung filed its federal claims against him.[65] Anderer further argues that "[t]he applicable time period is when the Defendants sought to join Anderer to this action, not when this action was first filed against the other parties on wholly unrelated issues."[66] Anderer argues that the "the Supreme Court[, in *Hicks*] implicitly recognized that the relevant date is the date a party is joined to an action; it is not the date on which the action is filed."[67] "When the State Court Action was filed: (a) Anderer was not a party to this federal case; (b) there were no issues in this case addressing any liens or lien rights against the Assets; and (c) Anderer was not a party to the underlying contract, which was the subject of the lawsuit between DP and 4EY."[68] Therefore, Anderer contends, that "the case has not progressed beyond the embryonic stage as it relates to Anderer."[69]

4EverYoung contends that where "there have been proceedings of substance and the federal litigation has moved beyond the 'embryonic stage' before the state action commences,

---

[63] *Taylor v. Jaquez*, 126 F.3d 1294, 1297 (10th Cir. 1997).

[64] *Amanatullah v. Colorado Bd. of Med. Examiners*, 187 F.3d 1160, 1163 (10th Cir. 1999).

[65] Anderer's Bench Memo at 4.

[66] Anderer's Reply at 6.

[67] *Id.* at 7 (relying on *Hicks v. Miranda*, 422 U.S. 332, 349 (1975)).

[68] *Id.* at 8.

[69] *Id.*

federal courts 'do not have the discretion to abstain from exercising jurisdiction.'"[70] It cites to *For Your Eyes Alone, Inc. v. City of Columbus*[71] where the Eleventh Circuit stated that "the determination of whether a prosecution is pending is not made based on the respective commencement dates of the state and federal actions. Instead, the [Supreme] Court has ruled that federal courts are to abstain [only] if the state criminal prosecution commenced 'before any *proceeding of substance on the merits* have taken place in the federal court.'"[72] 4EverYoung argues that the "federal proceedings in this case had moved well beyond the 'embryonic stage' before Anderer commenced the State Court Action on December 22, 2014."[73] "Moreover, the parties had briefed and the Court had ruled on substantive issues regarding the merits of the case long before Anderer initiated the State Court action . . . ."[74] According to 4EverYoung, the analysis above does not change simply because Anderer was not named as a party in this case until shortly after the commencement of the State Court Action.[75] "Indeed, the claims against Anderer arise out of the same set of transactions and occurrences that have been at issue in the case since it was filed, and Anderer is an insider and until very recently was the chairman of Derma Pen, which is the party who commenced this case."[76]

---

[70] 4EY's Response at 4 (quoting *For Your Eyes Alone, Inc.* v. City of Columbus, 281 F.3d 1209, 1217 (11th Cir. 2002)); *see also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 929 (1975) (stating that state action is "ongoing" if the federal litigation is in "an embryonic stage and no contested matter has been decided"); *iMergent, Inc. v. Giani*, No. 2:06-cv-00720, 2007 WL 895128, *5 (D. Utah March 21, 2007) (unpublished) (noting that case was in "embryonic stage" where the court had "decided no contested matters")).

[71] For Your Eyes Alone, Inc., 271 F.3d at 1217 (quoting *Hicks v. Miranda*, 422 U.S. 332, 349 (1976)).

[72] 4EY's Response at 4 (emphasis added).

[73] *Id.* at 5.

[74] *Id.*

[75] *Id.*

[76] *Id.*

At the time the State Court Action was initiated, federal proceedings of substance on the merits of some of 4EverYoung's claims[77] had occurred. Specifically, proceedings of substance relating to the Trademark and Domain Name had occurred:  the court had set trial for August 11, 2014, on the issue of whether 4EverYoung could obtain specific performance of its right to purchase the Trademark and Domain Name. The court had ruled on multiple motions in limine leading up to the trial, when the court had to stay the action because of Derma Pen's bankruptcy filing.[78]  Thus, the present litigation was past the "embryonic stage" as it related to the assets in question.

The Supreme Court, in *Hicks*, held that "where state . . . proceedings are begun . . . after the federal complaint is filed but before any proceedings of substance on the merits have taken place in the federal court, the principles of *Younger v. Harris* should apply in full force."[79] *Hicks* clarified that the timing issue of the *Younger* doctrine is not the filing date of the federal action as compared to the state action nor is it the date that a party is joined, but it is the date when substantive proceedings begin. *Hicks* does not support Anderer's argument that the Court must look at the date when he became a party to the present lawsuit to determine whether any proceeding of substance had occurred, and he cited no other support for the position.

Proceedings of substance on the merits occurred in federal court before the State Action was filed, and it is of no consequence that Anderer was added as a party to this litigation later in time. *Younger* stands for the proposition that in some instances a federal court should not interfere with a substantive state judicial proceeding.[80] Here, the opposite situation exists. The

---

[77] *See, e.g.,* Memorandum Decision and Order re: Jury Trial on Derma Pen, LLC's 22nd and 24th Causes of Action and Part of Defendants' 1st Counterclaim Cause of Action, docket no. 207, filed June 24, 2014.

[78] *See* docket nos. 207–423.

[79] *Hicks,* 422 U.S. at 349.

[80] *Younger*, 401 U.S. at 43.

State Court Action threatens to dispose of property that forms the basis for this court's

substantive proceedings, the practical effect of which is to diminish the court's power to bring

this litigation, now pending for over a year and half, to a natural conclusion.

### Colorado River Doctrine[81]

Under *Colorado River Water Conservation Dist. v. United States*,[82] a federal court may

assess the appropriateness of abstention in the event of an exercise of concurrent state

jurisdiction.[83] The *Colorado River* doctrine is not an abstention doctrine in the technical sense;

rather it is a set of principles which rest on considerations of wise judicial administration.[84] The

Supreme Court has stressed, however, that the *Colorado River* exception to "the virtually

unflagging obligation of the federal courts to exercise the jurisdiction given them" is a narrow

one.[85] Only exceptional circumstances justify such a stay, and whether these circumstances exist

is determined by weighing of certain enumerated factors.[86]

If the suits are parallel, then the following factors must be considered in determining

whether *Colorado River* abstention is appropriate: (1) whether either court has assumed

jurisdiction over the property; (2) the inconvenience of the federal forum; (3) the desirability of

avoiding piecemeal litigation; (4) the order in which the courts obtained jurisdiction; (5) the

vexatious or reactive nature of either the federal or the state action; (6) whether federal law

provides a rule of decision; (7) the adequacy of the state court action to protect the federal

---

[81] Anderer, for the first time, raised the *Colorado River* Doctrine issue in his proposed Findings of Facts and Conclusions of Law. *See* [Anderer's Proposed] Findings of Fact, Conclusions of Law and Order . . . , docket no. 611, filed February 21, 2015.

[82] 424 U.S. 800 (1976).

[83] *Id.* at 817.

[84] *Id.*

[85] *Id.; see also Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 17 (1983).

[86] *Moses H. Cone*, 460 U.S. at 23–26.

plaintiff's rights; and (8) whether the party opposing abstention has engaged in impermissible forum shopping.[87]

This case and the State Court Action are parallel: both involve the same parties, similar claims, the same subject matter and, if fairly and fully litigated, the same disputed issues of fact (*i.e.*, the validity of Anderer's claims against Derma Pen and his security interest against the assets). As discussed above, this court first assumed jurisdiction over the property. The Second and Ninth Circuits have held that this factor alone is dispositive.[88] The analyses of the remaining factors also weigh against abstention. The federal forum is equally convenient to the parties as is the state forum. The desirability of avoiding piecemeal litigation weighs in favor of the federal proceeding which has been pending for over a year and a half and is well evolved. Because the state and federal cases involve identical parties and issues, the potential problem of inconsistent judgments may be obviated through res judicata if one court renders judgment before the other. As mentioned above, this court was first to obtain jurisdiction over the assets through constructive possession.

The record indicates that the State Court Action is vexatious. Mr. Anderer was an insider at Derma Pen and was keenly aware of this litigation and the trial set in August of 2014. As trial approached, this court granted 4EverYoung's Motion for Summary Judgment on Derma Pen's claim for rescission of the contract that obligated Derma Pen to offer for sell the Trademark and

---

[87] *Id.*

[88] *F.D.I.C. v. Four Star Holding Co.*, 178 F.3d 97, 102 (2d Cir. 1999) ("[T]he first prong of the *Colorado River* analysis is dispositive[.]) (citing *Princess Lida of Thurn and Taxis v. Thompson*, 305 U.S. 456, 466 (1939) ("[I]f the two suits are *in rem*, or *quasi in rem*, so that the court, or its officer, has possession or must have control of the property which is the subject of the litigation in order to proceed with the cause and grant the relief sought the jurisdiction of the one court must yield to that of the other.")); *40235 Washington St. Corp. v. Lusardi*, 976 F.2d 587, 589 (9th Cir.1992) (per curiam) (in an *in rem* or *quasi in rem* action, "the first prong of the *Colorado River* abstention test is dispositive. In proceedings *in rem* or *quasi in rem*, the forum first assuming custody of the property at issue has exclusive jurisdiction to proceed.").

the Domain Name to 4EverYoung.  On the eve of trial on specific performance of Derma Pen's obligation, Derma Pen filed for bankruptcy.  The bankruptcy court dismissed the case for having not been filed in good faith.  Immediately, Anderer took steps to attempt to prevent this court from adjudicating the parties' contractual obligations. On these facts, the State Court Action is vexatious.

However, federal law does not provide the rule of decision, and 4EverYoung has not suggested that the state court action is inadequate to protect its rights. But 4EverYoung has not engaged in any impermissible forum shopping. In balancing the factors as applied to this case, the balance weighs heavily in favor of this court's exercise of jurisdiction.

## CONCLUSION

Because this action falls within an exception to the Anti-Injunction Act and because the *Younger* and *Colorado River* doctrines do not apply, this court need not abstain from further action and may restrain Anderer from taking specified actions in the State Court Action.

Dated February 25, 2015.

BY THE COURT:

David Nuffer
United States District Judge

17

**Attachment C**

CORRECTED Memorandum Decision and Order Granting in Part 4EverYoung's Motion for Preliminary Injunction Against Michael E. Anderer; Denying Michael Anderer's Motion to Vacate, filed January 26, 2015

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DERMA PEN, LLC,<br><br>Plaintiff,<br><br>v.<br><br>4EVERYOUNG LIMITED d/b/a DERMAPENWORLD, BIOSOFT (AUST) PTY LTD d/b/a DERMAPENWORLD, EQUIPMED INTERNATIONAL PTY LTD d/b/a DERMAPENWORLD, and STENE MARSHALL d/b/a DERMAPENWORLD,<br><br>Defendants. | CORRECTED[*] MEMORANDUM DECISION AND ORDER GRANTING IN PART 4EVERYOUNG'S MOTION FOR PRELIMINARY INJUNCTION AGAINST MICHAEL E. ANDERER; DENYING MICHAEL ANDERER'S MOTION TO VACATE<br><br><br><br>Case No.:  2:13-CV-00729-DN-EJF<br><br>District Judge David Nuffer<br><br>Magistrate Judge Evelyn J. Furse |
| 4EVERYOUNG LTD. and EQUIPMED INTERNATIONAL PTY. LTD.,<br><br>Counterclaim Plaintiffs,<br><br>v.<br><br>DERMA PEN, LLC, MICHAEL E. ANDERER, JEREMY JONES, MICHAEL J. MORGAN, CHAD MILTON, MEDMETICS, LLC, a Delaware limited liability company, and JOHN DOES 1-25,<br><br>Counterclaim Defendants. | |

---

[*] This order was filed as docket no. 630 on February 25, 2015.  It is corrected and amended after a telephone conference with all counsel on February 26, 2015.  The correction adds four words in paragraph (c) of the Order and the amendment changes the date in paragraph (e) of the Order, all on the last page.

This order resolves issues in 4EverYoung Limited's ("4EverYoung") Motion for

Temporary Restraining Order and Preliminary Injunction against Michael E. Anderer[1] ("Motion

for Preliminary Injunction") and Michael E. Anderer's Motion to Vacate TRO and Memorandum

in Opposition to Motion for Preliminary Injunction Against Michael E. Anderer ("Motion to

Vacate")[2]. Counsel have been extraordinarily diligent and cooperative in working through an

arduous schedule, often on short notice. Hearings related to these motions were held on the

following dates:

      January 29, 2015[3]
      February 4, 2015[4]
      February 9, 2015[5]
      February 11, 2015[6]
      February 12, 2015[7]
      February 18, 2015[8]
      February 19, 2015[9]
      February 23, 2015[10]

      Testimony was received from John Udy, Stene Marshall, Michael Morgan, Jeremy Jones,

Casey Isom, Katie Allen, and Michael Anderer. Deposition testimony was admitted for Michael

Anderer[11] and Elliott Milstein.[12] Over 100 exhibits were received.

---

[1] Docket no. 504, filed January 21, 2015.

[2] Docket no. 529, filed January 28, 2015.

[3] January 29, 2015 Preliminary Injunction Hearing Transcript, docket no. 600, filed February 19, 2015; Minute Order, docket no. 533, filed January 29, 2015.

[4] February 4, 2015 Preliminary Injunction Hearing Transcript, docket no. 604, filed February 20, 2015; Minute Order, docket no. 563, filed February 4, 2015.

[5] February 9, 2015 Preliminary Injunction Hearing Transcript, docket no. 596, filed February 19, 2015; Minute Order, docket no. 573, filed February 9, 2015.

[6] February 11, 2015 Preliminary Injunction Hearing Transcript, docket no. 607, filed February 20, 2015; Minute Order, docket no. 579, filed February 11, 2015.

[7] February 12, 2015 Preliminary Injunction Hearing Transcript, docket no. 597, filed February 19, 2015; Minute Order, docket no. 583, filed February 12, 2015.

[8] February 18, 2015 Preliminary Injunction Hearing Transcript, docket no. 605, filed February 20, 2015; Minute Order, docket no. 593, filed February 18, 2015.

[9] February 19, 2015 Preliminary Injunction Hearing Transcript, docket no. 602, filed February 20, 2015; Minute Order, docket no. 595, filed February 19, 2015.

[10] Minute Order, docket no. 617, filed February 23, 2015.

Orders relating to this motion were previously entered.[13] In preparation for final argument on the motion, the parties submitted proposed findings of fact and conclusions of law[14] which have been very valuable in focusing issues.

This motion deals with the emerging stages of the latest battle related to 4EverYoung's contractual right to purchase a trademark and domain name from Derma Pen. This order determines that 4EverYoung is entitled to a preliminary injunction to restrain Michael Anderer, a former board member, current member, person of major influence, and sole contributor of funds in Derma Pen from taking extra-judicial and state judicial action to defeat a principal object of this litigation.

The litigation scenario is complex. This case has been pending about 18 months. But it has been to the Tenth Circuit twice[15] and was suspended from August to December 2014 because Derma Pen filed bankruptcy in Delaware.[16] That bankruptcy was dismissed as not being filed in good faith but as a litigation tactic.[17] Most recently, the Trademark and Domain Name are subject of a public UCC sale by Anderer and part of Anderer's pending execution levy on all of Derma Pen's assets in Utah State Court.

---

[11] Ex. 56.

[12] Ex. 57.

[13] Order Granting 4EverYoung's Motion for Temporary Restraining Order Against Michael E. Anderer and Taking Under Advisement Motion for Preliminary Injunction, docket no. 505, filed January 21, 2015; Docket Text Order Directing Parties to Exchange Documents, docket no. 506, filed January 22, 2015; Docket Text Order Directing Parties to Exchange Exhibits, docket no. 516, filed January 26, 2015; Docket Text Order Extending TRO, docket no. 556, filed February 4, 2015; Memorandum Decision and Order Denying [581] Oral Motion for Summary Relief, docket no. 589, filed February 16, 2015.

[14] [Anderer's Proposed] Findings of Fact, Conclusions of Law and Order . . . , docket no. 611, filed February 21, 2015; [4EverYoung's Proposed] Findings of Fact, Conclusions of Law, and Order . . . , docket no. 612, filed February 21, 2015.

[15] *Derma Pen LLC v. 4EverYoung Limited*, No. 13-4176 (10th Cir. May 8, 2014), docket no. 150, filed May 8, 2014; *Derma Pen LLC v. 4EverYoung Limited*, 773 F.3d 1117 (10th Cir. 2014), docket no. 466, filed December 31, 2014.

[16] Petition, docket no. 1, *In Re Derma Pen, LLC*, case no. 14-11894 (KJC), 2014 WL 7269762 (Bankr. D. Del. Dec. 19, 2014); Ex. 21.

[17] Memorandum at 17, docket number 273, *In Re Derma Pen, LLC*, case no. 14-11894 (KJC), 2014 WL 7269762 (Bankr. D. Del. Dec. 19, 2014), Ex. 125.

FINDINGS OF FACT .......................................................................................................... 5
    The Parties ................................................................................................................... 5
        4EverYoung ......................................................................................................... 5
        Marshall ............................................................................................................... 5
        Anderer ................................................................................................................ 5
        Saunders .............................................................................................................. 6
        MedMetics ........................................................................................................... 6
        S2 Partners V ...................................................................................................... 7
        Derma Gen ........................................................................................................... 7
        Jones .................................................................................................................... 7
        Morgan ................................................................................................................. 8
    The Sales Distribution Agreement ............................................................................. 8
    Anderer's 2011 and 2012 Loans .............................................................................. 12
    Derma Pen's Termination of the Sales Distribution Agreement ............................. 17
    Derma Pen and Anderer's Strategy to Avoid the Transfer Provisions in the Sales
        Distribution Agreement ....................................................................................... 18
    Derma Pen Files this Lawsuit ................................................................................... 20
    Anderer's Knowledge of and Participation in this Action and Related Proceedings ....... 21
    Anderer's Threats of Prolonged Litigation .............................................................. 22
    Derma Pen's Claims Against 4EverYoung ............................................................... 23
    Bifurcation and Stay ................................................................................................. 24
    Anderer's 2014 Advances ......................................................................................... 24
    Derma Pen's Bankruptcy Petition ............................................................................ 27
    Debtor In Possession (DIP) Financing ..................................................................... 28
    Dismissal of Derma Pen's Bankruptcy Petition ....................................................... 30
    The Confession of Judgment .................................................................................... 31
    The Trademark Assignment ...................................................................................... 33
    Revival of this Litigation .......................................................................................... 34
    The December 23, 2014 TRO .................................................................................... 35
    Withdrawal of Counsel for Derma Pen ..................................................................... 37
    The Specific Performance Defenses Order ............................................................... 38
    The Specific Performance Order ............................................................................... 38
    The January 6, 2015 Preliminary Injunction ............................................................ 40
    The January 9, 2015 UCC Filing .............................................................................. 41
    The Notice of UCC Sale ............................................................................................ 41
    The Writ of Execution ............................................................................................... 41
    Adding Anderer as a Party ........................................................................................ 42
    The January 21, 2015 TRO ........................................................................................ 43
DISCUSSION ................................................................................................................... 45
    Standard Applicable to Motion for Preliminary Injunction ...................................... 45
    Irreparable Harm ....................................................................................................... 45
    Balance of Harms ...................................................................................................... 47
    Public Interest ........................................................................................................... 47
    Likelihood of Success on UFTA Claims ................................................................... 47
        2012 Documents ................................................................................................ 49
        2014 Documents ................................................................................................ 49

4

Confession of Judgment and the Trademark Assignment ................................. 53
Debtor-In-Possession Financing Lien ................................................................. 57
Summary ............................................................................................................. 57
Other Issues Related to Likelihood of Success ....................................................... 57
Party Status and Service ....................................................................................... 57
Narrow Issues under the UFTA ........................................................................... 58
4EverYoung's Claims Were Not Concluded in Derma Pen's Bankruptcy .......... 59
The Sales Distribution Agreement Does Not Call for a Transfer in Gross ......... 59
Amount of Bond ......................................................................................................... 61
ORDER ............................................................................................................................. 63

# FINDINGS OF FACT[18]

## The Parties

**4EverYoung**

4EverYoung LTD ("4EverYoung") is a private limited liability company organized under

United Kingdom law, with its principal place of business in London.[19]

**Marshall**

Stene Marshall ("Marshall") is a resident of Australia who has interests in various

companies doing business in the United States[20] and is a principal in 4EverYoung.

**Anderer**

"Anderer is a member and owner of approximately 26% of Derma Pen, LLC ("Derma

Pen") and, up until approximately August 1, 2014, he was the chairman of the Derma Pen's

board."[21]  Anderer described himself as an "investor" in Derma Pen.[22] Anderer typically works

---

[18] In the event fact statements are contained in other sections of this order they are also findings of fact. Findings of fact and conclusions of law in a preliminary injunction ruling are not binding at the trial on the merits. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

[19] First Amended Counterclaim ¶ 1, docket no. 215, filed June 26, 2014; Plaintiff's Answer to Defendants' First Amended Counterclaim ¶ 1, docket no. 233, filed July 3, 2014.

[20] February 9, 2015 Preliminary Injunction Hearing Transcript at 16:3-8, docket no. 596.

[21] *See* Anderer Dep. at 42-43, Ex.56; January 21, 2015 TRO at 4 ¶ 8, docket no. 505.

[22] *See* Anderer Dep. at 18, 19, 20, Ex. 56.

through entities some of which he calls "incubators."[23]  His entities include, among others, S2, Derma Gen, and Tensor Cloud Solutions.[24]

**Saunders**

Samuel Saunders ("Saunders") is Anderer's attorney-in-fact, proxy, and counsel across Anderer's various entities, including MedMetics, LLC ("MedMetics").[25]  Saunders makes the decisions with respect to Anderer's business transactions.[26]

**MedMetics**

Anderer is the sole owner of MedMetics,[27] which was set up by Saunders, Erik Felsted ("Felsted"), or Baker Donelson.[28]

MedMetics products include or will include micro-needling devices.[29]  Anderer formed MedMetics because he wanted to develop products that would not be tied up by this litigation.[30]  Anderer described MedMetics as "a construct on paper" and "an accounting piece" with no employees.[31]  While Anderer denied any license agreement between Derma Pen and MedMetics,[32] Derma Pen's counsel of record in this case, Samuel F. Miller ("Miller"), claimed that there was such a license.[33]

---

[23] *See id.*

[24] *See id.* at 11-12.

[25] *See id.* at 12, 144-45; *see also* Milstein Dep. at 68:12-69:18, Ex. 57.

[26] *See* Anderer Dep. at 70-71, 145, 149, 151.

[27] *See* AMS Board Meeting Minutes at 52:11-15, dated December 2, 2014, Ex. 66; *see also* February 11, 2015 Preliminary Injunction Hearing Transcript at 20:4-5, docket no. 607.

[28] *See* Anderer Dep. at 172, 173, 197.

[29] *See id.* at 175.

[30] *See id.* at 173-74.

[31] *See id.* at 183-84.

[32] *See id.* at 198.

[33] Ex. 56.

MedMetics partnered with Biopelle, Inc. ("Biopelle"), a Canadian company, to form Advanced Microneedling Systems ("AMS") to sell the MDerma micro-needling device.[34]

**S2 Partners V**

S2 Partners V, LLC ("S2 Partners V") is another single-member entity owned 100% by Anderer.[35]  Anderer describes S2 Partners V as "just a container" without any operations or obligations.[36]

**Derma Gen**

Derma Gen, LLC ("Derma Gen") is another single-member entity owned 100% by Anderer.[37]  Derma Gen has no operating agreement, no employees, and was set up by Baker Donelson.[38]  Derma Gen loaned Derma Pen employees money during Derma Pen's bankruptcy.[39]  Those loan documents were drafted by Saunders.[40]  Derma Gen's subsidiary companies were set up during Derma Pen's bankruptcy proceeding.[41]

Derma Gen has a website with Dermapen-branded products identified.[42]

**Jones**

Jeremy Jones ("Jones") is the former COO and CEO of Derma Pen.[43]  Jones performs tasks for MedMetics and has a MedMetics e-mail account.[44]

---

[34] *See* Press Release, dated July 22, 2014, Ex.20; *see also* February 11, 2015 Preliminary Injunction Hearing Transcript at 6:13-14, docket no. 607.

[35] *See* Anderer Dep. at 117-18.

[36] *See id.* at 118-20.

[37] *See id.* at 152.

[38] *See id.* at 154-55, 188.

[39] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 156:10-20, docket no. 597; *see also* Anderer Dep. at 168.

[40] *See* Anderer Dep. at 168.

[41] *See id.* at 160-61.

[42] *See* Derma Gen Website, Ex. 88; *see also* February 11, 2015 Preliminary Injunction Hearing Transcript at 16:15-17:4, docket no. 607.

[43] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 155:7-156:3, docket no. 597.

**Morgan**

Michael Morgan ("Morgan") claims to be the former CEO of Derma Pen,[45] although in a December 2, 2014 AMS board meeting he claimed not to have resigned.[46]  Morgan also has a MedMetics e-mail account (as does Chad Milton ("Milton"), Derma Pen's President).[47]

**The Sales Distribution Agreement**

During the Summer of 2011, business discussions were held between Morgan and Marshall about a distribution agreement for the sale of micro-needling devices, then known as Epens (the "Device"),[48] and the related disposable micro-needled tips ("Tips") for the Device, throughout the United States of America ("USA").[49]

Marshall was the owner, either directly or indirectly, of 4EverYoung, an Australian company, which purportedly had the ability to grant Morgan's company, Derma Pen, LLC ("Derma Pen"), the exclusive right to sell the Device and related Tips in the USA and elsewhere.[50]

At the time, Morgan knew Anderer who was then, and had been, a successful inventor and investor in a variety of technology based start-up ventures, and with whom Morgan had had a prior business and personal relationship.[51]

Anderer's business model was to lend money to entrepreneurs with promising ideas or products.  He favored businesses that had reliable or recurring revenue streams.  This model

---

[44] *See id.* at 156:22-157:6; *see also* E-Mail Jones to Milstein, dated August 19, 2014, Ex. 48.

[45] *See* February 11, 2015 Preliminary Injunction Hearing Transcript at 5:13-6:1, docket no. 607.

[46] *See* AMS Board Meeting Minutes at 26:4-7, dated December 2, 2014, Ex. 66.

[47] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 158:20-25, docket no. 597.

[48] February 9, 2015 Preliminary Injunction Hearing Transcript at 71:13-25, 78:1.

[49] February 12, 2015 Preliminary Injunction Hearing Transcript a 104-105.

[50] January 6, 2015 Preliminary Injunction Hearing Transcript at 83:19-21; *see also* Ex. 1.

[51] February 11, 2015 Preliminary Injunction Hearing Transcript at 33:11-25, 34:1-10, 35:19-25, 36:1-5.

involved making loans to the businesses, secured with all of the assets, providing favorable

lending rates and terms, taking a minority interest in the company's equity and providing

mentoring and access to professional services to the entrepreneurs, with the owners to retain

control of the managerial and operational aspects of the business.[52]

     Morgan approached Anderer to inquire about whether Anderer was interested in

providing funds to Derma Pen so that Derma Pen could enter into a distribution agreement with

4EverYoung and begin purchasing Devices from 4EverYoung for resale.[53]

     Anderer initially met with Morgan and Morgan's business partner, Milton, to discuss the

proposed venture.[54]

     Anderer was interested in providing funding and mentoring for the project so long as (i)

the financial projections were based on a renewable revenue model, sometimes referred to as a

"razor and blades" program, where the company would receive ongoing recurring revenues from

sales of the Tips to the owners of the Devices, (ii) 4EverYoung had worldwide patents on the

Device and Tips and (iii) 4EverYoung had the ability to grant protectable exclusivity to Derma

Pen within the USA with regard to the Device and Tips.[55]

     Anderer contacted a renowned local physician and an experienced esthetician, who

confirmed, to Anderer's satisfaction, that the Device and Tips actually performed as represented

when used by an experienced physician or technician.[56]

     Morgan then arranged for a meeting between Anderer and Marshall which occurred

during the summer of 2011.[57] During this meeting, Morgan presented Anderer to Marshall as

---

[52] February 19, 2015 Preliminary Injunction Hearing Transcript at 6:5-7:9.

[53] *Id.* 12:24-13:23, 14-15.

[54] *Id.* 12:24-13:23.

[55] *Id.* 14:15-15:12, 46:15-25, 65:22-66:4.

[56] February 19, 2015 Preliminary Injunction Hearing Transcript at 15:17-16:1

Derma Pen's potential investor who would provide Derma Pen with funding for the business.[58]

During this meeting, Marshall "pitched" the program to Anderer and represented to him that

4EverYoung had worldwide patents on the Device and Tips and could grant and protect Derma

Pen's exclusive right to sell the same in the USA.  Marshall knew that Anderer was interested in

the patents and the exclusivity as a condition of supporting the project.[59]

In anticipation of entering into an agreement with Marshall, Morgan caused Derma Pen

to create and register the trademark DERMAPEN® (the "Trademark") in the USA.  He also

created a URL named www.dermapen.com (the "Domain Name").[60]

Simultaneously, Morgan and Marshall were working on a form of a distribution

agreement ("Sales Distribution Agreement") that Marshall drafted and had presented to Morgan

for review. On behalf of 4EverYoung, Marshall was the negotiator and drafter of the contract.[61]

Anderer was involved in the negotiations regarding the Sales Distribution Agreement,

and was well aware of the key provisions, including the post-termination transfer obligations in

that agreement.[62]

Internal discussion between Anderer, Morgan and Milton included the post-termination

transfer obligations and asked the question "WE NEED TO ASK OURSELVES . . . IF THE

TRADEMARK CLAUSE IS A DEAL KILLER."[63]

---

[57] February 12, 2015 Preliminary Injunction Hearing Transcript at 44-45.

[58] *Id.*

[59] February 12, 2015 Preliminary Injunction Hearing Transcript 44:18-45:3, 101-105; February 19, 2015 Preliminary Injunction Hearing Transcript 16:2-17:24.

[60] February 9, 2015 Preliminary Injunction Hearing Transcript at 72:11-24; February 12, 2015 Preliminary Injunction Hearing Transcript at 53-54.

[61] February 9, 2015 Preliminary Injunction Hearing Transcript at 116:11-17, 126:2-8.

[62] *See* Email Chad Milton to Mike Morgan and Mike Anderer, July 18, 2011, Ex. 67; Instant Messages, dated July 5, 2011, Ex. 77; Order Granting 4EverYoung's Motion for Temporary Restraining Order Against Michael E. Anderer ("January 21, 2015 TRO") at 4 ¶ 9, docket no. 505, entered January 21, 2015.

Derma Pen and 4EverYoung are parties to the Sales Distribution Agreement, which was signed on or about August 1, 2011[64] and had a term of two years.[65]

Under Sections 12.2 and 14.6 of the Sales Distribution Agreement (collectively, the "Transfer Provisions"), upon termination, Derma Pen must offer the Trademark and Domain Name to 4EverYoung for purchase and each party was required to appoint an independent auditor.[66] "If no agreement on price is reached, valuation must occur."[67]

Jones testified that if the Sales Distribution Agreement was valid, Derma Pen understands that 4EverYoung is entitled to a valuation and opportunity to buy the U.S. Trademark and the Domain Name.[68]

The Sales Distribution Agreement acknowledged that Derma Pen was the owner of the Trademark and Domain Name and had the exclusive right to use the Trademark and Domain Name and to distribute the Devices and Tips in the USA.[69] The Sales Distribution Agreement provided that 4EverYoung had the right to sell the Device and Tips worldwide, except in the USA,[70] but it did not grant 4EverYoung a license to use the Trademark and Domain Name. The agreement also did not prohibit 4EverYoung from registering the Trademark in countries other

---

[63] Email from Chad Milton to Mike Morgan and Mike Anderer, July 18, 2011, Ex. 67. The "Trademark Clause" referred to here is Sections 12.2 and 14.6 of the Sales Distribution Agreement, which required Derma Pen to offer for sale the Trademark and Domain Name to 4EverYoung upon termination of the Sales Distribution Agreement.

[64] *See* Sales Distribution Agreement at 18, Ex. 1; *see also* January 21, 2015 TRO at 2 ¶ ("4EverYoung and Derma Pen are parties to the Sales Distribution Agreement." (footnote omitted)), docket no. 505.

[65] *See* Sales Distribution Agreement § 11.1 (Term), Ex. 1; January 21, 2015 TRO at 2-3 ¶ 2, docket no. 505.

[66] *See* Sales Distribution Agreement §§ 12.2, 14.6, Ex. 1; *see also* Memorandum Decision and Order Granting 4EverYoung's 241 Motion for Partial Summary Judgment on Specific Performance and Granting in Part Defendants' 141 Motion for Preliminary Injunction ("Specific Performance Order") at 8, docket no. 476.

[67] Specific Performance Order at 10, docket no. 476; *see also* Sales Distribution Agreement §§ 12.2, 14.6, Ex. 1.

[68] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 158:15-19, docket no. 597.

[69] Ex. 1 at §§ 12.1, 14.6.

[70] Ex. 1 at §§ 2.1, 2.2.

than the USA.[71] Finally, the Sales Distribution Agreement did not contain any negative

covenants limiting or restricting, in any way, or at any time, Derma Pen's right to borrow money

and pledge the Trademark and Domain Name to secure those loans.[72]

The Sales Distribution Agreement also did not allow 4EverYoung to purchase any

property of Derma Pen except the Trademark and Domain Name, and Marshall acknowledged

that 4EverYoung had no right to purchase any other assets of Derma Pen, including Derma Pen's

goodwill.[73]

### Anderer's 2011 and 2012 Loans

On June 27, 2011, Anderer gave a personal check of $10,000 to Derma Pen.[74]

Subsequently, on July 22, 2011, Anderer gave a second personal check to Derma Pen of $60,000.

This sum enabled Derma Pen to begin purchasing the Devices and Tips from 4EverYoung.  The

memo sections of both checks designated the money as "loan."[75]

Initially, Anderer's funds given to Derma Pen were booked on Derma Pen's QuickBooks

debt ledgers as "capital contributions."  This designation was selected by Derma Pen's

bookkeeper as a "placeholder" to record the loan transactions until the loans could be

documented.[76]

---

[71] Ex. 1.

[72] Ex. 1; February 9, 2015 Preliminary Injunction Hearing Transcript at 118:11-18.

[73] February 9, 2015 Preliminary Injunction Hearing Transcript at 120:24-121:20, 229:1-24.

[74] February 12, 2015 Preliminary Injunction Hearing Transcript at 164:1-10, 165:6-167:13; February 19, 2015 Preliminary Injunction Hearing Transcript at 13:19-14:22.

[75] Exs. 147, 158; February 11, 2015 Preliminary Injunction Hearing Transcript at 71:1-10; February 12, 2015 Preliminary Injunction Hearing Transcript at 162-63, 164:1-10, 165:6-167:13, 226-28, 231.

[76] February 12, 2015 Preliminary Injunction Hearing Transcript at 229:19-230:8.

Between June 2011 and March 1, 2012, Anderer continued to advance money to Derma Pen.  An accounting of the credits (advances) and debits (loan repayments) of these loans is shown by Exhibits 147 and 148.[77]

On February 27, 2012, in an email regarding trademarks and marketing areas, Anderer stated he was going to review the "deal we have with Stene [Marshall] for the DermaPen brand" because "it will affect what we do with potential acquirers."[78] Just days later, on March 1, 2012, Note 1 and the 2012 SA were signed to document and secure advances previously made without a note and without security.

On March 1, 2012, Derma Pen executed a Secured Promissory Note ("Note 1") to Anderer in the amount of $200,000 to memorialize the Note 1 loans.[79] In addition, on the same day, Derma Pen signed a Security Agreement (the "2012 SA") in favor of Anderer that granted Anderer a security interest in the Trademark and Domain Name and Derma Pen's other property, including the proceeds therefrom, whether now owned or hereafter acquired" to secure Note 1.[80] Note 1 also was guaranteed personally by Morgan and Milton up to a total of $27,500 each.[81] Note 1 and the 2012 SA were signed to document and secure advances previously made without a note and without security.[82]

---

[77] Ex. 147 referenced in February 12, 2015 Preliminary Injunction Hearing Transcript 171, 234, 226-30, 255; Ex. 151 referenced in February 12, 2015 Preliminary Injunction Hearing Transcript at 162-68, 181-84, 231.

[78] Email from Mike Anderer to Mike Morgan, February 27, 2012, 10:01 p.m., Ex. 81 at 3.

[79] Exs. 9 and 10.

[80] Ex. 10.

[81] Ex. 11.

[82] Exs. 9 and 10.

13

On February 20, 2013, UCC-1 financing statements (the "2013 FS") were filed by Anderer in the appropriate public records offices in Utah and Delaware to perfect Anderer's security interests against Derma Pen's assets.[83]

Between September 20, 2012 and December 31, 2013, Anderer gave Derma Pen an additional $100,000. Derma Pen's books treated the advances as "Note 2."[84]

Most of the loan proceeds from Note 1 and Note 2 were used by Derma Pen to purchase Devices and Tips from 4EverYoung.[85]

Between June 25, 2011 and December 21, 2012, Anderer or his entities provided Derma Pen with $280,000.[86]  Only $255,000 of that amount was provided by Anderer directly.[87] There was no negotiation on the terms of those loans.[88] Anderer left it to Derma Pen to keep track of his loans.[89]

Note 1 and the funds identified as Note 2 were paid off, either by payment in full (Anderer received $299,108.09)[90] or by rolling into a subsequent note.[91]

Anderer agrees that his current efforts to foreclose on the assets of Derma Pen are not in collection of amounts owing under Note 1.[92]

---

[83] Exs. 12, 13.

[84] Ex. 148

[85] February 12, 2015 Preliminary Injunction Hearing Transcript at 94:5-25, 244:10-25, 333:16-25; February 19, 2015 Preliminary Injunction Hearing Transcript at 23:7-11.

[86] *See* Derma Pen Bank Statements at 1, 3, 5, Ex. 151; *see also* Derma Pen Bank Statements at 2, 4, 5, Ex. 63J; February 12, 2015 Preliminary Injunction Hearing Transcript at 164:22-175:8, docket no. 597.

[87] *See* Derma Pen Bank Statements at 1, 3, 5, 26, Ex. 151; *see also* Derma Pen Bank Statements at 2, 4, 5, Ex. 63J.

[88] *See* Anderer Dep. at 81.

[89] *See id.* at 103-04.

[90] *See* Derma Pen Bank Statements at 17, 38, 45, 53, 63, 66, 73, Ex. 151; *see also* Derma Pen Bank Statements at 1, 2, Ex. 63A; February 12, 2015 Preliminary Injunction Hearing Transcript at 179:18-187:5 docket no. 597.

[91] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 325:11-13, 336:12-14, docket no. 597; *see also* Anderer Dep. at 97.

[92] February 23, 2015, Preliminary Injunction Hearing Transcript at ___:___, docket no. ____, filed _____ _____, 2015.

In the spring of 2012, Derma Pen's management and Anderer asked Marshall to provide the proof of worldwide patents protecting the Device. Marshall advised Derma Pen that he had been mistaken about the extent of 4EverYoung's patent protection, and, in fact, the patent on the Device was held by SunWoo, the manufacturer, and was only effective in South Korea.[93]

Anderer then visited Marshall at 4EverYoung's offices in Australia to see if there was a way to fix the lack of sufficient patent protection.  He also wanted to personally evaluate Marshall's operations.  During this visit, he became "alarmed" by what he saw and learned, and no resolution was reached.[94]

Anderer and Derma Pen's management claim they first became aware at about this same time of 4EverYoung's worldwide rights under the Sales Distribution Agreement and of 4EverYoung's use of the Trademark outside the USA, also permitted under the Sales Distribution Agreement.[95]

They also learned that 4EverYoung was using materials from the Domain Name on 4EverYoung's website entitled www.dermapenworld.com.[96]  This use concerned Derma Pen's management because of the brand confusion and possible devaluing of the Trademark and Domain Name.[97]

The Sales Distribution Agreement did not require Derma Pen to forward any "international leads" to 4EverYoung that Derma Pen received from those who accessed its Domain Name or otherwise contacted Derma Pen.[98] Marshall testified that such referrals were

---

[93] February 12, 2015 Preliminary Injunction Hearing Transcript at 102-104; February 19, 2015 Preliminary Injunction Hearing Transcript at 34:15-21, 35:1-6.

[94] February 19, 2015 Preliminary Injunction Hearing Transcript at 35:2-12.

[95] *Id.* 71:3-72:12.

[96] February 12, 2015 Preliminary Injunction Hearing Transcript at 98:11-13.

[97] *Id.* 98:24-100:14; February 19, 2015 Preliminary Injunction Hearing Transcript 72:14-22.

[98] Ex. 1.

"customary in the industry," and that he expected that Derma Pen would forward such leads to 4EverYoung because Derma Pen's territory was limited to the USA.[99]

In an internal email chain generated on or about September 23, 2012, Derma Pen's management discussed the problems their company was having with 4EverYoung in connection with international leads. Anderer was copied on some of these communications, and responded by recommending that management seek legal advice to review the Sales Distribution Agreement and advise the company about its options. In the same email he expressed his views of Marshall and the Sales Distribution Agreement, saying, in part,

> If Stene has any threats or any other issues he wants to deal with it will end up with the attorneys and me. It is going to be a mess to extract ourselves in one piece from this really toxic deal. We will and we will move forward stronger than ever and unless Stene has some sort of Epiphany in the next week, the only place we will be hearing his name or dealing with him will be in court, unfortunately.[100]

In February 2013, 4EverYoung withheld supply from Derma Pen. In an email dated February 2, 2013, Marshall wrote to Anderer saying, in part, "we currently have them on stop supply due to the fact that there has been no effort at all from them to resolve the international lead referral problem." Marshall also stated that "[t]his action however just so happens to coincide with the expiry of the current distribution contract which at this point has expired and will not be renewed without agreement to the following items: . . . ." The email then contained a list of demands for modifications in the Sales Distribution Agreement.[101]

On November 27, 2012, Anderer also formed Derma Gen, as a company to patent, develop, and market a line of cosmetic and dermatological products, such as a "hydro-mask."

---

[99] February 9, 2015 Preliminary Injunction Hearing Transcript at 142:25-144:7, 212:5-20.

[100] Ex. 82.

[101] Ex. 6.

On May 21, 2013, Anderer formed MedMetics LLC as a research and development company to develop and patent a new micro-needling.  MedMetics was owned 100% by Anderer.[102]  MedMetics was in the process of developing a new form of the Device to be known as the MDerma.[103]  MedMetics was not a distribution company and did not have a sales force.  Instead, MedMetics intended to use Derma Pen as a distributor for the MDerma.[104]

Both MedMetics and Derma Gen were separate companies from Derma Pen.[105]  MedMetics also had an importer's license to import goods into the USA from other countries.[106]

### Derma Pen's Termination of the Sales Distribution Agreement

On May 30, 2013, Jones, on behalf of Derma Pen and with assistance of counsel,[107] notified 4EverYoung that Derma Pen was terminating the Sales Distribution Agreement effective at the end of its initial two-year term.[108]  Jones's email to Marshall confirmed a wire transfer to 4EverYoung for additional product and indicated that:

> As you are very well aware and have been pushing for some time now, we need to renegotiate our arrangement.  We absolutely agree with this need and therefore are taking the appropriate steps in noticing you of our intent to not renew our existing agreement so that we may begin working on a solution.[109]

That same day, Marshall, on behalf of 4EverYoung, responded "[n]o problems with the notice not to renew," and requested that Derma Pen comply with its post-termination obligations

---

[102] February 12, 2015 Preliminary Injunction Hearing Transcript at 134:13-14.

[103] *Id.* 134: 2-12.

[104] *Id.* 134:10-12.

[105] February 11, 2015 Preliminary Injunction Hearing Transcript at 10:19-11:4; February 12, 2015 Preliminary Injunction Hearing Transcript at 82:8-10.

[106] February 11, 2015 Preliminary Injunction Hearing Transcript at 18:14-19:4.

[107] February 19, 2015 Preliminary Injunction Hearing Transcript at 41:13-28; February 12, 2015 Preliminary Injunction Hearing Transcript at 158:4-6.

[108] *See* Letter Jones to Marshall, dated May 30, 2013, Ex. 2.

[109] Ex. 3.

under the Sales Distribution Agreement.[110]  "'The Distribution Agreement has been terminated. Derma Pen terminated it.'"[111]

Several days later, Jones wrote to Marshall, stating "regarding the trademark we are focused on performing our duties under the agreement until it expires on August 2.  We can speak at the end of the term about any post-agreement duties that each of us have."[112]

On July 25, 2013, Marshall wrote to Jones again requesting Derma Pen's compliance with its post-termination obligations under the Sales Distribution Agreement and requested a response by August 1, 2013.[113]

Between May 30, 2013 and August 1, 2013, Derma Pen's management learned that 4EverYoung was using the Trademark to sell Devices and Tips in the USA.[114]  The situation became acute for Derma Pen when it was unable to register as a marketer at a medical device trade show in the USA because 4EverYoung had previously registered at the same trade show using the Trademark.[115]

### Derma Pen and Anderer's Strategy to Avoid the Transfer Provisions in the Sales Distribution Agreement

Almost immediately after the execution of the Sales Distribution Agreement, Anderer and Derma Pen became increasingly dissatisfied with the terms of the agreement[116] and displeased with Marshall.[117]

---

[110] *See* E-Mail Exchange between Jones and Marshall, dated May 30, 2013, Ex. 3.

[111] January 21, 2015 TRO at 3 ¶ 4, docket no. 505 (quoting December 23, 2014 TRO at 4, docket no. 451); *see also* Letter Jones to Marshall, dated May 30, 2013, Ex. 2.

[112] E-Mail Jones to Marshall, dated June 4, 2013, Ex. 3.

[113] *See* Letter Marshall to Jones, dated July 25, 2013, Ex. 4.

[114] February 9, 2015 Preliminary Injunction Hearing Transcript at 87:24-91:12.

[115] February 12, 2015 Preliminary Injunction Hearing Transcript at 99:5-20.

[116] *See, e.g.*, E-Mail Exchange, dated November 1, 2011, Ex. 78; E-Mail Exchange, dated February 13, 2013, Ex. 7.

[117] *See* E-Mail Exchange, dated December 14, 2011, Ex. 79; *see also* E-Mail Anderer to Marshall, dated July 2, 2012, Ex. 80; E-Mail Exchange, dated September 23, 2012, Ex. 82.

In February 2012, Anderer suggested that Derma Pen simply breach the agreement and register trademarks in the name Dermapen in the European Union.[118]  Anderer made clear that he was an architect – if not the architect – of Derma Pen's strategy for exiting the Sales Distribution Agreement and retaining the Trademark in a September 7, 2012 e-mail, in which he outlined the manner in which he thought the facts should be characterized and in which another former member of Derma Pen, Felsted, stated that "over Mike A.'s dead body is he going to just allow Stene to take control of those assets," *i.e.*, the Trademark and Domain Name.[119]

On March 2, 2013, in an e-mail to Derma Pen's board, Morgan wrote that "I hate Stene !!!"[120]

In an e-mail sent by Biopelle's President and CEO, Elliott Milstein ("Milstein"), he reiterated what Jones told him about Derma Pen's strategy with respect to the Trademark and Domain Name:

> Derma Pen, LLC is the owner of the trade name "DermaPen" in the United States.  Equipmed is the owner of the same trade name in a number of other countries.  Derma Pen, LLC used to be affiliated with Equipmed and when they broke that affiliation, Equipmed formed its US subsidiary, Dermapenworld, to challenge Derma Pen's ownership of the trade name DermaPen. This legal battle has been going on for over a year.
>
> As a strategy in fighting this legal battle, the partners of Derma Pen, LLC formed a new company, Medmetics, LLC, and have transferred most of the assets of Derma Pen, LLC to this new entity, including the ownership of the trademark. But it has been their intention for some time to abandon the Dermapen trademark and develop a new, uncontested trademark.  The new company and its name were part of this strategy as well as creating a new trade name, MDerma FDS, for its new generation device.  The bankruptcy filing was just another step in this strategy.[121]

---

[118] *See* E-Mail Anderer to Derma Pen, dated February 27, 2012, Ex. 81.

[119] E-Mail Felsted to Morgan, *et al.*, dated September 7, 2012, Ex. 5; *see also* January 21, 2015 TRO at 4 ¶ 10, docket no. 505.

[120] E-Mail M. Morgan to Derma Pen Board, dated March 2, 2013, Ex. 8.

[121] E-Mail Milstein to Biopelle, dated August 12, 2014, Ex. 49; *see also* Memorandum at 2 (quoting Milstein e-mail), Ex. 125.

During his deposition, Milstein confirmed that the information contained in his e-mail accurately reflected what was told to him by Jones.[122]  Milstein also testified that Saunders told him that, by terminating the Sales Distribution Agreement, Derma Pen had "unwittingly triggered some aspect of trademark ownership."[123]

During a December 2, 2014 AMS board of directors meeting, Anderer discussed the landscape "[o]nce Dermapen is gone"[124] and strategy to shift to the MDerma micro-needling device.[125]  Derma Pen's minutes also reflect its intent to shift away from the Dermapen name.[126]

During Morgan's and Jones's testimony at the preliminary injunction hearing, they were still visibly and expressly "tender" and angry about the Sales Distribution Agreement and their relationship with 4EverYoung and Marshall.[127]

Other than statements in the hearings on this preliminary injunction motion, neither Anderer nor any representative of Derma Pen has communicated to 4EverYoung that Derma Pen was ready to offer the Trademark and Domain Name to 4EverYoung.[128]

### Derma Pen Files this Lawsuit

On August 1, 2013, Derma Pen filed this lawsuit.[129]  Derma Pen filed this lawsuit on the date that Marshall had requested a response to his July 25, 2013 inquiry whether Derma Pen would honor its post-termination transfer obligations. The Complaint sought declaratory relief

---

[122] *See* Milstein Dep. at 50:16-51:5, 56:20-61:25, 67:3-69:18, 82:14-83:3, 86:20-22, Ex. 57.

[123] *See id.* at 68:12-69:18, Ex. 57.

[124] AMS Board Meeting Minutes at 15:10-14, dated December 2, 2014, Ex. 66.

[125] *See id.* at 21:15-22.

[126] *See* Derma Pen Minutes at 2, 9, 14, 17, Ex. 91.

[127] *See, e.g.*, February 11, 2015 Preliminary Injunction Hearing Transcript at 53:20-22, 68:9-11, 71:12, 73:3-22, docket no. 607; *see also* February 12, 2015 Preliminary Injunction Hearing Transcript at 141:19-24, docket no. 597.

[128] February 23, 2015, Preliminary Injunction Hearing Transcript at ___:___, docket no. ____, filed _____ _____, 2015.

[129] *See* Complaint, docket no. 2.

that no such obligation existed. But the Complaint did not identify the post-termination

obligations or attach the Sales Distribution Agreement.  Derma Pen only provided the Court a

copy of the Sales Distribution Agreement after Derma Pen filed its motion for temporary

restraining order and preliminary injunction, after the Court requested a copy, and before

4EverYoung or the other Defendants were represented by counsel.[130]

4EveryYoung counterclaimed on May 2, 2014.[131] "Part of 4EverYoung's claim for

breach of contract seeks specific performance and damages under Sections 12.2 and 14.6 of the

Sales Distribution Agreement, which 'provide 4EverYoung with certain rights to purchase the

Derma Pen US trademark and the dermapen.com domain name after the Sales Distribution

Agreement terminated.'"[132]

### Anderer's Knowledge of and Participation in this Action and Related Proceedings

Anderer has attended numerous depositions in this case, including the October 22, 2013

Rule 30(b)(6) deposition of Derma Pen at which Milton testified as the company representative

and the June 5, 2014 deposition of Stene Marshall.

In the bankruptcy case, Anderer's own deposition was taken in Florida, and he attended

the depositions of two former employees of Derma Pen.

---

[130] Docket no. 25, filed October 10, 2013.

[131] Answer to First Amended Complaint, Counterclaim, Third-Party Amended Complaint, and Demand for Jury Trial ¶C, docket no. 139, filed May 2, 2014; *see also* Third Amended Counterclaim ¶¶ 45, 46, docket no. 547.

[132] January 21, 2015 TRO at 3 ¶ 5, docket no. 505 (quoting Memorandum Decision and Order Granting in Part Defendants' Motion for Temporary Restraining Order ("The December 23, 2014 TRO") at 4, docket no. 451); *see also* Third Amended Counterclaim ¶¶ 45, 46, docket no. 547.

### Anderer's Threats of Prolonged Litigation

At the conclusion of Milton's deposition in the Derma Pen Bankruptcy, Anderer informed Marshall, in the presence of counsel, that he would follow Marshall all over the world and would sue him anywhere and everywhere.[133]

During the December 2, 2014 AMS board of directors meeting[134] attended by Morgan and Milstein, among others, Anderer reiterated his "promise" to sue Defendants "for the next twenty years."[135]   Anderer went on to state, "[Defendants] will not, and this could go on the record, they will not wake up a day in the rest of their lives when they don't wake up to me suing them for something, for the damage that they've done."[136]   Morgan vouched for Anderer's sincerity to the others present.[137]

Anderer also explained that he had been paying for all of the litigation regarding the Trademark and Domain Name and that the cost did not matter to him.[138]

In the summer of 2014, Derma Pen began purchasing Devices and Tips from MedMetics, which, in turn, purchased these products directly from a Philippine supplier of SunWoo. MedMetics resold these products to Derma Pen at a markup.[139]

Also during the summer of 2014, MedMetics entered into a joint venture with Biopelle, which made a cosmetic cream to be used with the Devices.  The joint venture was called

---

[133] *See* February 9, 2015 Preliminary Injunction Hearing Transcript at 186:14-187:1, docket no. 596.

[134] This meeting was recorded by a court reporter, with which recording Anderer expressed he was "not real comfortable."  AMS Board Meeting Minutes at 4:23-25, dated December 2, 2014, Ex. 66.  Anderer even suggested that the minutes be "destroy[ed]" or altered.  *Id.* at 5:23-6:2, Ex. 66.

[135] *See id.* at 16:23-17:7, dated December 2, 2014, Ex. 66.

[136] See *id.* at 17:3-7.

[137] *See id.* at 17:1-2.

[138] *See id.* at 12:24-13:3, dated December 2, 2014, Ex. 66.

[139] February 11, 2015 Preliminary Injunction Hearing Transcript at 18:14-20:18.

AMS.[140]  The purpose of AMS was to sell both the cream and the MDerma device as a package

to physicians and, thereby, take advantage of the combined marketing power of both products

and the increased renewable revenues from selling additional creams and Tips.  Because of

production delays in bringing the MDerma to market, the Device was offered for free to initial

purchasers of the packages, with the promise of replacing the Device with the MDerma once it

became available.[141]

### Derma Pen's Claims Against 4EverYoung

Derma Pen claims that since as least August 1, 2013, 4EverYoung has been using

Dermapenworld to market and sell Devices in the United States by using the Trademark at issue

in this case.[142] Derma Pen recently filed a summary of its motions related to this issue, the

parties will file supplemental briefs, and a hearing is set March 6, 2015 to hear Derma Pen's

motion for a preliminary injunction.[143]

Derma Pen claims that after Keli Cypriano was terminated from Derma Pen, she began

working for Dermapenworld Sales and hacked into Derma Pen's computer systems on multiple

occasions gaining access to Derma Pen's confidential information and trade secrets, including its

lists of current customers and potential customers[144] and that with this information

---

[140] *Id.* at 6:13-14.

[141] February 12, 2015 Preliminary Injunction Hearing Transcript 82:8-10, 99:5-20, 134:5-12.

[142] February 9, 2015 Preliminary Injunction Hearing Transcript at 82:8-10, 99:5-20, 134:5-12.87:24-91:12; February 11, 2015 Preliminary Injunction Hearing Transcript at 82:8-10, 99:5-20, 134:5-12.30:8-10.

[143] Identification of Documents Related to Derma Pen's Motion for Temporary Restraining Order and Preliminary Injunction, docket no. 590, filed February 16, 2015; Minute Order docket no. 595, filed February 19, 2015.

[144] February 12, 2015 Preliminary Injunction Hearing Transcript at 82:8-10, 99:5-20, 134:5-12.109:2-7, 279:13 -282:6; February 18, 2015 Preliminary Injunction Hearing Transcript at 82:8-10, 99:5-20, 134:5-12.20:4-21:12, 61:14-62:12.

Dermapenworld has actively targeted Derma Pen's customers in an effort to lure them away from Derma Pen and make them customers of Dermapenworld.[145]

## Bifurcation and Stay

On May 2, 2014, Defendants filed a motion for temporary restraining order and preliminary injunction ("Defendants' Injunction Motion"),[146] seeking, among other things, an order requiring Derma Pen to specifically perform on the Transfer Provisions under the Sales Distribution Agreement, including its obligation to offer to 4EverYoung for purchase the Trademark and Domain Name.[147]

On May 15, 2014, this court bifurcated certain threshold claims related to Derma Pen's claim for rescission of the Sales Distribution Agreement and 4EverYoung's claim for specific performance of that agreement, and stayed the remaining claims and issues in the case.[148]

Prior to the January 6, 2015 hearing, the Court had expressly granted, in whole or part, Defendants' motion for partial summary judgment, save Defendants' motion for partial summary judgment regarding specific performance.[149]

## Anderer's 2014 Advances

Anderer also claims a lien by virtue of money paid in 2014, just before Derma Pen filed bankruptcy.[150]  The money was disbursed by Saunders, S2 Partners V, or Tensor Cloud

---

[145] February 18, 2015 Preliminary Injunction Hearing Transcript at 82:8-10, 99:5-20, 134:5-12.142:8-143:4; February 12, 2015 Preliminary Injunction Hearing Transcript at 82:8-10, 99:5-20, 134:5-12.98:7-100:14

[146] Docket no. 141, dated May 2, 2014.

[147] *See id.* at v.

[148] Memorandum Decision and Order Re: Expedited Schedule on Rescission Claims and Trademark Rights and Staying All Other Issues in the Case, docket no. 155, entered May 15, 2014; *see also* Memorandum Decision and Order Re: Jury Trial on Derma Pen, LLC's 22nd and 24th Causes of Action and Part of Defendants' 1st Counterclaim Cause of Action, docket no. 207, entered June 26, 2014.

[149] Memorandum Decision and Order Granting 4EverYoung's 238 Motion for Partial Summary Judgment on Rescission, docket no. 397, entered August 4, 2014; Memorandum Decision and Order Granting in Part and Denying in Part 4EverYoung's 244 Motion for Partial Summary Judgment on Fraudulent Inducement, docket no. 400, entered under seal August 4, 2014; Memorandum Decision and Order Granting 4EverYoung's 240 Motion for Partial Summary Judgment Directed Against Derma Pen LLC's Defenses to Specific Performance (the "Specific Performance Defenses Order"), docket no. 465, entered December 30, 2014.

Solutions,[151] although the loan documents identified Anderer as the lender.[152]  Saunders

negotiated and documented these loans.[153]  Anderer never read the loan documents.[154]

In order to maximize FDIC insurance protection for his cash assets, Anderer diversified

his cash holdings among various bank accounts in the names of entities that he solely owned and

controlled, such as S2 Partners V, LLC and Tensor Cloud, LLC.[155]

Anderer also relied on his personal attorney, Sam Saunders, who had check signing and

disbursement authority on these affiliated entity bank accounts, to disburse funds from these

accounts as Anderer directed.[156]

Occasionally, some of Anderer's loan advances to Derma Pen were made from these

affiliated bank accounts,[157] but all of the funds advanced were of Anderer's personal money.[158]

In addition, on occasion Anderer authorized Saunders, and Saunders's wife, Patricia

Saunders, to make loan advances for Derma Pen in the form of paying Derma Pen's obligations

to lawyers through the use of personal American Express credit card accounts that were owned

---

[150] *See* Bankruptcy Petition, dated August 8, 2014, Exs. 21, 22.

[151] *See* Saunders Credit Card Statements at 2, 6, 8, 13-15, 17, Ex. 74; *see also* S2 Partners V Credit Card Statement at 3, 5, 8, Ex. 75; Tensor Cloud Solutions Credit Card Statements at 3, Ex. 76. *See also* February 12, 2015 Preliminary Injunction Hearing Transcript at 188:18-195:7, docket no. 597; Anderer Dep. at 117, 122.

[152] *See* Secured Promissory Note, dated July 1, 2014, Ex. 14; *see also* Security Agreement, dated July 1, 2014, Ex. 15; Amendment to Secured Promissory Note and Security Agreement, August 7, 2014, Ex. 16; Utah UCC Filing, dated August 7, 2014, Ex. 17.

[153] *See* Anderer Dep. at 109, 122-23, 137-38.

[154] *See id.* at 135-36.

[155] February 19, 2015 Preliminary Injunction Hearing Transcript at 24:3-25:4.

[156] *Id.* at 25:5-26:20.

[157] Ex. 153.

[158] February 12, 2015 Preliminary Injunction Hearing Transcript at 174:19-175:2, 191:14-192:14; February 19, 2015 Preliminary Injunction Hearing Transcript at 25:25-26:23.

by Mr. and Ms. Saunders.[159] On these occasions, Anderer promptly reimbursed the Saunders' for these credit card charges from his personal funds.[160]

On July 1, 2014, Derma Pen executed and delivered another Secured Promissory Note to Anderer in the amount of $278,400 (the "2014 Note" or "Note 3").[161] The 2014 Note was secured with a Security Agreement of the same date (the "2014 SA").[162] The 2014 SA granted Anderer a security interest in the Trademark and Domain Name and Derma Pen's other property.[163]

The loan proceeds from the 2014 Note were used to pay legal fees that Derma Pen owed to its counsel in connection with this lawsuit.[164]

The 2014 Note was amended on August 7, 2014 (the "2014 Note Amendment") to increase the note balance by an additional $301,884.90, for a total 2014 Note balance, at that date, of $580,284.90.[165] The loan proceeds from the 2014 Note Amendment also were used to pay Derma Pen's legal fees in connection with this lawsuit.[166]

At the time the 2014 Note and the 2014 Note Amendment were signed, both Anderer and Derma Pen expected that Derma Pen would be able to repay the obligations from Derma Pen's future revenues.[167]

---

[159] Exs. 152, 153.

[160] February 19, 2015 Preliminary Injunction Hearing Transcript at 25:25-26:23.

[161] Ex. 14

[162] Ex. 15.

[163] *Id.*

[164] February 12, 2015 Preliminary Injunction Hearing Transcript 235:15-237:15; Exs. 146, 149, 152, 153.

[165] Exs. 16, 149.

[166] February 12, 2015 Preliminary Injunction Hearing Transcript at 235:15-237:15; Exs. 146, 149, 152, 153.

[167] February 19, 2015 Preliminary Injunction Hearing Transcript at 46:25-47:3; February 18, 2015 Preliminary Injunction Hearing Transcript at 78:20-79:4.

**Derma Pen's Bankruptcy Petition**

On August 8, 2014, after 4EverYoung had filed and prevailed on multiple motions for partial summary judgment related to its attempt to enforce the transfer provisions, and just one business day before the jury trial on the bifurcated contract claims in this case, Derma Pen filed chapter 11 bankruptcy in Delaware.[168]  Each of the members of Derma Pen, including Anderer, executed a resolution authorizing the filing of the bankruptcy.[169]

Just prior to Derma Pen filing the Bankruptcy Case, Anderer resigned from the board of Derma Pen, because he believed there was a conflict with his role as a creditor and his role as a board member.[170]

That bankruptcy filing halted the August 11, 2014 jury trial and prevented the Court from entering further orders.

In the Bankruptcy Case, Derma Pen scheduled 4EverYoung with a contingent, unliquidated and disputed unsecured claim in the amount of $56,150.05, [Schedule F].  It scheduled Anderer with an undisputed secured claim in the amount of $580,284.90 [Schedule D].  It also scheduled MedMetics as an undisputed, unsecured creditor with a claim of $79,862.77 [Schedule F].[171]

Jones testified that Derma Pen still owed at least approximately $56,000 to 4EverYoung under the Sales Distribution Agreement.[172]

---

[168] *See In Re Derma Pen, LLC*, case no. 14-11894 (KJC), 2014 WL 7269762 (Bankr. D. Del. Dec. 19, 2014); *see also* Notice of Filing of Bankruptcy and Automatic Stay Under 11 U.S.C. § 362, docket no. 422, filed August 8, 2014; *see also* January 21, 2015 TRO at 5 ¶ 12, docket no. 505.

[169] Bankruptcy Petition at 6, Ex. 21; *see also* Amended Bankruptcy Petition at 6, Ex. 22; January 21, 2015 TRO at 5 ¶ 13, docket no. 505.

[170] February 19, 2015 Preliminary Injunction Hearing Transcript at 48:18-24.

[171] Ex. 115.

[172] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 159:23-161:9, docket no. 597.

In the bankruptcy case, Derma Pen attempted to "reject" its post-termination obligations to 4EverYoung under the Sales Distribution Agreement.[173]  Anderer prepared a stalking horse bid so the Trademark and Domain Name could be sold out of bankruptcy.[174]  The price on the stalking horse bid for the Trademark and Domain Name (*i.e.*, $1.08 million) was calculated by Anderer and represented an amount that "would pay off the secured creditors and it would -- it would pay back the rest of the shareholders twice what the average collections were in Delaware in a bankruptcy case."[175]

### Debtor In Possession (DIP) Financing

During the Bankruptcy Case, Derma Pen sought authority to use Anderer's cash collateral, and it also sought authority to borrow up to an additional $150,000 from Anderer.[176]  4EverYoung objected to Derma Pen's efforts to obtain this authority.[177]  Ultimately, after discovery and further hearings, the Bankruptcy Court entered its Final Order authorizing Derma Pen's use of cash collateral, granting adequate protection to Anderer and authorizing post-petition financing.[178]  Among other things, this Final Order recognized that Derma Pen and Anderer stipulated to the validity, priority and amount of Anderer's security interest and secured debt, and the final order granted additional liens to Anderer in connection with his post-bankruptcy loans to Derma Pen.[179]

---

[173] *See* Debtor's Motion for Entry of an Order (A) Approving the Sale of the Debtor's Assets Free and Clear of Liens Claims and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief, Ex. 24.

[174] *See id.*

[175] *See* December 19, 2014 Preliminary Injunction Hearing Transcript at 49:17-50:4, docket no. 602.

[176] Exs. 116, 122.

[177] Exs. 117, 119, 121.

[178] Ex. 123.

[179] *Id.*

The DIP financing was governed by terms consistent with the 2014 Note and 2014 SA[180] but with special protection under Section 364(e) of the Bankruptcy Code.[181]

In Section 3 of the Bankruptcy Court's Final Order, the Bankruptcy Court granted 4EverYoung and Marshall a reservation of rights to challenge Anderer's security interests and liens, but it established a deadline for 4EverYoung and Marshall to do so.[182]  The same section also preserved Anderer's defenses to any such challenge, if one were filed.[183]  Ultimately, the Bankruptcy Court extended 4EverYoung's challenge deadline to December 23, 2014.[184]  The Bankruptcy was dismissed December 19, 2014 before that deadline expired.

The funds from Anderer's post-bankruptcy loans to Derma Pen were used by Derma Pen to retain bankruptcy counsel.[185]  Anderer advanced $100,000 under the post-bankruptcy loans.[186]

Derma Pen has not repaid any of the funds loaned to it by Anderer during the bankruptcy.[187]  As of January 29, 2015, the outstanding balance on the post-petition bankruptcy loan was $102,383.80, consisting of unpaid principal in the amount of $100,000 and accrued and unpaid interest in the amount of $2,383.80.[188]

At the time Anderer made these post-bankruptcy loans to Derma Pen, he expected that Derma Pen would be able to repay him from its operating revenues, or from a sale of the Trademark and Domain Name.[189]

---

[180] *Id.* ¶¶5, 7-9 at 4-6 of Stipulation.

[181] *Id.* ¶ D. at 2.

[182] Ex. 123 at § 3.

[183] *Id.*

[184] Ex. 124.

[185] February 19, 2015 Preliminary Injunction Hearing Transcript at 49:8-16.

[186] Ex. 25.

[187] February 12, 2015 Preliminary Injunction Hearing Transcript at 97:17-98:3; *id.* at 237:18-21.

[188] Ex. 150; February 12, 2015 Preliminary Injunction Hearing Transcript at 243:11-18.

[189] February 19, 2015 Preliminary Injunction Hearing Transcript at 49:8-51:24.

At all times that Anderer was a lender to Derma Pen, he believed that the value of Derma Pen's assets was greater than the amount of its liabilities.[190]

Derma Pen's bankruptcy sworn schedules showed that Derma Pen's assets were significantly greater than its liabilities at the time the Bankruptcy Case was filed.[191]

In its bankruptcy schedules and even now, Derma Pen maintains that the Trademark and Domain Name are worth in excess of $6 million.[192]

No one other than Anderer has advanced funds to Derma Pen, either as a lender or equity investor.

### Dismissal of Derma Pen's Bankruptcy Petition

Following full briefing and evidentiary hearings, Derma Pen's bankruptcy was dismissed on Friday, December 19, 2014, after the bankruptcy court concluded that the bankruptcy was filed "as a litigation tactic, rather than as a good faith attempt to reorganize or preserve value for creditors."[193]  The bankruptcy court stated as follows:

> I conclude that the totality of the facts and circumstances of this case support a determination that Derma Pen's bankruptcy petition was filed as a litigation tactic, rather than as a good faith attempt to reorganize or preserve value for creditors. Derma Pen filed the complaint that started the Utah Litigation and the Utah District Court was addressing the numerous claims.  When the Utah District Court entered preliminary rulings that were not in Derma Pen's favor, Derma Pen filed a bankruptcy petition.  The timing of the petition, and the lack of facts demonstrating that Derma Pen was in financial distress at that time, indicate that the bankruptcy petition was filed to avoid the expense of trial and the possibility of additional rulings against it.  The bankruptcy filing is an improper attempt by the Debtor to re-start the contract and trademark battle with the Movants in a new court.  Rather than filing to assuage operational difficulties and financial stress caused by the trademark dispute, Derma Pen's petition is an attempt to disrupt the

---

[190] *Id.* 39:13-22, 46:15-47:3.

[191] Ex. 115.

[192] *See* Bankruptcy Schedules at 13, Ex. 115; *see also* Draft Navigant Valuation, Ex. 40.

[193] Memorandum at 17, Ex. 125; *see also* January 21, 2015 TRO at 5 ¶ 14, docket no. 505.

litigation process.  The Debtor has failed to meet its burden that its chapter 11 petition was filed in good faith.[194]

On December 19, 2014, after the bankruptcy dismissal, Anderer's counsel sent a default notice to Jones, as the CEO of Derma Pen, demanding immediate payment of $687,918.82, plus interest, in connection with Derma Pen's secured obligations to Anderer.[195]

### The Confession of Judgment

Anderer testified that, up until the bankruptcy case was dismissed, he would have continued to extend funds to Derma Pen indefinitely, had no concern over how the monies were used, and never had any intention of taking action against Derma Pen.[196]

On Friday, December 19, 2014 (*i.e.*, the same day that the bankruptcy case was dismissed), Saunders, on behalf of Anderer, verbally asked Jones to confess judgment on behalf of Derma Pen in favor of Anderer.[197]

Jones testified that, on December 19, 2014, he spoke with Derma Pen's then-counsel, Russell S. Walker ("Walker"), for forty minutes regarding Saunders's request.[198]  Yet, during a December 23, 2014 telephonic conference in court, Walker stated that he only became aware of Derma Pen's intent to surrender assets to Anderer on the evening of December 22, 2014.[199]

Jones testified that he did not perceive that Derma Pen had any defense to Anderer's claims.[200]  However, he was aware of 4EverYoung's standing motion and draft complaint in the bankruptcy on behalf of Derma Pen to avoid obligations to Anderer.[201]

---

[194] Memorandum at 17-18 (internal footnote omitted), Ex. 125.

[195] Ex. 128.

[196] *See* February 19, 2015 Preliminary Injunction Hearing Transcript at 28:6-10, 39:20-22, 45:4-6, 56:18-57:13, 58:21-59:5, docket no. 602; *see also* Anderer Dep. at 111, 124, 138-39.

[197] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 202:3-206:19, 220:24-221:3, docket no. 597.

[198] *See id.* at 202:21-24, 214:4-215:2.

[199] *See* December 23, 2014 Telephonic Conference Transcript at 16:6-10, 17:10-23, docket no. 520.

[200] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 221:6-9, docket no. 597.

On Monday, December 22, 2014, Anderer appeared at Derma Pen's office with a notary, and Derma Pen executed a Confession of Judgment in favor of Anderer without meeting or discussion.[202]  Jones, on behalf of Derma Pen, executed the Confession of Judgment, acknowledging a liability of Derma Pen to Anderer in the amount of $791,012.18.[203]

The Confession of Judgment correctly recites the principal under the post-bankruptcy loans as $100,000 but is in error in reciting that the interest rate is 10% on those loans.  The correct rate is 5%.

Jones, Morgan, and Milton executed a written consent by which they approved the Confession of Judgment.[204]

Jones testified that he understands that, as an officer of Derma Pen, his fiduciary duties were to the "stakeholders," not the company itself.[205]

On December 22, 2014, Anderer filed an action (the "Confession of Judgment Action") in the Third District Court, State of Utah, to levy on Derma Pen's secured assets.[206]

On December 24, 2014, based on the Confession of Judgment, the state court entered a judgment against Derma Pen in favor of Anderer in the amount of $791,012.18 (the "Judgment").[207]

---

[201] *See id.* at 221:20-24; *see also* 4EverYoung's Standing Motion, Court's Exhibit 3 from February 4, 2015 Hearing.

[202] *See* Confession of Judgment, dated December 22, 2014, Ex. 25; *see also* February 12, 2015 Preliminary Injunction Hearing Transcript at 199:17-202:2, docket no. 597.

[203] Exs. 25, 135.

[204] *See* Confession of Judgment at 3, Ex. 25.

[205] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 206:6-19, docket no. 597.

[206] *See Anderer v. Derma Pen, LLC*, in the Third Judicial District Court, Salt Lake County, Utah, Case No. 140908635, Honorable Robert Faust.

[207] Ex. 30.

**The Trademark Assignment**

On the evening of December 19, 2014, and again unbeknownst to 4EverYoung, Saunders, Anderer's counsel, purportedly called due Derma Pen's debt to Anderer.[208]  That same evening, Jones expressed Derma Pen's concession to Anderer's position.[209]

On December 22, 2014, Saunders sent an email to Jones that requested a "partial surrender of some of the secured collateral assets in favor of Mike Anderer per Article 9 of the Utah Commercial Code, rather than being in a situation where Mike would have to seize the assets."  As such, Anderer's counsel requested that Derma Pen immediately record an assignment of the Trademark using the USPTO Electronic Transfer Assignment System in order "to effectuate this partial surrender in as timely a manner as possible."[210]  Anderer's counsel also provided a form of Trademark Assignment for Jones to execute on behalf of Derma Pen.[211]

In approximately the hour that followed, Jones made an electronic assignment of the Trademark to Anderer and received a receipt from the USPTO to that effect.[212]  An actual Assignment of the Trademark also was executed on December 22, 2014,[213] and the USPTO acknowledged that the Assignment was effected on December 22, 2014.[214]

---

[208] *See* E-Mail Saunders to Jones, dated December 19, 2014 (6:46 p.m.), Ex. 128; *see also* February 12, 2015 Preliminary Injunction Hearing Transcript at 212:7-213:12, docket no. 597.

[209] *See* E-Mail Jones to Saunders, dated December 19, 2014 (9:00 p.m.), Ex. 129.

[210] *See* E-Mail Saunders to Jones, dated December 22, 2014 (7:10 p.m.), Ex. 130; *see also* February 12, 2015 Preliminary Injunction Hearing Transcript at 213:13-215:2, docket no. 597.

[211] Ex. 130.

[212] Ex. 131-132.  *See* Receipt of Trademark Assignment Filing, dated December 22, 2014 (8:17 p.m.), Ex. 28; *see also* E-Mail Jones to Saunders, dated December 22, 2014 (10:17 p.m.), Ex. 131; *see also* Trademark Assignment, dated December 22, 2014, Ex. 27.

[213] Ex. 133.

[214] Ex. 134.

### Revival of this Litigation

The same day that the bankruptcy court dismissed Derma Pen's bankruptcy (*i.e.*, December 19, 2014),[215] 4EverYoung filed a notice of the dismissal and requested a pretrial conference.[216]   On December 21, 2014 (*i.e.*, before the Confession of Judgment or Trademark Assignment were executed), a telephone conference was scheduled for Tuesday, December 23, 2014 "to discuss how the civil case should proceed going forward in light of the recent bankruptcy ruling dismissing the bankruptcy case."[217]   Recipients of that telephone conference notice included Baker Donelson, still counsel of record for Derma Pen and used by Derma Pen, Anderer, and entities owned solely by Anderer; as well as Mark Gibb of Durham Jones & Pinegar, local counsel for Derma Pen.[218]

On December 23, 2014, at the beginning of the telephone conference to discuss the impact of the bankruptcy dismissal, counsel for 4EverYoung requested "that the Court rule upon the motion for preliminary injunction filed by 4EverYoung, which was Document 141."[219] Further, 4EverYoung's counsel stated the "need to lock down and preserve the trade – what the bankruptcy court I believe referred to as the trademark asset, the trademark and the domain name. So we have a fulsome record before the Court that will enable this Court to enter the preliminary injunction without further proceedings[.]"[220]

---

[215] *See* Memorandum, Ex. 125; *see also* Order Dismissing Bankruptcy Case, dated December 19, 2014, Ex. 126; Bankruptcy Court Docket, Ex. 127.

[216] *See* Notice of Dismissal of Bankruptcy Case and Request for Pretrial Conference, docket no. 448, filed December 19, 2014.

[217] E-Mail Chambers to Counsel, dated December 21, 2014, lodged February 23, 2015 as docket no. 614.

[218] Anderer Dep. at 188:32-37, 197:17-20; *see also* February 19, 2015 Preliminary Injunction Hearing Transcript at 41:12-18, docket no. 602, filed February 20, 2015.

[219] December 23, 2014 Telephone Conference Transcript at 5:2-3, docket no. 520, filed January 27, 2015.

[220] December 23, 2014 Telephone Conference Transcript at 10:15-21, docket no. 520, filed January 27, 2015.

Derma Pen's bankruptcy counsel, Walker, then stated that he had just learned "late" on the prior evening that a Confession of Judgment was filed in Utah State Court on December 22, 2014, which was intended to result in surrender of the Trademark and Domain Name to Anderer.[221]  Derma Pen's counsel in this litigation stated that they were unaware of the Confession of Judgment, Trademark Assignment, or intended surrender.[222]

Mr. Von Maack was directed to submit the form of a TRO.[223]  No objections were made by counsel for Derma Pen. But counsel for Derma Pen did request a TRO be set on Derma Pen's motion that had been recently remanded from the 10th Circuit.[224]

Following that scheduling conference, the Court set the jury trial on the remaining threshold issues for February 2-13, 2015,[225] and, as discussed below, entered the first of several injunctions to prevent further transfer of the Trademark or Domain Name.

### The December 23, 2014 TRO

On December 23, 2014, the Court entered a temporary restraining order (the "December 23, 2014 TRO"),[226] granting in part Defendant's Motion for Temporary Restraining Order and Preliminary Injunction filed May 2, 2014.[227]  That motion contained 76 paragraphs of facts from the record. The Court ordered that "Derma Pen, its officers, agents, servants, employees, and

---

[221] *See* December 23, 2014 Telephone Conference Transcript at 16:6-18:2, docket no. 520, filed January 27, 2015; *see also* December 23, 2014 TRO at 2-3, docket no. 451; January 6, 2015 Preliminary Injunction Order at 4, docket no. 476; January 21, 2015 TRO at 7 ¶ 21, docket no. 505.

[222] *See* December 23, 2014 Telephone Conference Transcript at 16:6-18:22, docket no. 520, filed January 27, 2015; *see also* December 23, 2014 TRO at 3, docket no. 451; January 6, 2015 Preliminary Injunction Order at 4, docket no. 476.

[223] December 23, 2014 Telephone Conference Transcript at 22:12-13, docket no. 520, filed January 27, 2015.

[224] *Id.* 23:20-23.

[225] Notice of Pretrial Status Conference and Trial, docket no. 452, entered December 23, 2014.

[226] *See* December 23, 2014 TRO, docket no. 451; *see also* January 21, 2015 TRO at 7 ¶ 22, docket no. 505.

[227] Docket no. 141.

attorneys, and those acting in concert, with them (collectively, the 'Enjoined Parties') shall not transfer the trademark and domain name."[228]

The December 23, 2014 TRO made extensive preliminary findings and recited that the "bankruptcy dismissal declares that the bankruptcy filing was a bad faith attempt to prevent adjudication in this case" and that the "Confession of Judgment is also an attempt to evade this adjudication process by placing the trademark beyond the reach of the court."[229]

The December 23, 2014 TRO includes language similar to that under Rule 65(d)(2)(c) of the Federal Rules of Civil Procedure, reciting that the temporary restraining order binds "persons who are in active concert or in participation with" Derma Pen, which includes Anderer.[230]

On or before December 24, 2014, Anderer, through his counsel, received notice of the December 23, 2014 TRO.[231]  Anderer also likely learned of the December 23, 2014 TRO during his holiday party in early January 2015, which was attended by "Derma Pen people, Derma Gen people," Jones, Morgan, and at least one of Anderer's attorneys, among others.[232]

The Court required 4EverYoung to post security of $10,000 related to the issuance of the December 23, 2014 TRO.[233]  4EverYoung timely posted that security.[234]

The December 23, 2014 TRO also set a preliminary injunction hearing for January 6, 2015.[235]

---

[228] December 23, 2014 TRO at 6 ¶ 2, docket no. 451; *see also* January 21, 2015 TRO at 7 ¶ 22, docket no. 505.

[229] December 24, 2014 TRO at 5, docket no. 451; *see also* January 21, 2015 TRO at 7 ¶ 22, docket no. 505.

[230] *See* Fed. R. Civ. P. 65(d)(2).

[231] *See* E-Mail Von Maack to Scofield, dated December 24, 2014, docket no. 481 at 28; *see also* E-Mail Von Maack to Hon. Faust and Counsel, dated December 24, 2014, Docket no. 481 at 30; Letter D. Scofield to Hon. Faust, dated January 8, 2015, Docket no. 481 at 16.

[232] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 198:5-199:4, Docket no. 597.

[233] January 6, 2015 Preliminary Injunction Order at 5, docket no. 476.

[234] *See* Notice of Security Bond, docket no. 462, entered December 29, 2014; *see also* Notice of Posting of Security for Temporary Restraining Order, docket no. 463, filed December 29, 2014; January 6, 2015 Preliminary Injunction Order at 5, docket no. 476; January 21, 2015 TRO at 7 ¶ 23, docket no. 505.

**Withdrawal of Counsel for Derma Pen**

On December 23, 2014, after entry of the TRO, the Court granted the pending motions to withdraw filed by Derma Pen's counsel.[236]  In granting those motions to withdraw, the Court required Derma Pen to appear through counsel "[o]n or before January 5, 2015, at 3:00 p.m." and warned that Derma Pen's failure "to file a Notice of Substitution of Counsel or Notice of Appearance as set forth above, may . . . subject [it] to sanction pursuant to Federal Rule of Civil Procedure 16(f)(1), including but not limited to dismissal or default judgment."[237]

On January 5, 2015, at 4:38 p.m. Walker and Reid W. Lambert of Woodbury & Kesler filed a Notice of Limited Appearance.[238]  According to that notice, "[t]he scope of Woodbury & Kesler's appearance is limited to [the January 6, 2015] hearing.  Derma Pen, LLC remains responsible for all matters not specifically described in this notice."[239] No general appearance followed.

On January 7, 2015, the Court entered the Order to Show Cause and Warning, which warned Derma Pen that "it has failed to comply with the Orders and with the local rules of this court.  Derma Pen's default and an order striking claims may be entered if this failure is not immediately cured."[240]

---

[235] *See* December 23, 2014 TRO at 6 ¶ 3, docket no. 451; *see also* January 6, 2015 Preliminary Injunction Order at 5, docket no. 476; January 21, 2015 TRO at 7 ¶ 23, docket no. 505.

[236] Order on Motion for Withdrawal of Counsel (Nicholas L. Vescovo), docket no. 453, entered December 23, 2014; Order on Motion for Withdrawal of Counsel (Maia T. Woodhouse), docket no. 454, entered December 23, 2014; Order on Motion for Withdrawal of Counsel (Samuel F. Miller), docket no. 455, entered December 23, 2014; Order Granting Motion to Withdraw as Counsel (Peter Donaldson), docket no. 456, entered December 23, 2014; Order Granting Motion to Withdraw as Counsel (Ryan Pahnke), docket no. 457, entered December 23, 2014; Order Granting Motion to Withdraw as Counsel (Mark Gibb), docket no. 458, entered December 23, 2014 (collectively, the "Withdrawal Orders").

[237] *See id.*

[238] Docket no. 467, filed January 5, 2015.

[239] *See id.* at 1-2.

[240] Docket no. 470 at 3, entered January 7, 2015.

**The Specific Performance Defenses Order**

On December 30, 2014, the Court granted Defendants' Motion for Partial Summary Judgment on Plaintiff's Defenses to Specific Performance[241] through the Court's Specific Performance Defenses Order.[242]  In the Specific Performance Defenses Order, the Court rejected all of Derma Pen's defenses to specific performance, including unclean hands, laches, waiver, equitable estoppel, failure to meet a necessary precondition, lack of standing, fraud or fraudulent inducement, lack of mutuality, nonrenewal of Sales Distribution Agreement, survival clause, and first material breach.[243]

**The Specific Performance Order**

On January 6, 2015, the Court granted 4EverYoung's Motion for Partial Summary Judgment on Specific Performance.[244]  That ruling was memorialized on January 12, 2015 in the Court's Memorandum Decision and Order Granting 4EverYoung's 241 Motion for Partial Summary Judgment on Specific Performance and Granting in Part Defendants' 141 Motion for Preliminary Injunction (the "Specific Performance Order" or "January 6, 2015 Preliminary Injunction Order").[245]

In the Specific Performance Order, the Court ruled as follows:

Summary judgment is granted on 4EverYoung's specific performance claim as there remain no genuine issues as to any material fact regarding Derma Pen's obligation, pursuant to Sections 12.2 and 14.5 of the Sales Distribution Agreement, to offer the Trademark and Domain Name.  As discussed in the Specific Performance Defenses Order, it is clear from the undisputed facts that Derma Pen terminated the Sales Distribution Agreement.  The language of Sections 12.2 and 14.6 of that Sale Distribution Agreement makes it clear that

---

[241] Docket no. 240, filed July 3, 2014.

[242] Docket no. 465, entered December 30, 2014.

[243] *See generally* Specific Performance Defenses Order, docket no. 465.

[244] Defendants' Motion for Partial Summary Judgment on Specific Performance and Memorandum in Support, docket no. 241, dated July 3, 2014; *see also* Specific Performance Order, docket no. 476, entered January 12, 2015.

[245] Specific Performance Order, docket no. 476.

Derma Pen had the obligation to offer the Trademark and Domain Name to 4EverYoung for purchase and each party was required to appoint an independent auditor.  The record is clear that Derma Pen did not make an offer and did not timely appoint an auditor to value the Trademark and Domain Name.  Sections 12.2 and 14.6 also contain the implied obligation that Derma Pen cooperate with the auditor appointed by 4EverYoung.  That, on the undisputed facts, was not done.  In fact, Derma Pen repudiated the process by filing this suit and including a claim for a declaration that it had no obligations under Sections 12.2 and 14.6.

. . . .

Specific performance of Sections 12.2 and 14.6 is not a single event, but a process, due to the stages of activity outlined in each section. The Specific Performance Defenses Order outlined, in construing the sections, the process to follow.  The specific performance process in its various phases will be supervised by this Court. . . .

. . . .

. . . The Sales Distribution Agreement states "that the value will be determined by the courts of the land that is governing this contract."  Section 17.7 (Governing Law) of the Sales Distribution Agreement contemplates the United Kingdom as the land governing that contract.  These provisions have been at issue many times in the case.

As trial on important issues approached in August 2014 an order declaring choice of law for the proceeding stated that Utah law will govern the breach of contract claims and fraudulent inducement claims.  Thus, Utah is "the land that is governing [the Sales Distribution Agreement]," and this Court is the "court[] of the land that is governing this contract."  For that reason, valuation is proper here under Section 17.7.

. . . .

There are other reasons that the valuation should occur in this court.  Derma Pen filed bankruptcy to stop this case.  The bankruptcy court dismissed Derma Pen's filings with a declaration that Derma Pen was not acting in good faith:

The bankruptcy filing is an improper attempt by the Debtor to re-start the contract and trademark battle with the Movants in a new court.  Rather than filing to assuage operational difficulties and financial stress caused by the trademark dispute, Derma Pen's petition is an attempt to disrupt the litigation process. The Debtor has failed to meet its burden that its chapter 11 petition was filed in good faith.

Derma Pen's change of heart on venue—from filing in this court, to repudiating this court—and bankruptcy filing, followed by transfer of the assets at issue evidences Derma Pen's determination to frustrate 4EverYoung's rights of purchase.  Requiring valuation to occur in the United Kingdom, which has been shown to be so difficult and expensive that the parties decided to return to this venue, would aid Derma Pen's strategy.  Derma Pen raised a textbook litany of defenses to the specific performance claim as well as unreasonable construction of the provisions of Sections 12.2 and 14.6.  These were all rejected by the

Specific Performance Defenses Order.  Derma Pen's insistence on valuation in the United Kingdom, when it has repudiated the entire offer process and taken no steps toward that valuation, is merely obstructive.[246]

### The January 6, 2015 Preliminary Injunction

In the hearing on January 6, 2015, Derma Pen consented to continuation of the December 23, 2014 TRO as a preliminary injunction (the "January 6, 2015 Preliminary Injunction"), and the Court issued a written preliminary injunction order on January 12, 2015 (the "January 6, 2015 Preliminary Injunction Order").[247]

In the January 6, 2015 Preliminary Injunction Order, the Court explained that the December 23, 2014 TRO included language similar to Rule 65(d)(2)(C), "reciting that the temporary restraining order binds 'persons who are in active concert or participation with' Derma Pen, which includes Anderer."[248]

On or before January 8, 2014, Anderer, through his counsel, received notice of the January 6, 2015 Preliminary Injunction.[249]  Anderer also likely learned of the January 6, 2015 Preliminary Injunction during his holiday party in early January 2015, which was attended by "Derma Pen people, Derma Gen people," Jones, Morgan, and at least one of Anderer's attorneys, among others.[250]

---

[246] Specific Performance Order at 7-10, 12-13 (footnotes omitted), docket no. 476.

[247] January 6, 2015 Preliminary Injunction Order, docket no. 476, entered January 12, 2015; *see also* January 21, 2015 TRO at 7 ¶ 24, docket no. 505.

[248] January 6, 2015 Preliminary Injunction Order at 4-5, docket no. 476; *see also* January 21, 2015 TRO at 8 ¶ 25, docket no. 505.

[249] *See* E-Mail C. Von Maack to Hon. Faust and Counsel, dated January 8, 2015, docket no. 481 at 32; *see also* Letter D. Scofield to Hon. Faust, dated January 8, 2015, docket no. 481 at 17-18; E-Mail C. Von Maack to Hon. Faust and Counsel, dated January 12, 2015, docket no. 481 at 35; E-Mail C. Von Maack to Counsel, dated January 12, 2015, docket no. 481 at 38; E-Mail D. Scofield to C. Von Maack, dated January 12, 2015, docket no. 481 at 40; E-Mail T. Dance to C. Von Maack, dated January 12, 2015, docket no. 481 at 44.

[250] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 198:5-199:4, docket no. 597.

**The January 9, 2015 UCC Filing**

On January 9, 2015, Anderer (through counsel, Snell & Wilmer) filed a UCC Financing Statement in Delaware.[251]  That UCC filing expressly covered the Trademark and Domain Name.[252]

**The Notice of UCC Sale**

On January 9, 2015, Anderer (through counsel, Snell & Wilmer) issued a notice of public sale of Derma Pen and its assets, including the Trademark.[253]  According to the Notice of Sale, the sale was to take place on January 22, 2015, at 8:00 a.m., at the Salt Lake City office of Snell & Wilmer.[254]

**The Writ of Execution**

On January 12, 2015, Anderer (through counsel, David Scofield) filed an Application for Writ of Execution.[255]  The Application for Writ of Execution sought to execute upon the Trademark and Domain Name.[256]

On January 13, 2015, the State Court issued Anderer's proposed Writ of Execution in the Confession of Judgment Action.[257]  That same day, Anderer (through counsel, David Scofield) executed a Praecipe directing the Sheriff or any constable "to levy upon, attach and hold" Derma Pen's assets, including the Trademark and Domain Name.[258]

---

[251] *See* Delaware UCC Financing Statement, dated January 9, 2015, Ex. 18.

[252] *See id.*

[253] *See* Notice of Public Disposition of Collateral (the "Notice of Sale"), dated January 9, 2015, Ex. 31.

[254] *See* Notice of Sale at 1, Ex. 31.

[255] *See* Application for Writ of Execution, Ex. 32.

[256] *See id.* at 19.

[257] *See* Writ of Execution, Ex. 33.

[258] *See* Praecipe, dated January 13, 2015, Ex. 139.

On January 14, 2015, Anderer (through the Salt Lake County Constable) served upon Derma Pen the Writ of Execution and Praecipe.[259]  That same date, Derma Pen executed a Keeper's Receipt.[260]

On or about January 16, 2015, Anderer (through the Salt Lake County Constable) issued a Notice of Constable Sale.[261]  According to that notice, the Trademark and Domain Name were to be sold on January 30, 2015 at 2:00 p.m. at the Derma Pen offices at 3216 South Highland Drive, Suite 200, Salt Lake City, Utah 84106.[262]

4EverYoung filed a reply (Reply) to the Writ of Execution[263] and according to counsel for Derma Pen, a hearing has been set on the subject on March 4, 2015.[264]  The Reply does not mention the Utah Fraudulent Transfer Act.

### Adding Anderer as a Party

4EverYoung's Motion to add Anderer as a party in this case was filed January 12, 2015,[265] and taken under advisement the next day.[266] Any response was required by January 20, 2015.[267]

On January 21, 2015, 4EverYoung filed a third-party complaint against Anderer and others.[268]

---

[259] *See* Proof of Service, dated January 14, 2015, Ex. 142.

[260] *See* Keeper's Receipt, dated January 14, 2015, Ex. 140.

[261] *See* Notice of Constable Sale, dated January 16, 2015, Ex. 141.

[262] *See id.*

[263] Reply to Writ and Request for Hearing, dated January 26, 2015, in Confession of Judgment Action, docket no. 576, Exhibit 2.

[264] Notice of Hearing, docket no. 615, filed February 23, 2015; February ___, 2015 Preliminary Injunction Hearing Transcript ___;___, docket no. ___, filed _____

[265] Docket no. 475, filed January 19, 2015.

[266] Docket Text Order, docket no. 477, filed on January 20, 2015.

[267] *Id.*

A few hours later, 4EverYoung also filed an *ex parte* motion to effect service on Anderer by serving Anderer's counsel, who previously had only entered a special, limited appearance in the case in connection with the OSC hearing, and who appeared on the form which had given notice of public sale, as well as Anderer's counsel in the Confession of Judgment Action.[269]  An order granting the motion for alternative service was promptly filed.[270]

### The January 21, 2015 TRO

4EverYoung's Motion for Temporary Restraining Order Against Michael E. Anderer[271] was filed and granted in part on the evening of January 21, 2015.[272]  The TRO was intended to stop the January 22, 2015, 9:00 a. m. public sale for which notice was given January 9, 2015. The January 21, 2015 TRO contained preliminary findings:

> 27.    4EverYoung is likely to suffer irreparable injury in the absence of preliminary injunctive relief by reason of transfer of the Trademark and Domain Name, and defeat of its contractual rights, and the harm it faces outweighs the harm faced by Anderer from the issuance of an injunction which is measurable by monetary damages.  The facts are established by an uncontested record that the sale is set to occur less than 12 hours from now, without any intervening business hours.

> 28.    The public interest favors this restraining order to uphold contractual rights, prevent transfer of assets outside the control of parties subject to orders of the court, and ensure orderly resolution of disputes.

> 29.    4EverYoung is at this stage shown to be likely to prevail on the merits of its claim for fraudulent transfer.

> 30.    Under Utah Code Ann. § 25-6-5(1)(a), a transfer is fraudulent if

---

[268] Second Amended Counterclai, Third-Party Complaint, and Demand for Jury Trial, docket no. 492, filed January 21, 2015.

[269] Docket no. 501, filed January 21, 2015.

[270] Docket no. 503, filed January 21, 2015.

[271] Docket no. 504, filed January 21, 2015.

[272] Order Granting 4EverYoung's Motion for Temporary Restraining Order Against Michael E. Anderer, docket no. 505, filed January 21, 2015.

(1) the creditor has a claim that arose either before or after the transfer was made or the obligation was incurred; and

(2) the transfer was made with actual intent to hinder, delay, or defraud any creditor of the debtor.

31.     The facts recited show the actual intentions of the control group including Anderer to hinder, delay and obstruct 4EverYoung's claims.

32. Under Utah Code Ann. 25-6-6(2), a transfer is fraudulent where:

(1) the creditor has a claim that arose before the transfer was made or the obligation was incurred;

(2) the transfer was made to an insider for an antecedent debt;

(3) the debtor was insolvent at the time;

(4) the insider had reasonable cause to believe that the debtor was insolvent.

33.     4EverYoung's claim arose before Derma Pen transferred the trademark and domain name to Anderer.

34.     Anderer is an insider.

35.     The antecedent debts are the 2012 and 2014 Notes and Security Agreements.

36.     Anderer had reasonable cause to believe that Derma Pen was insolvent. The statements in a paper filed by Derma Pen and by Derma Pen's counsel in court that Derma Pen has a verbal license from Anderer to use the Trademark show the transfer is likely illusory.

38.     Derma Pen and Anderer stated in court that the Public Sale will convey title to the Trademark, Domain Name and other property subject of the sale and that there is no effect on that sale by reason of the levy of execution in the Confession of Judgment Action.

39.     This Temporary Restraining Order is issued without notice because there are no working hours before the time set for the public sale and for the reasons stated in 4EverYoung's Emergency Ex Parte Motion for Alternative Service and the Declaration of Christine T. Greenwood in support of that motion.[273]

---

[273] January 21, 2015 TRO at 8-10 ¶¶ 27-39 (footnotes omitted), docket no. 505.

The Anderer TRO did not prohibit Anderer from selling the Trademark and Domain
Name to 4EverYoung.  Accordingly, though Anderer's counsel appeared at the sale on January
22, 2015 4EverYoung did not attend, did not post a deposit as required in the Notice of Sale, did
not demonstrate its ability to pay, and did not bid.

## DISCUSSION

### Standard Applicable to Motion for Preliminary Injunction

In order to obtain a preliminary injunction, movant must show: (1) a substantial
likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied;
(3) the threatened injury outweighs the harm that the preliminary injunction may cause the
opposing party; and (4) the injunction, if issued, will not adversely affect the public interest .[274]
"[W]here the moving party has established that the three 'harm' factors tip decidedly in its favor,
the 'probability of success' requirement is relaxed.' In such cases, '[t]he movant need only show
questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair
ground for litigation.'"[275]

### Irreparable Harm

"To constitute irreparable harm, an injury must be certain, great, actual 'and not
theoretical.'"[276] "[T]he party seeking injunctive relief must show that the injury complained of is
of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable
harm."[277] "It is also well settled that simple economic loss usually does not, in and of itself,
constitute irreparable harm; such losses are compensable by monetary damages."[278]

---

[274] *General Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007).

[275] *Star Fuel Marts, LLC v. Sam's E., Inc.*, 362 F.3d 639, 653 (10th Cir. 2004) (quoting *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003)) (internal citations omitted).

[276] *Heideman*, 348 F.3d at 1189 (quoting *Wisconsin Gas Co. v. GERC*, 758 F.2d 669, 675 (D.C. Cir. 1985)).

[277] *Id.*

[278] *Id.*

4EverYoung has presented clear and convincing evidence that it faces an irreparable loss if sale under the 2014 SA and DIP Lienn occurs.  4EverYoung has shown that Anderer would likely proceed with the sale if not enjoined.  Anderer would be able to credit bid the entire balance he is owed, which his attorneys claim is approaching $2 million.  4EverYoung's ability to receive its contracted right to purchase the Trademark and Domain Name would be frustrated.

Separate valuation proceedings are underway in this case to determine the price 4EverYoung must pay Derma Pen for the Trademark and Domain Name. This is not inconsistent with 4EverYoung's assertion that they are unique assets, the loss of which would be irreparable. The Sales Distribution Agreement gave 4EverYoung the right to purchase these valuable assets, and gave Derma Pen the right to receive their value.  The Sales Distribution Agreement provided specific property for money.

The circumstances of these parties need stabilization.  After the bankruptcy dismissal, Derma Pen was first approached about a Confession of Judgment.[279]  Then, almost immediately, a Trademark Assignment[280] was presented.  Early on Derma Pen asserted that Derma Pen still had use of the Trademark by a verbal license in spite of the Trademark Assignment.[281]  Derma Pen and Anderer then claimed this Trademark Assignment was not what it appears to be on its face, but was only a possessory transfer.  Then a Notice of Public Sale[282] was given, and an Application for a Writ of Execution[283] was filed, both seeking sales of the same property by different methods.  The last two months have been a fast paced scramble as the means of

---

[279] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 202:3-206:19, 220:24-221:3, docket no. 597.

[280] Ex. 27.

[281] Response to Sua Sponte Order to Show Cause and Warning, docket no. 488, filed January 20, 2015; Transcript January 21, 2015, at 23:10-12. This is consistent with a statement made in Bankruptcy Court by Mr. Morgan about "'oral understandings' between Derma Pen and Medmetics that grant Medmetics a 'right to use' the U.S. Trademark." Ex. 125 at 10.

[282] Ex. 31

[283] Ex. 32.

effecting a transfer evolve.  Stability can be achieved by stanching the evolution of innovative

transfer means, and avoiding a loss of control of the Trademark and Domain Name.

### Balance of Harms

Anderer claims to be a secured creditor with a set amount owing on Notes.  He bargained

for recovery of a specific sum of money, with interest, and legal fees.  By contrast, 4EverYoung

contracted for purchase of the specific Trademark and Domain Name.  Despite arguments that

4EverYoung has a damages remedy if specific performance is frustrated, the contractual object

was the Trademark and Domain Name, not a compensating sum of money.  The difference

between Anderer and 4EverYoung shows that the balance of harm from the loss of the

Trademark and Domain Name would fall more heavily on 4EverYoung.

### Public Interest

The public has an interest in soundness of secured transactions and also has an interest in

having parties comply with agreements that were freely negotiated, such as 4EverYoung's right

to purchase.  Public interest favors avoidance of transfers that hinder, delay or defraud creditors.

There is no issue of deception to the public since the Trademark and Domain Name are used by

both parties with respect to the same product.  The public interest slightly favors 4EverYoung.

### Likelihood of Success on UFTA Claims

4EverYoung contends that certain transfers made by Derma Pen to Anderer were

fraudulent pursuant to either Utah Code Ann. §§ 25-6-5(1)(a) or 25-6-6(2) of the Utah Uniform

Fraudulent Transfer Act ("UFTA").[284] 4EverYoung's likelihood of success depends on these

claims.

---

[284] The Memorandum Decision of February 16, 2015 [Dkt. 589] concluded that 4EverYoung had standing to assert a claim under the UFTA.

To establish a fraudulent transfer claim under Utah Code Ann. § 25-6-5(1)(a), referred to as the "actual fraud" section, 4EverYoung must establish: (i) that it has a claim that arose either before or after the transfer was made or the obligation was incurred, and that (ii) the transfer was made with actual intent to hinder, delay, or defraud any creditor of the debtor.[285] Section 25-6-5 enumerates factors which may be considered, among others, to determine if "actual intent" existed. These include whether:

> (a) the transfer or obligation was to an insider; (b) the debtor retained possession or control of the property transferred after the transfer; (c) the transfer or obligation was disclosed or concealed; (d) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (e) the transfer was of substantially all the debtor's assets; (f) the debtor absconded; (g) the debtor removed or concealed assets; (h) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; and (k) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."[286]

These factors are termed "badges of fraud."[287] "The badges' value as evidence, however, is relative not absolute, and they are considered facts which throw suspicion on a transaction and which call for an explanation."[288] "In other words, '[t]hey are not usually conclusive proof; they are open to explanation.'"[289]   And they are not exclusive, as the statute states.

To establish a fraudulent transfer claim under Utah Code Ann. § 25-6-6(2), referred to as the "constructive  fraud" section, 4EverYoung must establish that: (i) it claim arose before the transfer; (ii) the transfer was made to an insider, (iii) for an antecedent debt; (iii) the debtor was

---

[285] Utah Code Ann. § 25-6-5(1)(a).

[286] Utah Code Ann. § 25-6-5(2).

[287] *Tolle v. Fenley,* 2006 UT App 78, ¶ 27, 132 P.3d 63 (quoting *Dahnken, Inc. v. Wilmarth,* 726 P.2d 420, 423 (Utah 1986)).

[288] *Wasatch Oil & Gas, L.L.C. v. Reott,* 2007 UT App 223, ¶ 33, 163 P.3d 713 (internal quotation marks and citation omitted).

[289] *Id.* (quoting *Territorial Sav. & Loan Ass'n v. Baird,* 781 P.2d 452, 462 (Utah Ct. App. 1989)).

insolvent at the time; and (iv) the insider had reasonable cause to believe that the debtor was insolvent.[290]

4EverYoung alleges that the following transfers were fraudulent under §§ -5(1)(a) or -6(2): (i) the 2012 Security Agreement and the 2013 UCC-1 financing statement ("2012 Documents");[291] (ii) the 2014 Security Agreement and the 2015 UCC-1 financing statement ("2014 Documents") ;[292] (iii) the Confession of Judgment and the Trademark Assignment.[293] Each of these alleged transfers will be discussed below.

## 2012 Documents

There is no need to analyze the 2012 Documents because "obligations under the 2012 Note . . . were rolled into the amount of the 2014 Note."[294] Anderer agreed at argument that his current efforts to foreclose on the assets of Derma Pen are not in collection of amounts owing under Note 1.[295]

## 2014 Documents

### (1)    Utah Code Ann. § 25-6-5(1)(a)

The granting of a security interest by Derma Pen to Anderer was a transfer. The UFTA defines transfer as "every mode, direct or indirect, absolute or condition, or voluntary or involuntary, of disposing of or parting with an Asset, or an interest in an Asset, and includes . . . creation of lien or other encumbrance."[296]  At the time of the transfer, 4EverYoung was a

---

[290] Utah Code Ann. § 25-6-6(2).

[291] Third Amended Counterclaim at 46, ¶ 165.

[292] *Id.* at 46, ¶ 166.

[293] *Id.* at 47, ¶ 167.

[294] Exs. 147 and 149. Anderer's FFCC at 51, ¶75.

[295] February 23, 2015, Preliminary Injunction Hearing Transcript at ___:___, docket no. ____, filed _____ _____, 2015.

[296] Utah Code Ann. § 25-6-2(12).

creditor[297] and Derma Pen was a debtor.[298] The timing of the transfer is of no importance in this

UFTA section. The remaining issue is whether Derma Pen made the transfer with actual intent to

hinder, delay, or defraud any creditor of the debtor.  Derma Pen's intent is established through

the presence of several badges of fraud. In addition to the badges of fraud, the statute authorizes

the court to consider other facts that may guide the court's conclusion. It is undisputed that

Anderer is an insider.[299] Derma Pen has maintained control of the Domain Name and Trademark

at all times, even after the Trademark Assignment and Confession of Judgment.[300] The transfer

was not made known by concurrent filing of UCC-1 financing statement and 4EverYoung was

not aware of the transfer until Derma Pen filed for Bankruptcy.[301] This litigation was pending at

the time of the transfer.[302] The 2014 Security Agreement was of substantially all of Derma Pen's

assets.[303] Derma Pen became insolvent shortly after the transfer was made.[304] First, Derma Pen

declared itself insolvent by its bankruptcy filing, and second, Derma Pen was presumed insolvent

because it was unable to pay its attorneys' fees as they became due and had to borrow money to

make payments.[305]

 The 2014 Documents were executed in contemplation of impending trial in this case.

They were also executed in very close proximity to Derma Pen's bankruptcy filing which was

---

[297] 4EverYoung's status as a creditor with a claim was established in the Memorandum Decision and Order Denying [581] Oral Motion for Summary Relief, docket no. 589, filed February 16, 2015.

[298] *Id.*

[299] Utah Code Ann. § 25-6-5(2)(a).

[300] *Id*. § 25-6-5(2)(b).

[301] *Id*. § 25-6-5(2)(c).

[302] *Id*. § 25-6-5(2)(d).

[303] Ex. 106, exhibit A (Collateral: Those certain items of personal property and intellectual property rights owned by the Grantor including any and all inventory, together with all accessions, replacements, additions, or proceeds therefrom, whether now owned or hereafter acquired, and all of the Grantor's trademarks, tradenames, patent rights, and domain names, including but not limited to "DERMAPEN," the "Dermapen 'D' logo," and "dermapen.com".).

[304] *Id*. § 25-6-5(2)(i).

[305] *Id*. § 25-6-3(2).

dismissed as not filed in good faith, but as a strategic move to avoid consequences in this court.[306] In viewing all of the circumstances and badges of fraud surrounding the 2014 Documents, 4EverYoung is likely to establish by clear and convincing evidence Derma Pen's intent to defraud 4EverYoung.

*Defenses*

After 4EverYoung shows likelihood of success, the burden shifts to Anderer, the transferee, to come forward with rebuttable evidence that he took in good faith and for a reasonably equivalent value.[307] Section 25-6-9(1) of the UFTA states the defense of a good faith purchase for value: "A transfer or obligation is not voidable under Subsection 25-6-5(1)(a) against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee."[308] Anderer has failed to show a good faith purchase to rebut the presumption of fraud.

"Good faith embodies the concept that one is free 'from knowledge of circumstances which ought to put the holder on inquiry.'"[309] It is an objective standard.[310] Anderer is not simply a third-party lender to Derma Pen. He is an insider and part owner of Derma Pen, and was aware of the present litigation, which involved, among other things, Derma Pen's post-termination obligation to offer for sale the Trademark and Domain Name to 4EverYoung, the

---

[306] Memorandum at 17–18, Ex. 125.

[307] *See* Utah Code Ann. § 25-6-9(1). *See also* Territorial *Sav. & Loan Ass'n v. Baird,* 781 P.2d 452, 462 n. 18 (Utah Ct.App.1989); *see e.g., In re M & L Bus. Mach. Co., Inc.,* 84 F.3d 1330, 1338 (10th Cir.1996) (stating that transferee has the burden of establishing good faith under § 548(c) of the Bankruptcy Code, a section similar to that of the UFTA); *Aptix Corp. v. Quickturn Design Systems Inc.,* 148 Fed. Appx. 925, 930 (Fed. Cir.2005) (stating that statute requires the transferee present evidence of transferee's good faith).

[308] Utah Code Ann. § 25-6-9.

[309] *S.E.C. v. Madison Real Estate Group, LLC,* 657 F.Supp.2d 1271 (D. Utah. 2009) (quoting *Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.),* 84 F.3d 1330, 1335 (10th Cir.1996)).

[310] *In re Lockwood Auto Group, Inc.,* 428 B.R. 629, 636 (Bankr. W.D. Pa. 2010) ("First, good faith is determined according to an objective or 'reasonable person' standard, and not based on subjective knowledge or belief of the transferee. Courts thus look to what the transferee objectively knew or should have known concerning the nature of the underlying circumstances involved with the transfer.").

same two assets that were secured as collateral in the 2014 Security Agreement. Many of the same facts that tend to establish 4EverYoung's claim rebut the assertion of good faith. The borrowed funds for 2014 did not go toward operating funds for the business, but to pay legal fees for this litigation. The borrowed funds were very close in time to a jury trial setting in the present litigation and to the bankruptcy filing. Although the value of the Trademark and Domain Name is yet to be determined, Derma Pen has consistently claimed that the value of the Trademark alone is worth over $5 million dollars. Therefore, viewed from Derma Pen's point of view, there is a large disparity between the total secured debt and the value of the collateral. The 2014 Documents can be seen as an effort to take those assets out of reach of 4EverYoung by the imposition of a sizeable encumbrance.

Good faith must pertain specifically to the taking of a security interest.  In *Aptix Corp. v. Quickturn Design Systems, Inc.*,[311] the Federal Circuit carefully distinguished between business needs of the debtor, Aptix; the lending and borrowing motivations of both parties; and the good faith of the creditor, Mohsen, in taking a security interest:

> Here, Mohsen attempts to rebut the presumption of fraudulent intent by focusing on the reason that Aptix needed to borrow money from Mohsen, i.e. it could not obtain funding elsewhere, and its ultimate use of the money, i.e. to pay employees and other creditors. Although Mohsen's argument may explain why Aptix entered into the loan arrangement with Mohsen, it does not explain why it was necessary for Aptix to grant Mohsen a security interest in substantially all of its assets when Mohsen had never required such an interest for his past loans.[312]

Similarly here, Anderer advanced all the funds under Note 1 in 2011 well before there was any documentation of the loan or security interest on that loan. Filing of a financing statement was delayed a year. Then, on Note 2, there was no documentation at all. Note 3 was documented while advances made in the heat of this litigation, to lawyers in this litigation, who would have

---

[311] 148 Fed. Appx. at 929.

[312] *Id.*

had unsecured claims in the bankruptcy, on the eve of bankruptcy filing. Anderer never testified

as to needing security, but said he left documentation to his lawyers, and said that he always

expected to be paid out of the business operations. He said he never thought he would need to

foreclose.

(2)      Utah Code Ann. § 25-6-6(2)

The 2014 Documents were not transferred to Anderer, an insider, for an *antecedent* debt.

The 2014 security interest was granted to Anderer for "contemporaneous new value" that

Anderer provided to Derma Pen by payment of Derma Pen's legal fees.  Because the antecedent

debt element of § 25-6-6(2) is not satisfied, 4EverYoung's fraudulent transfer claim on the 2014

Documents pursuant to § 25-6-6(2) cannot succeed.

**Confession of Judgment and the Trademark Assignment**

(3)      Utah Code Ann. § 25-6-5(1)(a)

The Confession of Judgment and Trademark Assignment fall under the broad definition

of transfer.[313] At the time of the transfers, 4EverYoung was a creditor and Derma Pen was a

debtor.[314] The timing of the transfers is of no importance in this UFTA section. Derma Pen's

actual intent to hinder, delay, or defraud 4EverYoung is likely to be established through the

presence of the following badges of fraud: Anderer was still an insider due to his part ownership

interest of Derma Pen.[315] After the transfer, Derma Pen originally argued that it no longer owns

---

[313] *See e.g.,* P*osner v. S. Paul Posner 1976 Irrevocable Family Trust*, 2004 WL 2473984 (N.Y.A.D. 1 Dept.) (A family trust's confession of judgment in a purported lender's favor was not given and taken in good faith, and thus was invalid and had to be set aside as a fraudulent transfer, even if the confession of judgment was a fair equivalent for the purported lender's alleged outstanding loans to the trust); In re XYZ Options, Inc., 154 F3d 1262 (11th Cir. 1998) (court could examine a consent judgment to determine whether or not it constituted a fraudulent transfer); Generic Farms v. Stensland, 518 N.W.2d 800, 802 (Iowa Ct. App. 1994) ("The trial court determined the assignment of the Land O'Lakes seed corn contracts by Stensland to Knecht as a result of the trademark assignment was a fraudulent conveyance.").

[314] Memorandum Decision and Order Denying [581] oral Motion for Summary Relief, <u>docket no. 589</u>, filed February 16, 2015.

[315] Utah Code Ann. § 25-6-5(2)(a).

the assets, only a license to use the assets. Derma Pen now maintains that it owns and controls all of its assets, and that Anderer simply has possession.[316] The transfers were not made known to 4EverYoung until after the transfers.[317] Derma Pen's own attorneys were not aware of the transfers. The Bankruptcy stay in this litigation had lifted only a few days before the transfers occurred, and notice of a status conference in this litigation had issued at the time of the transfers.[318] The bankruptcy court concluded that Derma Pen had filed bankruptcy as a litigation avoidance tactic and the bankruptcy was not filed in good faith.[319] The transfers included Derma Pen's most valuable assets.[320] Derma Pen was insolvent at the time the transfers were made.[321] First, Derma Pen declared itself insolvent by its bankruptcy filing, and second, Derma Pen was presumed insolvent because it was unable to pay its attorneys' fees as they became due and had to borrow money to make payments.[322] And the Confession of Judgment was executed because Derma Pen's management felt it had no defense to Anderer's claims.[323] The above badges of fraud show 4EverYoung is likely to establish, by clear and convincing evidence, Derma Pen's intent to hinder, delay and defraud 4EverYoung.

---

[316] *Id.* § 25-6-5(2)(b).

[317] *Id.* § 25-6-5(2)(c).

[318] *Id.* § 25-6-5(2)(d).

[319] Memorandum at 17–18, Ex. 125.

[320] Ex. 106, Exhibit A (Collateral: Those certain items of personal property and intellectual property rights owned by the Grantor including any and all inventory, together with all accessions, replacements, additions, or proceeds therefrom, whether now owned or hereafter acquired, and all of the Grantor's trademarks, tradenames, patent rights, and domain names, including but not limited to "DERMAPEN," the "Dermapen 'D' logo," and "dermapen.com".).

[321] *Id.* § 25-6-5(2)(i).

[322] *Id.* § 25-6-3(2).

[323] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 221:6-9, docket no. 597.

*Defenses*

Anderer has failed to meet his burden of proving his good faith in these transfers for the same reasons outlined above.[324] Additional factors strongly suggest the lack of Anderer's good faith. Saunders, on behalf of Anderer (both with the full knowledge of this pending litigation) asked Jones to confess judgment on behalf of Derma Pen the very day that the bankruptcy case was dismissed.[325] Similarly, the following day, Saunders asked Jones to execute the Trademark Assignment—the trademark that has been at issue in this case for over one year.[326] Neither Anderer nor Derma Pen notified 4EverYoung of Anderer's demand, nor gave 4EverYoung an opportunity to pay off Anderer's debt.

### (4)   Utah Code Ann. § 25-6-6(2)

Both of these transfers fall under the broad transfer definition.[327] 4EverYoung's claim had arisen before the transfers were made—during this pending litigation. Anderer, was at the time of the transfers, an insider. The transfers were made pursuant to Derma Pen's antecedent debt from the 2014 Documents and the DIP lien. Derma Pen was insolvent at the time the transfers were made.[328] First, Derma Pen declared itself insolvent by its bankruptcy filing, also Derma Pen was presumed insolvent because, by that time, it was not paying its attorneys' fees as they became due.[329] As an insider and part owner of Derma Pen, Anderer had at the time of the transfers reason to know of Derma Pen's finances as he was the one funding Derma Pen's present litigation and was aware of the substantial amount of legal fees that Derma Pen owed its

---

[324] Utah Code Ann. § 25-6-9(1).

[325] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 202:3-206:19, 220:24-221:3, docket no. 597.

[326] *See* E-Mail Saunders to Jones, dated December 19, 2014 (6:46 p.m.), Ex. 128; *see also* February 12, 2015 Preliminary Injunction Hearing Transcript at 212:7-213:12, docket no. 597.

[327] Utah Code Ann. § 25-6-2(12).

[328] *Id.* § 25-6-5(2)(i).

[329] *Id.* § 25-6-3(2).

attorneys. 4EverYoung is likely to prevail in establishing constructive fraud under § 25-6-6(2) by

clear and convincing evidence.

*Defenses*

Anderer argues that even if there is a finding of constructive fraud, "[a] transfer is not

voidable under Subsection 25-6-6(2): . . . (c) if made pursuant to a good-faith effort to

rehabilitate the debtor and the transfer secured present value given for that purpose as well as an

antecedent debt of the debtor.[330] This defense is not applicable to the Confession of Judgment

and Trademark Assignment transfers because neither transfer was to rehabilitate the debtor. They

occurred after the bankruptcy dismissal.

Anderer also argues as a defense that the "transfer is not voidable under . . . Section 25-6-

6 if the transfer results from: . . . (b) enforcement of a security interest in compliance with Title

70A, Chapter 9a, Uniform Commercial Code – Secured Transactions."[331] As previously ruled,

Anderer is not absolutely insulated from a fraudulent transfer attack simply because he holds a

security interest.[332] If Anderer's rationale were true, then any fraudulent transfer of a security

interest would be insulated.[333] 4EverYoung has the right to attempt to show that Anderer's

security interests and other documents may be part of the alleged fraudulent transfer of assets. If

4EverYoung ultimately prevails at trial on the merits of its UFTA claim(s), then Anderer's

security interest, and therefore his valid liens, would be voidable just as any other transfer under

---

[330] This section "reflects a policy judgment that an insider who has previously extended credit to a debtor should not
be deterred from extending further credit to the debtor in a good faith effort to save the debtor from a forced
liquidation in bankruptcy or otherwise."  Uniform Fraudulent Transfer Act § 8, cmt. 6.  Relevant considerations in
determining whether the transfer was in good faith under this section include (i) the amount of the present value
given, (ii) the size of the antecedent debt secured, and (iii) the likelihood of success for the rehabilitative effort.  *Id.;
Prairie Lakes Health Care Sys., Inc. v. Wookey*, 1998 S.D. 99, ¶ 26, 583 N.W.2d 405, 417 (determining that
rehabilitation defense was inapplicable because transfer was "obviously not made to rehabilitate" but instead to
"dispose of [defendants'] entire real estate holdings and thus end their ownership of the farming business").

[331] Utah Code Ann. § 25-6-9(5).

[332] *See* Memorandum Decision and Order Denying [581] Oral Motion for Summary Relief at 9, docket no. 589, filed
February 16, 2015.

[333] *Id.*

the UFTA,[334] and his security interest defense would not support the Confession of Judgment

and Trademark Assignment transfers.

**Debtor-In-Possession Financing Lien**

4EverYoung's Third-Amended Counterclaim does not identify nor specifically seek to

avoid the DIP Lien.[335] At the time 4EverYoung filed the Third Amended Counterclaim, it was

aware of the DIP Lien, as it had objected to the lien on several occasions during the Bankruptcy

Case.[336] But the Third Amended Counterclaim states no claim against the DIP Lien. Similarly,

the draft findings and conclusions submitted by 4EverYoung make no reference to invalidation

of the DIP Lien. Whether the DIP Lien is analyzed under § 25-6-5(1)(a) or § 25-6-6(2), the

supervision of that financing by the bankruptcy court suggest that evidence could not be clear

and convincing that the DIP lien was a fraudulent transfer.

**Summary**

4EverYoung is likely to succeed on its claim that the 2014 Documents, Confession of

Judgment and Trademark Assignment were made with the intent to hinder, delay or defraud, and

are fraudulent transfers. Anderer is not likely to succeed in proving any defense.

**Other Issues Related to Likelihood of Success**

**Party Status and Service**

Anderer raises other issues, such as his party status, which was discussed in an order

previously.[337] And contrary to his claims, service on him by alternative means was properly

---

[334] *Id.* at 12.

[335] Third Amended Counterclaim and Demand for Jury trial, docket no. 547, filed February 3, 2015.

[336] Exs. 117, 119, 121.

[337] *See* Memorandum Decision and Order Granting [569] *Nunc Pro Tunc* Motion, docket no. 588, filed February 16, 2015.

authorized because service was "impracticable under the circumstances."[338]  Further, he generally appeared through counsel on January 26, 2015.[339]

**Narrow Issues under the UFTA**

Another prior order dealt with arguments under the Uniform Fraudulent Transfer Act.[340] Anderer argued that as holder of a facially valid security interest, he had a "valid lien" and was immune from UFTA claims, and that 4EverYoung was not a creditor with a claim. This argument was resolved in a prior order.[341]

Derma Pen and Anderer also argued that the UFTA does not permit voiding of a transfer.[342] This argument is unavailing.  Utah Courts have held that "transfers of property designed to place a debtor's assets beyond the reach of the debtor's creditors are void as to the creditors."[343] In *Tolle*, the trial court found that the transfer of the property at issue was fraudulent and therefore void.[344] The Utah Court of Appeal held that the "trial court properly voided the transfers."[345] Moreover, § 25-6-8(1)(c)(iii) of the UFTA stated that "a creditor . . . may obtain . . . (iii) any other relief the circumstances may require."[346] Voiding a fraudulent transfer is a relief that is contemplated in the broad language of § 25-6-8(1)(c)(iii).

---

[338] Utah R. Civ. P. 4(d)(4)(A).

[339] Notice of Appearance of Counsel (David E. Leta) docket no. 517, filed January 26, 2015; Notice of Appearance of Counsel (Michael A. Gehret) docket no. 518, filed January 26, 2015; Notice of Appearance of Counsel (Douglas P. Farr) docket no. 519, filed January 26, 2015.

[340] *See* Memorandum Decision and Order Denying [581] Oral Motion for Summary Relief, docket no. 589, filed February 16, 2015.

[341] *Id.*

[342] January 29, 2015 Preliminary Injunction Hearing Transcript at 68.

[343] *Tolle v. Fenley,* 2006 UT App 78, ¶ 13, 132 P.3d 63 (quoting *National Loan Investors, L.P. v. Givens,* 952 P.2d 1067, 1069 (Utah 1998)).

[344] *Id.* ¶ 9.

[345] *Id.* ¶ 30.

[346] Utah Code Ann. § 25-6-8(1)(c)(iii).

**4EverYoung's Claims Were Not Concluded in Derma Pen's Bankruptcy**

Anderer has also argued that 4EverYoung's claims were concluded in the Derma Pen

Bankruptcy.  Anderer argues that the Final Order . . . (I) Authorizing the Debtor to Use Cash

Collateral, (II) Granting Adequate Protection, and (III) Authorizing Post-Petition Financing[347]

finally and completely adjudicates the validity of his 2014 security interest and loan and the

Debtor in Possession financing. On the record in the February 4, 2015 hearing, the court ruled on

these assertions.[348] Anderer cites language about validity of the 2014 SA and Note 3 from a

stipulation to which 4EverYoung was not a party. 4EverYoung never had an opportunity to

present its current claims in Bankruptcy Court and never missed a deadline for such presentation.

The deadline was extended until a date that turned out to be after the bankruptcy dismissal, and

Anderer presented no authority that that date continued to have meaning.  The deadline was

related only to the bankruptcy proceedings and was not a statute of limitation. The bankruptcy

judge was repeatedly careful to note 4EverYoung's claim was specifically reserved. Anderer has

not pointed to an express waiver 4EverYoung made in the Bankruptcy Court.

**The Sales Distribution Agreement Does Not Call for a Transfer in Gross**

Anderer argues that the Sales Distribution provides for an ineffective transfer in gross of

the Trademark.  That is, he contends that the bare transfer of the Trademark is ineffective

because it is not accompanied by a transfer of the associated goodwill.  The Sales Distribution

Agreement neither requires Derma Pen to sell any of its goodwill, business assets or customer

lists to 4EverYoung, nor does it allow 4EverYoung to exercise any form of option or right of

first refusal to acquire those items, upon termination of the Sales Distribution Agreement.

"Courts have consistently held that a valid assignment of a trademark or service mark requires

---

[347] Ex. 123.

[348] Minute Order, docket no. 563, filed February 4, 2015.

the transfer of the goodwill associated with the mark."[349] "A trademark identifies the source and quality of the goods and services offered."[350] "For a company to purchase the rights to a well-known trademark to use it in a manner which is wholly unrelated to the business or products which made the trademark famous would confuse or deceive the consumer."[351] "The purpose for requiring transfer of goodwill along with the transfer of the . . . [trademark] is to ensure that consumers receive accurate information about the product or service associated with the mark."[352]

"Consonant with this purpose, courts have recognized exceptions to the general rule that trademarks cannot be assigned without the goodwill of the accompanying business."[353] Such assignments are upheld "if . . . the assignee is producing a product or performing a service substantially similar to that of the assignor and that the consumers would not be deceived or harmed."[354]

---

[349] *Vittoria N. Am., L.L.C. v. Euro-Asia Imports Inc.*, 278 F.3d 1076, 1082 (10th Cir. 2001); *see also Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 956 (7th Cir.1992) ("[T]he transfer of a trademark apart from the goodwill of the business which it represents is an invalid 'naked' or 'in gross' assignment, which passes no rights to the assignee." (citation and quotations omitted)); *Berni v. Int'l Gourmet Rests. of Am., Inc.,* 838 F.2d 642, 646 (2d Cir.1988) (same).

[350] *J. Atkins Holding Ltd. v. English Discounts, Inc*., 729 F.Supp. 945 (1990).

[351] *Id.*

[352] *See e.g., Vittoria N. Am., L.L.C., 278 F.3d at 1083; Sugar Busters LLC v. Brennan,* 177 F.3d 258, 265 (5th Cir.1999) ("The purpose of the rule prohibiting the sale or assignment of a trademark in gross is to prevent a consumer from being misled or confused as to the source and nature of the goods or service that he or she acquires."); *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1289 (9th Cir.1992) (same); *Patterson Labs., Inc. v. Roman Cleanser Co. (In re Roman Cleanser Co.),* 802 F.2d 207, 208–09 (6th Cir.1986) (same); *Marshak v. Green,* 746 F.2d 927, 929–930 (2d Cir.1984) ) (same).

[353] *Id.*

[354] *Marshak,* 746 F.2d at 930 (citations omitted); *see also Sugar Busters,* 177 F.3d at 266; *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.,* 759 F.2d 1053, 1059 (2d Cir.1985) ("[A] trademark may be validly transferred without the simultaneous transfer of any tangible assets, as long as the recipient continues to produce goods of the same quality and nature previously associated with the mark." (citation omitted)); *Visa, U.S.A., Inc. v. Birmingham Trust Nat'l Bank,* 696 F.2d 1371, 1376 (Fed.Cir.1982) ( "[T]ransfer of goodwill requires only that the services be sufficiently similar to prevent consumers of the service offered under the mark from being misled from established associations with the mark." (quotations omitted)).

4EverYoung's purchase of the Trademark falls within the exception to the general rule.

Under the Sales Distribution Agreement, 4EverYoung granted Derma Pen the exclusive right to

sell the Device and the related Tips in the USA and 4EverYoung also provided Derma Pen the

Device and the Tips to market and sell.[355] While Derma Pen sold the Device in the USA,

4EverYoung sold the same Device outside of the USA. Under the circumstances of this case,

4EverYoung's purchase of the Trademark, without its associated goodwill, will not separate the

trademark from the goods upon which its reputation is based.[356]  The Device that 4EverYoung is

selling is not so different from what Derma Pen has been selling, since the inception of the Sales

Distribution Agreement, to work a deception upon the public. Variations in type or quality of the

product will not invalidate the purchase.[357] No evidence has been presented that 4EverYoung

seeks to apply the trademark to an entirely different type of product. Accordingly, the Derma Pen

Trademark may be validly purchased without being accompanied by the goodwill.

### Amount of Bond

As with every other issue in this case, views on an appropriate bond are disparate.

Anderer claims his $791,012.18 judgment will swell to $2,000,000 by the time this dispute is

---

[355] Ex. 1, § 2.1.

[356] *See e.g., J. Atkins Holding Ltd.* at 729 F.Supp. 945, 950 (1990) ("If, on the other hand, one looks at the overall facts, this is not an assignment that separates the trademark from the goods or services upon which its reputation is based. To the contrary, this was an assignment . . . which is designed to continue the employment of the trademarks in connection with the same goods on which their reputation is based. . . ."). *See also Visa U.S.A., Inc.,* 696 F.2d at 1376 (mark signifying a promise to guarantee a check can be assigned from a supermarket chain to a credit card organization).

[357] *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F.Supp. 899, 907 (E.D. NY 1988); *see also* citing *Hy–Cross Hatchery, Inc. v. Osborne,* 303 F.2d 947 (1962) (upholding assignment of mark where the mark was transferred to a producer who raised a different variety of chickens); *E.I. DuPont de Nemours & Co. v. G.C. Murphy Co.,* 199 U.S.P.Q. 807, 813 (T.T. & A. Bd.1978) (holding that a change in the quality of a paint from premium priced to budget-type would not interrupt the continuity of the mark, so long as "[t]he inherent and identifiable character of the goods remains the same."); *Glamorene Products Corp. v. Procter & Gamble Co.,* 538 F.2d 894 (upholding assignment of mark used on different dry cleaning detergent); *Beech–Nut Packing Co. v. P. Lorillard Co.,* 299 F. 834, 849 (D.C.N.J.1924) (upholding assignment of mark upon predecessor's liquidation, although assignee applied the mark to tobacco of a different blend and formula); and *White Satin Mills Corporation v. Woodward,* 34 F.2d 158 (D.C.Minn.), *aff'd.,* 42 F.2d 987 (8th Cir.1929) (change in type of sugar sold under the mark did not invalidate assignment).

resolved, and seeks a bond in that amount.[358] His estimate includes legal fees in this case which he asserts Derma Pen is required to pay in collection of the notes, even though the fees are incurred in a separate fraudulent transfer action, defending against a separate party. His theory ignores the security of the Trademark and Domain Name which Derma Pen has consistently valued at millions of dollars. He does acknowledge that 4EverYoung values the Trademark and Domain Name at $353,000.[359]

Another theory advanced by Anderer is that the bond should be set at the entire value of the Trademark and Domain Name on the assumption that they might be valueless as a result of this litigation. However, eighteen months of litigation and combative competition have not dampened the parties' enthusiasm for the Trademark and Domain Name.

4EverYoung provides no rationale for its argument[360] that the $20,000 it already posted in the form of a $10,000 bond on this temporary restraining order[361] and the $10,000 bond it posted on the December 23, 2014 TRO[362] is sufficient security.

These polar positions do little to assist the establishment of a bond amount. The Anderer obligation is on its face fully secured. Interest accrues under the judgment at 5% per annum.[363] The judgment says it bears interest "at the judgment rate." Assuming that rate to be 5%, the

---

[358] [Anderer's Proposed] Findings of Fact, Conclusions of Law and Order . . . , ¶196 at 76, docket no. 611, filed February 21, 2015.

[359] *Id.* ¶197 at 76. This value estimate is highly questionable. Separate proceedings in this case about the value of the Trademark and Domain Name as of August 31, 2013 have yielded evidence showing the estimate is undoubtedly far too low by reason of assumptions 4EverYoung's expert has made about royalty rates and discount rates, among other factors.

[360] [4EverYoung's Proposed] Findings of Fact, Conclusions of Law, and Order . . . , ¶35 at 53-54, docket no. 612, filed February 21, 2015.

[361] Docket no. 508, filed January 22, 2015.

[362] Docket no. 462, filed December 29, 2014.

[363] Judgment in the Confession of Judgment Action, docket no. 496 in this case, filed January 21, 2015 and Ex. 30. *See also* Confession of Judgment, docket no. 460-1 in this action, filed December 24, 2014, and Ex 25.  At the hearing February 23, 2015, counsel for Anderer clarified that the Confession of Judgment is in error in reciting a 10% interest rate for the $100,000 advanced in bankruptcy.  February 23, 2015 Preliminary Injunction Hearing Transcript ___;___, docket no. ___, filed _____.

judgment may increase by $40,000 each year. This litigation may extend three years which yields a total of $120,000. The accrual of interest is a direct cost of delay of Anderer's foreclosure. Anderer also incurs costs which may be recoverable under Fed. R. Civ. P. 54 which should be secured by a bond. Those costs are not likely to exceed $10,000. Thus, the total bond supporting this preliminary injunction will be $130,000 to which the $10,000 bond filed already[364] for restraint of Anderer may be credited.

The new additional bond of $120,000 must be posted by Monday March 2, 2015. If it is not posted, this preliminary injunction shall dissolve.

## ORDER

Based upon the pending motions,[365] the evidentiary hearing and argument, the pleadings and papers on file with the Court, and for good cause shown,

IT IS HEREBY ORDERED:

4EverYoung's Motion for Temporary Restraining Order and Preliminary Injunction Against Michael E. Anderer[366] is GRANTED IN PART and DENIED IN PART.  A preliminary injunction is entered as follows:

> (a)      Anderer, his agents, servants, employees, and attorneys, and those acting in concert, with them (collectively, the "Enjoined Parties") shall not transfer the Trademark or Domain Name or any interest therein of any kind or any obligation secured thereby except in connection with a foreclosure based on the Debtor In Possession (DIP) Financing;

---

[364] Docket no. 508, filed January 22, 2015.

[365] Docket nos. 504 and 529.

[366] Docket no. 504.

(b)      Anderer may not credit bid any amounts (specifically including but not limited to amounts claimed under Note 3 also known as the 2014 Note and under the 2014 SA) other than the principal and interest owing under the Debtor In Possession (DIP) Financing (see the Findings of Fact at p. 28–29) at any foreclosure based on the lien of or amounts owing under the Debtor In Possession (DIP) Financing without further order of this court;[367]

(c)      The assets sold under any foreclosure based on amounts owing under the Debtor In Possession (DIP) Financing shall be subject to the lien interest, if any, represented by the 2014 SA, and any debt or obligation secured thereby, as shall later be adjudicated by this court and all documents issued in connection with such a foreclosure shall recite that fact and refer to this order by court, case number and title, and docket number and date;

(d)      This preliminary injunction will remain in effect until otherwise ordered by the Court; and

(e)      4EverYoung must post $120,000 additional security for the issuance of this preliminary injunction on or before March 5, 2015.

IT IS FURTHER ORDERED that Anderer's Motion to Vacate TRO[368] is DENIED.

Dated February 26, 2015.

BY THE COURT:

David Nuffer
United States District Judge

---

[367] Anderer's counsel agreed at the hearing February 23, 2015, that if the DIP financing proceeded to foreclosure, and foreclosure of Note 3, the 2014 Note, was restrained, that amounts secured by that latter obligation could not be credit bid.  February 23, 2015, Preliminary Injunction Hearing Transcript at ___:___, docket no. ____, filed _____ _____, 2015.

[368] Docket no. 529.

**Attachment D**

Memorandum Decision and Order Holding Michael E. Anderer in Contempt of Court for Violating December 23, 2014 Temporary Restraining Order and January 6, 2015 Preliminary Injunction, filed April 15, 2015

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **DERMA PEN, LLC,** | **MEMORANDUM DECISION AND ORDER HOLDING MICHAEL E. ANDERER IN CONTEMPT OF COURT FOR VIOLATING DECEMBER 23, 2014 TEMPORARY RESTRAINING ORDER AND JANUARY 6, 2015 PRELIMINARY INJUNCTION** |
| **Plaintiff,** | |
| **v.** | |
| **4EVERYOUNG LTD., DERMAPENWORLD, BIOSOFT (AUST) PTY. LTD. d/b/a DERMAPENWORLD, EQUIPMED INTERNATIONAL PTY. LTD. d/b/a DERMAPENWORLD, and STENE MARSHALL d/b/a DERMAPENWORLD,** | |
| **Defendants.** | |
| **4EVERYOUNG LTD. and EQUIPMED INTERNATIONAL PTY. LTD.,** | |
| **Counterclaim Plaintiffs,** | |
| **v.** | **Case No.:  2:13-CV-00729-DN-EJF** |
| **DERMA PEN, LLC, MICHAEL E. ANDERER, JEREMY JONES, MICHAEL J. MORGAN, CHAD MILTON, MEDMETICS, LLC, a Delaware limited liability company, and JOHN DOES 1-25,** | **District Judge David Nuffer**<br><br>**Magistrate Judge Evelyn J. Furse** |
| **Counterclaim Defendants.** | |

This matter came before the Court on the Emergency Motion for Order to Show Cause Regarding Trademark and Domain Name Transfer Injunctions (the "First OSC Motion"),[1] filed by Defendants and Counterclaim Plaintiffs 4EverYoung Limited ("4EverYoung") and Equipmed International Pty. Limited ("Equipmed") and Defendants Biosoft (Aust.) Ltd. Pty. ("Biosoft") and Stene Marshall ("Marshall") (collectively "Defendants").   Following briefing,[2] hearings regarding the First OSC Motion were held on January 21,[3] January 29,[4] February 4,[5] February 9,[6] February 11,[7] February 12,[8] February 17,[9] February 19,[10] and March 25, 2015.[11]   At those

---

[1] Docket no. 481, filed January 15, 2015; *see also* Docket Text Order, docket no. 482, entered January 16, 2015.   The "Second OSC Motion" is the Motion for Order to Show Cause Regarding Preliminary Injunction [Docket No. 634] Against Michael E. Anderer, docket no. 639, filed February 27, 2015.   With respect to the Second OSC Motion, during the March 25, 2015 hearing, the Court found Anderer in contempt of the Memorandum Decision and Order Granting in Part 4EverYoung's Motion for Preliminary Injunction Against Michael E. Anderer; Denying Michael Anderer's Motion to Vacate, docket no. 630, entered February 25, 2015; and the Corrected Memorandum Decision and Order Granting in Part 4EverYoung's Motion for Preliminary Injunction Against Michael E. Anderer; Denying Michael Anderer's Motion to Vacate, docket no. 634, entered February 26, 2015 (collectively, with docket no. 630, the "February 2015 Preliminary Injunction").   *See* March 25, 2015 Hearing Transcript at 13:12-15:7, docket no. 716, filed March 25, 2015.   A separate contempt order addresses the issues presented in the Second OSC Motion.   *See* Memorandum Decision and Order Holding Michael E. Anderer in Contempt of Court for Violating February 2015 Preliminary Injunction, docket no. ___, entered April __, 2015.

[2] *See* Opposition to Emergency Motion for Order to Show Cause Re Trademark and Domain Name Transfer Injunctions ("Derma Pen Opposition"), docket no. 485, filed January 20, 2015; *see also* Supplemental Memorandum in Opposition to Motion for Order to Show Cause ("Anderer Opposition"), docket no. 527, filed January 28, 2015.

[3] *See* Minute Order, docket no. 495, entered January 21, 2015.

[4] *See* Minute Order, docket no. 533, entered January 29, 2015.

[5] *See* Minute Order, docket no. 563, entered February 4, 2015.

[6] *See* Minute Order, docket no. 573, entered February 9, 2015.

[7] *See* Minute Order, docket no. 579, entered February 11, 2015.

hearings, Plaintiff and Counterclaim Defendant Derma Pen, LLC ("Derma Pen") was

represented by Douglas R. Short; Counterclaim Defendant Michael E. Anderer ("Anderer") was

represented by David E. Leta and Michael A. Gehret of SNELL & WILMER LLP; and, Defendants

were represented by Christine T. Greenwood and Christopher M. Von Maack of MAGLEBY &

GREENWOOD, P.C.  At those hearings, testimony and evidence were admitted through multiple

witnesses and by stipulation.[12]

## BACKGROUND

Substantial findings related to the issues addressed in this order were made in the

February 2015 Preliminary Injunction.[13]  Those findings relate to the issues addressed in this

order and are incorporated by reference into this order.

### The December 23, 2014 Temporary Restraining Order

On December 23, 2014, the Court entered its Memorandum Decision and Order Granting

in Part Defendants' Motion for Temporary Restraining Order (the "December 23, 2014

Temporary Restraining Order"), ordering that "Derma Pen, its officers, agents, servants,

_____

(...continued)
[8] *See* Minute Order, docket no. 583, entered February 12, 2015.

[9] *See* Minute Order, docket no. 591, entered February 17, 2015.

[10] *See* Minute Order, docket no. 595, entered February 19, 2015.

[11] *See* Minute Order, docket no. 712, entered March 25, 2015; *see also* March 25, 2015 Hearing
Transcript at 15:8-20:5, docket no. 716.

[12] *See* February 2015 Preliminary Injunction at 2, docket nos. 630, 634.

[13] *See* Docket nos. 630, 634.

employees, and attorneys, and those acting in concert, with them (collectively, the 'Enjoined Parties') shall not transfer the trademark and domain name."[14]

The December 23, 2014 Temporary Restraining Order includes language similar to that under Rule 65(d)(2)(c) of the Federal Rules of Civil Procedure, reciting that the temporary restraining order binds "persons who are in active concert or in participation with" Derma Pen, which includes Anderer.[15]

On or before December 24, 2014, Anderer, through his counsel, received notice of the December 23, 2014 Temporary Restraining Order.[16]  Anderer also likely learned of the December 23, 2014 Temporary Restraining Order during his holiday party in early January 2015, which was attended by "Derma Pen people[;] Derma Gen people[;]" Jeremy Jones ("Jones"), the former COO and CEO of Derma Pen; Michael J. Morgan ("Morgan"), the purportedly former CEO of Derma Pen; and at least one of Anderer's attorneys, among others.[17]

### The January 6, 2015 Preliminary Injunction

On January 6, 2015, the Court entered a preliminary injunction from the bench, which injunction was memorialized in the Memorandum Decision and Order Granting 4EverYoung's

---

[14] December 23, 2014 Temporary Restraining Order at 6 ¶ 2, docket no. 451, entered December 23, 2014.

[15] *See* Fed. R. Civ. P. 65(d)(2); *see also* February 2015 Preliminary Injunction at 36, docket nos. 630, 634.

[16] *Se*e E-Mail Von Maack to Scofield, dated December 24, 2014, docket no. 481 at 28; *see also* E-Mail Von Maack to Hon. Faust and Counsel, dated December 24, 2014, docket no. 481 at 30; Letter D. Scofield to Hon. Faust, dated January 8, 2015, docket no. 481 at 16; February 2015 Preliminary Injunction at 36, docket nos. 630, 634.

[17] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 198:5-199:4, docket no. 597; *see also* February 2015 Preliminary Injunction at 7, 8, 36, docket nos. 630, 634.

241 Motion for Partial Summary Judgment on Specific Performance and Granting in Part

Defendants' 141 Motion for Preliminary Injunction (the "January 6, 2015 Preliminary

Injunction").[18]

   In the January 6, 2015 Preliminary Injunction, the Court explained that the December 23,

2014 Temporary Restraining Order included language similar to Rule 65(d)(2)(C), "reciting that

the temporary restraining order binds 'persons who are in active concert or participation with'

Derma Pen, which includes Anderer."[19]

   On or before January 8, 2014, Anderer, through his counsel, received notice of the

January 6, 2015 Preliminary Injunction.[20]  Anderer also likely learned of the January 6, 2015

Preliminary Injunction during his holiday party in early January 2015, which was attended by

"Derma Pen people, Derma Gen people," Jones, Morgan, and at least one of Anderer's attorneys,

among others.[21]

---

[18] Docket no. 476, entered January 12, 2015; *see also* February 2015 Preliminary Injunction at 40, docket nos. 630, 634.

[19] January 6, 2015 Preliminary Injunction at 4-5, docket no. 476; *see also* February 2015 Preliminary Injunction at 40, docket nos. 630, 634.

[20] *See* E-Mail C. Von Maack to Hon. Faust and Counsel, dated January 8, 2015, docket no. 481 at 32; *see also* Letter D. Scofield to Hon. Faust, dated January 8, 2015, docket no. 481 at 17-18; E-Mail C. Von Maack to Hon. Faust and Counsel, dated January 12, 2015, docket no. 481 at 35; E-Mail C. Von Maack to Counsel, dated January 12, 2015, docket no. 481 at 38; E-Mail D. Scofield to C. Von Maack, dated January 12, 2015, docket no. 481 at 40; E-Mail T. Dance to C. Von Maack, dated January 12, 2015, docket no. 481 at 44.

[21] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 198:5-199:4, docket no. 597; *see also* February 2015 Preliminary Injunction at 40, docket nos. 630, 634.

**The January 9, 2015 UCC Filing**

On January 9, 2015, Anderer (through counsel, Snell & Wilmer) filed a UCC Financing Statement in Delaware.[22]  That UCC filing expressly covered the Trademark and Domain Name.[23]

**The Notice of UCC Sale**

On January 9, 2015, Anderer (through counsel, Timothy J. Dance of Snell & Wilmer) issued a notice of public sale of Derma Pen and its assets, including the Trademark.[24]  According to the Notice of Sale, the sale was to take place on January 22, 2015, at 8:00 a.m., at the Salt Lake City office of Snell & Wilmer.[25]

---

[22] *See* Delaware UCC Financing Statement, dated January 9, 2015, Preliminary Injunction Hearing Ex. 18; *see also* February 2015 Preliminary Injunction at 41, docket nos. 630, 634.

[23] *See* Delaware UCC Financing Statement, dated January 9, 2015, Preliminary Injunction Hearing Ex. 18, docket no. 496 at 1; *see also* February 2015 Preliminary Injunction at 41, docket nos. 630, 634.

[24] *See* Notice of Public Disposition of Collateral (the "Notice of Sale"), dated January 9, 2015, Preliminary Injunction Hearing Ex. 31, docket no. 489-3 at 2-5; *see also* February 2015 Preliminary Injunction at 41, docket nos. 630, 634.

[25] *See* Notice of Sale at 1, Preliminary Injunction Hearing Ex. 31, docket no. 489-3 at 2; *see also* February 2015 Preliminary Injunction at 41, docket nos. 630, 634.

**The Confession of Judgment**

On Friday, December 19, 2014 (*i.e.*, the same day that Derma Pen's bankruptcy case was dismissed as a bad-faith litigation tactic), Samuel Saunders ("Saunders"), as Anderer's attorney, verbally asked Jones to confess judgment on behalf of Derma Pen in favor of Anderer.[26]

On Monday, December 22, 2014, Anderer appeared at Derma Pen's office with a notary, and Derma Pen executed a Confession of Judgment in favor of Anderer without meeting or discussion.[27] Jones, on behalf of Derma Pen, executed the Confession of Judgment, acknowledging a liability of Derma Pen to Anderer in the amount of $791,012.18.[28] That same day, Anderer filed an action (the "Confession of Judgment Action") in the Third District Court, State of Utah, to levy on Derma Pen's secured assets.[29]

---

[26] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 202:3-206:19, 220:24-221:3, docket no. 597; *see also* February 2015 Preliminary Injunction at 31, docket nos. 630, 634.

[27] *See* Confession of Judgment, dated December 22, 2014, Preliminary Injunction Hearing Ex. 25; *see also* February 12, 2015 Preliminary Injunction Hearing Transcript at 199:17-202:2, docket no. 597; February 2015 Preliminary Injunction at 32, docket nos. 630, 634.

[28] *See* Confession of Judgment, dated December 22, 2014, Preliminary Injunction Hearing Ex. 25; *see also* February 12, 2015 Preliminary Injunction Hearing Transcript at 199:17-202:2, docket no. 597; February 2015 Preliminary Injunction at 32, docket nos. 630, 634.

[29] *See Anderer v. Derma Pen, LLC*, in the Third Judicial District Court, Salt Lake County, Utah, Case No. 140908635, Honorable Robert Faust; *see also* February 2015 Preliminary Injunction at 31, docket nos. 630, 634.

**The Writ of Execution**

On January 12, 2015, Anderer (through counsel, David W. Scofield of Peters Scofield) filed an Application for Writ of Execution.[30]  The Application for Writ of Execution sought to execute upon the Trademark and Domain Name.[31]

On January 13, 2015, the State Court issued Anderer's proposed Writ of Execution in the Confession of Judgment Action.[32]

On January 14, 2015, Anderer (through the Salt Lake County Constable) served upon Derma Pen the Writ of Execution.[33]

On January 18, 2015, Anderer caused a return of service for the Writ of Execution to be filed with the State Court.[34]

**The Praecipe**

On January 13, 2015, Anderer (through counsel, David W. Scofield of Peters Scofield) executed a Praecipe directing the Sheriff or any constable "to levy upon, attach and hold" Derma Pen's assets, including the Trademark and Domain Name.[35]

---

[30] *See* Application for Writ of Execution, dated January 12, 2015, Preliminary Injunction Hearing Ex. 32, docket no. 496 at 10-19; *see also* February 2015 Preliminary Injunction at 41, docket nos. 630, 634.

[31] *See* Application for Writ of Execution at 10, Preliminary Injunction Hearing Ex. 32, docket no. 496 at 19; *see also* February 2015 Preliminary Injunction at 41, docket nos. 630, 634.

[32] *See* Writ of Execution, dated January 13, 2015, Preliminary Injunction Hearing Ex. 33, docket no. 496 at 5-6; *see also* February 2015 Preliminary Injunction at 41, docket nos. 630, 634.

[33] *See* Proof of Service, dated January 14, 2015, Preliminary Injunction Hearing Ex. 142; *see also* February 2015 Preliminary Injunction at 42, docket nos. 630, 634.

[34] *See* Confession of Judgment Action Docket, Preliminary Injunction Hearing Ex. 26.

8

On January 14, 2015, Anderer (through the Salt Lake County Constable) served upon

Derma Pen the Praecipe.[36]

### The Keeper's Receipt

On January 14, 2015, Derma Pen executed a Keeper's Receipt.[37]

### The Notice of Constable Sale

On or about January 16, 2015, Anderer (through the Salt Lake County Constable) issued

a Notice of Constable Sale.[38]  According to that notice, the Trademark and Domain Name were

to be sold on January 30, 2015 at 2:00 p.m. at the Derma Pen offices at 3216 South Highland

Drive, Suite 200, Salt Lake City, Utah 84106.[39]

### The First OSC Motion

On January 15, 2015, Defendants filed the First OSC Motion, seeking to hold Anderer in

contempt of Court.[40]

_____

(...continued)

[35] *See* Praecipe, dated January 13, 2015, Preliminary Injunction Hearing Ex. 139; *see also* February 2015 Preliminary Injunction at 41, docket nos. 630, 634.

[36] *See* Proof of Service, dated January 14, 2015, Preliminary Injunction Hearing Ex. 142; *see also* February 2015 Preliminary Injunction at 42, docket nos. 630, 634.

[37] *See* Keeper's Receipt, dated January 14, 2015, Preliminary Injunction Hearing Ex. 140; *see also* February 2015 Preliminary Injunction at 42, docket nos. 630, 634.

[38] *See* Notice of Constable Sale, dated January 16, 2015, Preliminary Injunction Hearing Ex. 141; *see also* February 2015 Preliminary Injunction at 42, docket nos. 630, 634.

[39] *See* Notice of Constable Sale, dated January 16, 2015, Preliminary Injunction Hearing Ex. 141; *see also* February 2015 Preliminary Injunction at 42, docket nos. 630, 634.

[40] *See* First OSC Motion, docket no. 481.

On January 21, 2015, Anderer expressed in open court his intent to go forward with the sale of the Trademark and Domain Name, notwithstanding the December 23, 2014 Temporary Restraining Order and January 6, 2015 Preliminary Injunction.[41]

After briefing and multiple days of hearings, the Court ruled from the bench on March 25, 2015 and held Anderer in contempt of Court.[42]

## DISCUSSION

### The Valid Orders

On December 23, 2014, the Court granted Defendant's motion for temporary restraining order.[43]  The language of that temporary restraining order is clear.

On January 12, 2015, the Court issued a written order, following a hearing January 6, 2015, granting Defendants' motion for preliminary injunction.[44]

### Anderer's Knowledge of the Orders

It is clear that Anderer had notice of the December 24, 2014 Temporary Restraining Order on December 24, 2014.  Counsel for 4EverYoung sent a copy of the temporary restraining order to David W. Scofield, Anderer's counsel in the Confession of Judgment Action.[45]

---

[41] *See* January 21, 2015 Hearing Transcript at 25:3-12, docket no. 509, filed January 22, 2015.

[42] *See* March 25, 2015 Hearing Transcript at 15:8-20:5, docket no. 716.

[43] *See* December 23, 2014 Temporary Restraining Order, docket no. 451.

[44] *See* January 6, 2015 Preliminary Injunction, docket no. 476.

[45] *See* E-Mail Von Maack to Scofield, dated December 24, 2014, docket no. 481 at 28; *see also* E-Mail Von Maack to Hon. Faust and Counsel, dated December 24, 2014, docket no. 481 at 30; Letter D. Scofield to Hon. Faust, dated January 8, 2015, docket no. 481 at 16; February 2015 Preliminary Injunction at 36, docket nos. 630, 634.

On January 8, 2015, counsel for 4EverYoung notified Anderer's counsel of the Court's

January 6, 2015 Preliminary Injunction.[46]  On January 12, 2015, counsel for 4EverYoung

provided Anderer notice of the Court's memorialized preliminary injunction order.[47]

### Anderer's Disobedience

Certain actions were taken by Anderer or his agents following the January 6, 2015

Preliminary Injunction.  Those actions include preparing and filing the Delaware UCC Financing

Statement,[48] preparing and issuing the Notice of Sale,[49] preparing and filing the Application for

Writ of Execution,[50] preparing and filing the Praecipe,[51] and preparing and issuing the Keeper's

Receipt.[52]

---

[46] *See* E-Mail C. Von Maack to Hon. Faust and Counsel, dated January 8, 2015, docket no. 481 at 32; *see also* Letter D. Scofield to Hon. Faust, dated January 8, 2015, docket no. 481 at 17-18.

[47] *See* E-Mail C. Von Maack to Hon. Faust and Counsel, dated January 12, 2015, docket no. 481 at 35; *see also* E-Mail C. Von Maack to Counsel, dated January 12, 2015, docket no. 481 at 38; E-Mail D. Scofield to C. Von Maack, dated January 12, 2015, docket no. 481 at 40; E-Mail T. Dance to C. Von Maack, dated January 12, 2015, docket no. 481 at 44.

[48] *See* Delaware UCC Financing Statement, dated January 9, 2015, Preliminary Injunction Hearing Ex. 18.

[49] *See* Notice of Sale, dated January 9, 2015, Preliminary Injunction Hearing Ex. 31, docket no. 489-3 at 2-5.

[50] *See* Application for Writ of Execution, dated January 12, 2015, Preliminary Injunction Hearing Ex. 32, docket no. 496 at 10-19.

[51] *See* Praecipe, dated January 13, 2015, Preliminary Injunction Hearing Ex. 139.

[52] *See* Keeper's Receipt, dated January 14, 2015, Preliminary Injunction Hearing Ex. 140.

In furtherance of Anderer's actions in the Confession of Judgment Action, the State Court issued the Writ of Execution,[53] which Anderer served on January 14, 2015.[54]  On January 16, 2015, Anderer issued the Notice of Constable Sale,[55] which was filed in the Confession of Judgment Action on January 18, 2015.[56]  Also on January 18, 2015, Anderer filed the return of service for the Writ of Execution.[57]

On January 21, 2015, Anderer stated in open court his intent to go forward with the sale of the Trademark and Domain Name, notwithstanding the December 23, 2014 Temporary Restraining Order and January 6, 2015 Preliminary Injunction.[58]  That statement, in itself, is not a violation, but it reflects Anderer's intentions and attitude.

### Anderer and Derma Pen Acted in Concert

The facts show that Anderer and Derma Pen were acting in concert.  Anderer, since the inception of Derma Pen, has been an investor, part owner, and director at many times.[59]  He has been the only person to provide funds to Derma Pen.[60]  He was consulted on major decisions for Derma Pen and, in fact, the testimony was that, except for one major decision, the officers of

---

[53] *See* Writ of Execution, dated January 13, 2015, Preliminary Injunction Hearing Ex. 33, docket no. 496 at 5-6.

[54] *See* Proof of Service, dated January 14, 2015, Preliminary Injunction Hearing Ex. 142.

[55] *See* Notice of Constable Sale, dated January 16, 2015, Preliminary Injunction Hearing Ex. 141.

[56] *See* Confession of Judgment Action Docket, Preliminary Injunction Hearing Ex. 26.

[57] *See id.*, Preliminary Injunction Hearing Ex. 26.

[58] *See* January 21, 2015 Hearing Transcript at 25:3-12, docket no. 509.

[59] *See* February 2015 Preliminary Injunction at 5-6, 12-14, 27-30, docket nos. 630, 634.

[60] *See id.* at 30, docket nos. 630, 634.

Derma Pen could not recall any instance in which a decision had been made contrary to

Anderer's direction.  Anderer was aware of the Sales Distribution Agreement, was aware of the

obligations under the Sales Distribution Agreement, expressed that the Sales Distribution

Agreement was a highly contested issue in this lawsuit, was aware of this lawsuit, and was aware

of and involved in it and in the bankruptcy case where this dispute between these parties has

been excessively litigated.[61]  Anderer funded the bankruptcy litigation entirely.[62]  The litigation

in bankruptcy was found to be a bad-faith attempt by Derma Pen, and the bankruptcy was

dismissed for that reason.[63]  The Bankruptcy Judge specifically found that the bankruptcy was a

litigation strategy to avoid the results of this litigation.[64]  The security interest was taken by

Anderer with the intention to give him the ability to have another mechanism to prevent

4EverYoung from purchasing Trademark and Domain Name.[65]  Anderer has had this knowledge,

these strategies, and these purposes at all relevant times and effectuated them through Derma Pen

even after his resignation.[66]

      Anderer, through his attorneys, demanded immediate payment in full from Derma Pen,

immediately after the bankruptcy stay was lifted.[67]  Anderer, directly, proposed documents to be

executed, to which documents the nominal officers of Derma Pen acquiesced.[68]

---

[61] *See id.* at 10, docket nos. 630, 634.

[62] *See id.* at 24-28, docket nos. 630, 634.

[63] *See id.* at 30-31, docket nos. 630, 634.

[64] *See id.*, docket nos. 630, 634.

[65] *See id.* at 12-14, 24-30, docket nos. 630, 634.

[66] *See id.* at 18-20, 22-23, docket nos. 630, 634.

[67] *See id.* at 31, docket nos. 630, 634.

Anderer continued to associate with and have contact with, directly and through counsel, the Derma Pen principals.[69]  He made statements that are in the record and referenced in the February 2015 Preliminary Injunction regarding his intentions before his resignation, which he effected after his resignation, to make sure that he would do whatever possible to bar 4EverYoung from purchasing the Trademark and Domain Name.[70]

Throughout the litigation over the last two months, the concurrent and largely consistent arguments of Anderer's counsel and Derma Pen's counsel reflect a joint and collective effort. The Dermagen transfer further reflects Anderer's determination to effect the overall strategy, exercised through Derma Pen and on his own, to ensure that 4EverYoung has every barrier possible to its purchase of the Trademark and Domain Name if that is eventually what 4EverYoung is entitled to.

The Court finds by clear and convincing evidence that Anderer has, at all times, been in effective control of Derma Pen, even after his resignation from nominal offices; that his common design and plan with his entity, Derma Pen, was to keep 4EverYoung from having access to the Trademark and Domain name; and that all of the actions that are described above created an effective strategy for him to exercise his goal.  Clearly Anderer was acting in concert with Derma Pen.  Clearly Anderer was acting for the goal of doing exactly what the December 24, 2014 Temporary Restraining Order and January 6, 2015 Preliminary Injunction prohibited.

---

(...continued)

[68] *See id.* at 31-33, docket nos. 630, 634.

[69] *See id.* at 6-8, 22, 31-32, 36, 40, docket nos. 630, 634.

[70] *See id.* at 18-20, docket nos. 630, 634.

**ORDER**

Based upon the First OSC Motion, the many days of hearings, the evidence admitted at those hearings, the pleadings and papers on file with the Court, and for good cause shown,

IT IS HEREBY ORDERED:

1.      Anderer is in contempt of Court for violations of the December 23, 2014 Temporary Restraining Order and January 6, 2015 Preliminary Injunction.

2.      Anderer shall compensate defendants for their costs and expenses, including reasonable attorney's fees incurred with respect to the First OSC Motion.  4EverYoung shall file its motion for attorney fees on or before April 3, 2015.  Other parties may respond to that motion on or before April 10, 2015.  Thereafter, the Court will rule.

3.      The Court reserves ruling until a later time on any other appropriate sanctions against Anderer, including reasonable attorney fees incurred with respect to 4EverYoung's Motion for Temporary Restraining Order and Preliminary Injunction against Michael E. Anderer ("Motion for Preliminary Injunction")[71] and Michael E. Anderer's Motion to Vacate TRO and Memorandum in Opposition to Motion for Preliminary Injunction Against Michael E. Anderer ("Motion to Vacate").[72]

Dated April 15, 2015.

BY THE COURT:

David Nuffer
United States District Judge

---

[71] Docket no. 504, filed January 21, 2015.

[72] Docket no. 529, filed January 28, 2015.

**Attachment E**

Memorandum Decision and Order Holding Michael E. Anderer in Contempt of Court for
Violating February 2015 Preliminary Injunction, filed April 15, 2015

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| **DERMA PEN, LLC,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**4EVERYOUNG LTD., DERMAPENWORLD, BIOSOFT (AUST) PTY. LTD. d/b/a DERMAPENWORLD, EQUIPMED INTERNATIONAL PTY. LTD. d/b/a DERMAPENWORLD, and STENE MARSHALL d/b/a DERMAPENWORLD,**<br><br>    **Defendants.** | **MEMORANDUM DECISION AND ORDER HOLDING MICHAEL E. ANDERER IN CONTEMPT OF COURT FOR VIOLATING FEBRUARY 2015 PRELIMINARY INJUNCTION** |
| **4EVERYOUNG LTD. and EQUIPMED INTERNATIONAL PTY. LTD.,**<br><br>    **Counterclaim Plaintiffs,**<br><br>**v.**<br><br>**DERMA PEN, LLC, MICHAEL E. ANDERER, JEREMY JONES, MICHAEL J. MORGAN, CHAD MILTON, MEDMETICS, LLC, a Delaware limited liability company, and JOHN DOES 1-25,**<br><br>    **Counterclaim Defendants.** | **Case No.:  2:13-CV-00729-DN-EJF**<br><br>**District Judge David Nuffer**<br><br>**Magistrate Judge Evelyn J. Furse** |

This matter came before the Court on the Motion for Order to Show Cause Regarding

Preliminary Injunction [Docket No. 634] Against Michael E. Anderer (the "Second OSC

Motion"),[1] filed by Defendants and Counterclaim Plaintiffs 4EverYoung Limited

("4EverYoung") and Equipmed International Pty. Limited ("Equipmed") and Defendants Biosoft

(Aust.) Ltd. Pty. ("Biosoft") and Stene Marshall ("Marshall") (collectively "Defendants").  In

opposition, Defendant Michael E. Anderer filed his Memorandum in Opposition to Counterclaim

Plaintiffs' Motion for Order to Show Cause Regarding Preliminary Injunction [Docket No. 634]

Against Michael E. Anderer, or, In the Alternative, Motion to Amend the Preliminary Injunction,

Dckt. No. 684.  Following briefing, a hearing was held on March 25, 2015.[2]  At that hearing,

Plaintiff and Counterclaim Defendant Derma Pen, LLC ("Derma Pen") was represented by

Douglas R. Short; Counterclaim Defendant Michael E. Anderer ("Anderer"), who was present,

was represented by David E. Leta and Michael A. Gehret of SNELL & WILMER LLP; and

Defendants were represented by Christine T. Greenwood and Christopher M. Von Maack of

MAGLEBY & GREENWOOD, P.C.[3]

---

[1] Docket no. 639, filed February 27, 2015.  The "First OSC Motion" is the Emergency Motion for Order to Show
Cause Regarding Trademark and Domain Name Transfer Injunctions, docket no. 481, filed January 15, 2015.  With
respect to the First OSC Motion, during the March 25, 2015 hearing, the Court found Anderer in contempt of the
Memorandum Decision and Order Granting in Part Defendants' Motion for Temporary Restraining Order (the
"December 23, 2014 Temporary Restraining Order"), docket no. 451, entered December 23, 2014; and the
Memorandum Decision and Order Granting 4EverYoung's 241 Motion for Partial Summary Judgment on Specific
Performance and Granting in Part Defendants' 141 Motion for Preliminary Injunction (the "January 6, 2015
Preliminary Injunction"), docket no. 476, entered January 12, 2015.  See March 25, 2015 Hearing Transcript at 15:8-
20:5, docket no. 716, filed March 25, 2015.  A separate contempt order addresses the issues presented in the First
OSC Motion.  See Memorandum Decision and Order Holding Michael E. Anderer in Contempt of Court for
Violating December 23, 2014 Temporary Restraining Order and January 6, 2015 Preliminary Injunction, docket no.
___, entered April __, 2015.

[2] See Minute Order, docket no. 712, entered March 25, 2015; see also March 25, 2015 Hearing Transcript, docket
no. 716.

[3] See Minute Order, docket no. 712; see also March 25, 2015 Hearing Transcript at 3:9-4:2, docket no. 716.

## BACKGROUND

On February 25, 2015, the Court entered its Memorandum Decision and Order Granting

in Part 4EverYoung's Motion for Preliminary Injunction Against Michael E. Anderer; Denying

Michael Anderer's Motion to Vacate,[4] which preliminary injunction enjoined Anderer from

transferring the Dermapen trademark in the United States (the "Trademark")[5] or

www.dermapen.com domain name (the "Domain Name") as follows:

> (a)      Anderer, his agents, servants, employees, and attorneys,
> and those acting in concert with them (collectively, the "Enjoined
> Parties") shall not transfer the Trademark or Domain Name or any
> interest therein of any kind or any obligation secured thereby
> except in connection with a foreclosure based on the Debtor In
> Possession Financing.[6]

On February 26, 2015, at approximately 3:00 p.m. (*i.e.*, about 90 minutes after the

conclusion of the February 26, 2015 telephone conference with the Court[7]), Anderer conducted a

sale of Derma Pen's personal property and, at that sale, Anderer, individually, purchased some of

Derma Pen's personal property, including the Trademark and Domain Name, for a credit bid of

$50,000.[8]

---

[4] Docket no. 630, entered February 25, 2015.  That preliminary injunction order was corrected on February 26, 2015, but the corrections have no impact on the issues involved in this contempt order.  *See* Corrected Memorandum Decision and Order Granting in Part 4EverYoung's Motion for Preliminary Injunction Against Michael E. Anderer; Denying Michael Anderer's Motion to Vacate, docket no. 634, filed February 26, 2015.  Docket numbers 630 and 634 orders are collectively referred to as the "February 2015 Preliminary Injunction."

[5] *See* USPTO trademark registration number 4096295.

[6] February 2015 Preliminary Injunction at 64, docket nos. 630, 634.

[7] *See* Minute Order, docket no. 633, entered February 26, 2015.

[8] *See* Report of Public Foreclosure Sale of Collateral Pursuant to Court's Preliminary Injunction, docket no. 635, filed February 27, 2015.

Following that sale, and also on February 26, 2015, Anderer transferred the Trademark

and Domain Name to an entity called Dermagen International, LLC ("Dermagen"), an Anguillan

limited liability company[9] over which Anderer claims a minority ownership, but no control.[10]

On February 27, 2015, Dermagen sent a cease and desist letter to 4EverYoung's United

States affiliate, Dermapenworld, LLC ("Dermapenworld"), asserting that Dermagen was the

owner of the Trademark, demanding that Dermapenworld cease its use of the Trademark, and

demanding that Dermapenworld not participate in an upcoming trade show in Miami Beach,

Florida, on March 1 and 2, 2015.[11]

On February 27, 2015, after receiving Dermagen's cease and desist letter, Defendants

filed the Second OSC Motion, which motion sought to hold Anderer in contempt of court, avoid

the transfer to Dermagen, and an award of Defendants' costs and expenses, including attorney

fees, incurred with respect to the contempt issue.[12]

Anderer opposed the Second OSC Motion, arguing that he did not violate the February

2015 Preliminary Injunction because Anderer was free to transfer the Trademark and Domain

Name following the February 26, 2015 foreclosure sale; Dermagen could have acquired the

Trademark and Domain Name at the February 26, 2015 foreclosure sale and thereby achieved

the same result without violating the preliminary injunction; the transfer to Dermagen was

---

[9] *See* Trademark Assignment Agreement, docket no. 697-1, filed March 18, 2015; *see also* Memorandum in
Opposition to Counterclaim Plaintiffs' Motion for Order to Show Cause Regarding Preliminary Injunction [Docket
No. 634] Against Michael E. Anderer, or in the Alternative, Motion to Amend the Preliminary Injunction
("Anderer's Opposition") at 4 ("At the [February 26, 2015] sale, Anderer purchased Derma Pen's Assets, including
the Trademark and [Domain Name] for a credit bid of $50,000 against the DIP Debt. Anderer, as the legitimate
purchaser of the Trademark and [Domain Name], then transferred his ownership interest in these assets to Dermagen
International, LLC ('Dermagen').")), docket no. 684, filed March 13, 2015.

[10] *See* March 25, 2015 Hearing Transcript at 10:13-11:13, docket no. 716.

[11] *See* Letter Sam Saunders to Joel Marshall, dated February 27, 2015, docket no. 639-1, filed February 27, 2015.

[12] *See* Second OSC Motion at 6, docket no. 639.

necessary to protect the Trademark and Domain Name; any violation of the preliminary injunction was unintentional; and the preliminary injunction should be amended to permit his transfer to Dermagen.[13]

A hearing was held on March 25, 2015, during which hearing the Court ruled from the bench and found Anderer in contempt of Court for violating the February 2015 Preliminary Injunction, among other Court orders.[14]

## DISCUSSION

The relevant facts are not in dispute here.  The dispute regards the interpretation of the February 2015 Preliminary Injunction.  The interpretation offered by Anderer defeats the language of the February 2015 Preliminary Injunction. Anderer states that, after the foreclosure sale, he was free, in spite of the preliminary injunction, to do whatever he wanted with the Trademark and Domain Name.  That is not what the February 2015 Preliminary Injunction states.  Therefore, the facts are not in dispute.  Here, it is not just a state of clear and convincing evidence, it is undisputed evidence.

Anderer violated this Court's February 2015 Preliminary Injunction by transferring the Trademark and Domain Name to Dermagen following the February 26, 2015 foreclosure sale. The February 2015 Preliminary Injunction only allowed a transfer in connection with a foreclosure of the DIP Lien.[15]  Anderer's subsequent transfer to Dermagen was prohibited by the February 2015 Preliminary Injunction.  Another entity could have purchased at the foreclosure sale, but that is not what happened.  If 4EverYoung, Dermagen, or a stranger had purchased the

---

[13] *See* Anderer Opposition, docket no. 684.

[14] *See* Minute Order, docket no. 712; *see also* March 25, 2015 Hearing Transcript at 13:12-15:7, docket no. 716.

[15] February 2015 Preliminary Injunction at 64, docket nos. 630, 634.

Trademark and Domain Name, Anderer would not have been further restrained.  But Anderer bought those assets, and he is restrained.  Transferring the Trademark and Domain Name to Dermagen were separate transactions, not part of or in connection with the foreclosure sale.

Anderer's arguments about form over substance, getting to the same result, and justification by business reasons, given the facts that are established here, do not establish any justification for his violation of the February 2015 Preliminary Injunction.

## ORDER

Based upon the Second OSC Motion, the March 25, 2015 hearing, the pleadings and papers on file with the Court, and for good cause shown,

IT IS HEREBY ORDERED:

1.       For his violations of the February 2015 Preliminary Injunction and for his contempt of this Court's orders contained in that preliminary injunction, Anderer, commencing March 30, 2015, will pay a fine of $5,000 per day until he has purged himself of his contempt by remediating the transfer to Dermagen; that is, by restoring the Trademark and Domain Name to himself.[16]

2.       Anderer will also compensate Defendants for the costs and expenses, including reasonable attorney fees, incurred with respect to the Second OSC Motion and the March 25, 2015 hearing.  Defendants shall file their motion for attorney fees on or before April 3, 2015.  Other parties may respond to that motion on or before April 10, 2015.  Thereafter, the Court will rule on the amount of Defendants' costs and expenses to be paid by Anderer.

---

[16] Subsequent to the hearing on March 25, 2015, the Court entered its Order Granting Emergency Motion for Approval of Alternative Remediation Relating to Contempt Ruling, Docket no. 729, which approved a transfer of the Trademark and Domain Name to Derma Pen IP Holdings, LLC, on certain conditions, and, thereafter, Anderer filed his Notice and Report of Compliance with such order, Docket no. 732.

3.      The Court reserves jurisdiction to impose further sanctions in connection with

Anderer's contempt.  This is not conclusive of the remedy regarding the Second OSC Motion.

4.      Further, Anderer's Motion to Amend the Preliminary Injunction[17] is hereby

denied.

Dated April 15, 2015.

BY THE COURT:

_____

David Nuffer
United States District Judge

---

[17] Docket no. 684.